**CASE NO. 25-7082**
**UNITED STATES COURT OF APPEALS**
**THE TENTH CIRCUIT**

---

**BARBARA BARRICK,**
**as Special Administrator of the**
**ESTATE OF BOBBY DALE BARRICK, deceased,**

**Plaintiff/Appellant,**

**v.**

**DEPUTY MATTHEW KASBAUM,**
**DEPUTY QUENTIN LEE,**
**and WARDEN MARK HANNAH,**

**Defendants/Appellees.**

---

On Appeal from the United States District Court
for the Eastern District of Oklahoma
Honorable John F. Heil, III, District Judge
District Court Case No. 23-CV-00129-JFH-GLJ

---

**APPELLANT'S OPENING BRIEF**
**(CORRECTED)**

---

**Christopher Lincoln Camp, OBA #18541**
**CAMP LAW FIRM**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma  74133**
**Telephone: (918) 200-4871**
**Facsimile: (918) 340-6799**
**E-mail: camplawfirm@gmail.com**

**D. Mitchell Garrett, Jr., OBA #20704**
**GARRETT LAW**
**320 South Boston Avenue, Suite 825-G**
**Tulsa, Oklahoma 74103**
**Telephone: (918) 221-6190**
**Facsimile: (918) 340-6799**
**E-mail: mitchell@garrettlawcenter.com**

---

**STATEMENT AS TO ORAL ARGUMENTS**
Oral arguments are requested.

## **TABLE OF CONTENTS**

Table of Contents .............................................................. i

Table of Authorities ........................................................ iii

Statement of Related Cases ............................................. 1

Jurisdictional Statement .................................................. 1

Summary of Argument and Statement of Issues Presented
for Review ........................................................................ 2

Statement of Facts Relevant to Issues Presented for Review .......................... 5

   A. Background / Conditions Warranting Protective Measures ................... 5

   B. Kasbaum, Lee, Storey, and Hannah Were Acting
      Under Color of State Law ......................................... 7

Standards Governing Court's Evaluation of Evidence Under
Rule 56 ........................................................................... 24

ARGUMENTS AND AUTHORITIES ............................................. 26

I. The District Court erred in granting summary judgment
  against Plaintiff on her 42 U.S.C. § 1983 claim on the basis
  that McCurtain County Sheriff Deputies Matthew Kasbaum
  and Quentin Lee -- along with Oklahoma Game Warden
  Mark Hannah -- were "acting under color of tribal law"
  during their encounter with Decedent Bobby Barrick on
  March 13, 2022. ............................................................ 26

   A. Applicable Law ...................................................... 26

   B. The District Court's conclusion that Defendants "were
      not acting under color of state law" was not the product
      of an intensely "fact-bound inquiry," but rather relied
      on a single "determinative factor," completely ignoring
      dozens of undisputed, well-supported facts giving rise
      to a triable issue. ................................................. 33

C.  The district court erred in finding that simultaneously
    "wearing two hats" (state color and tribal color) is not, in
    and of itself, sufficient evidence of "state color" to support
    a Section 1983 claim. ............................................................... 44

D.  In granting summary judgment, the court below impermissibly
    weighed evidence when it found that the "primacy" of tribal
    color outweighed all the state color Defendants were
    simultaneously exercising and prominently displaying. ..................... 46

E.  The District Court erred in holding that, during their
    encounter with Decedent, "neither Kasbaum, Lee, or
    Hannah were exercising power possessed by virtue of state
    law and made possible only because [they were] clothed
    with the authority of state law." ............................................. 49

F.  The District Court erred in holding, as a matter of
    law, that "in the absence of tribal authority, state law
    enforcement officers do not have jurisdiction to arrest
    Indians in Indian country." .................................................. 50

G.  The District Court erred to the extent it adopted the
    Magistrate's holding that Defendants had any "official
    duties" as "tribal officers," or that any activity addressed
    in the *Deputation Agreement* took precedence over the
    "official duties" that Defendants continuously performed as
    State law enforcement officers throughout their encounter
    with Decedent ................................................................. 54

Statement Concerning Oral Argument ........................................... 57

Certificate of Compliance with Type-Volume Limit ........................ 58

Certificate of Digital Submission .................................................. 59

Certificate of Service ................................................................... 60

Attachment 1 - *Opinion and Order* [Dkt. # 233]

Attachment 2 - *Judgment* [Dkt. # 234]

# TABLE OF AUTHORITIES

## CASES

*Adickes v. S.H. Kress & Co.*
398 U.S. 144 (1970) .................................................................. 28

*Alford v. McConnell*
27 F.Supp. 176 (N.D.Okla. 1939) ....................................... 55

*Allen v. Muskogee, Okla.*
119 F.3d 837 (10th Cir. 1997) ............................................. 25

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........................................................ 3 & 25

*Awnings v. Fullerton*
2016 WL 3906623 (D.Neb.) ................................................. 26

*Azua v. Overman*
2001 WL 37124914 (D.N.M.) .............................................. 30

*Barna v. City of Perth Amboy*
42 F.3d 809 (3rd Cir. 1994) .............................. 29, 30 & 32

*Barreto-Rivera v. Medina-Vargas*
168 F.3d 42 (1st Cir. 1999) ................................................. 32

*Calhoun v. Gaines*
982 F. 2d 1470 (10th Cir. 1992) ......................................... 25

*City of Chanute v. Williams Natural Gas Co.*
955 F.2d 641 (10th Cir. 1992) ............................................ 25

*City of Tulsa v. O'Brien*
--- P.3d ---, 2024 WL 5001684 (Okla.Crim.) ..................... 52

*Cone v. Longmont United Hosp. Ass'n*
14 F.3d 526 (10th Cir. 1994) .............................................. 25

*Crowe v. ADT Sec. Servs., Inc.*
649 F.3d 1189 (10th Cir. 2011) ................................... 25 & 33

*David v. City & Cnty of Denver*
101 F.3d 1344 (10th Cir. 1996) ............................................................ 32, 35 & 54

*Deo v. Parish*
541 P.3d 833 (Okla.Crim. 2023) ........................................................ 52

*E.F.W. v. St. Stephen's Indian H.S.*
264 F.3d 1297 (10th Cir. 2001) ........................................................ 27

*Evans v. McKay*
869 F.2d 1341 (9th Cir. 1989) ........................................................ 43

*Florom v. Elliott Mfg.*
867 F.2d 570 (10th Cir. 1989) ........................................................ 24

*Garcia v. Corrections Corp. of America, Inc.*
2016 WL 10587963 (D.N.M.) ........................................................ 27

*Grant v. John Hancock Mut. Life Ins. Co.*
183 F.Supp.2d 344 (D.Mass. 2002)................................................ 48

*Griffin v. State of Maryland*
84 S.Ct. 1770 (1964) ............................................................ 29, 31 & 32

*Gueits-Colon v. De Jesus*
177 F.Supp.2d 128 (D.P.R. 2001) .................................................. 31

*Hackford v. Utah*
845 F.3d 1325 (10th Cir. 2017) ........................................................ 52

*Haines v. Fisher*
82 F.3d 1503 (10th Cir. 1996) .................................................. 42 & 44

*Hall v. Witteman*
569 F.Supp.2d 1208 (D.Kan. 2008) .............................................. 29

*Harman v. Diversified Medical Investment Corp.*
488 F.2d 111, 113 (10th Cir. 1973) .............................................. 25

*Hiner v. Deere & Co.*
340 F.3d 1190 (10th Cir. 2003) ........................................................ 34

*Howerton v. Gabica*
708 F.2d 380 (9th Cir. 1983) ........................................................ 30 & 48

*Jackson-Gilmore v. Dixon*
2005 WL 3110991 (E.D.Pa.) ..........................................................30-32

*Johnson v. Orr*
780 F.2d 386 (3rd Cir. 1986) ............................................................... 46

*Kauth v. Manuel*
2025 WL 870906 (E.D.Cal.) .................................................................. 30

*Lake Country Estates, Inc. v. Tahoe Reg. Planning Agency*
440 U.S. 391 (1979) ............................................................................... 45

*Layne v. Sampley*
627 F.2d 12 (6th Cir. 1980) .................................................................. 31

*Lopez v. Dep't of Health Servs.*
939 F.2d 881 (9th Cir. 1991) ....................................................... 30 & 48

*Lugar v. Edmondson Oil Co., Inc.*
457 U.S. 922 (1982) ...................................................... 28, 32 & 35

*Luke v. Hospital Shared Services, Inc.*
2013 WL 1136937 (10th Cir.).................................................... 24 & 32

*Lusby v. T.G. & Y. Stores, Inc.*
749 F.2d 1423 (10th Cir. 1984) .......................................................... 30

*Madison v. Desert Livestock Co.*
574 F.2d 1027 (10th Cir. 1978) .......................................................... 24

*Marquez v. Toledo Davila*
2008 WL 11638980 (D.P.R.) ............................................................... 47

*Martinez v. Harroun*
2024 WL 422785 (D.Colo.) .................................................................. 46

*Maynard v. City of Chicago*
755 F.Supp.3d 1067 (N.D.Ill. 2024).................................................... 46

*McGirt v. Oklahoma*
--- U.S. ---, 140 S. Ct. 2452 (2020) ....................................................... 51

*Monroe v. Pape*
365 U.S. 167 (1961) .............................................................................. 31

*Morgan v. Ramsey*
2013 WL 869046 (N.D.Okla. 2013) ....................................................... 25

*Murril v. M&M Mars Co.*
2006 WL 618898 (C.D.Ill.) ................................................................... 34

*National American Ins. Co. v. American Re-Insurance Co.*
358 F.3d 736 (10th Cir. 2004) .............................................................. 34

*Nesmith v. Fulton*
615 F.2d 196 (5th Cir. 1980) ................................................................ 46

*Norton v. Liddel*
620 F.2d 1375 (10th Cir. 1980) ............................................................ 31

*Oklahoma v. Castro-Huerta*
--- U.S. ---, 142 S.Ct. 2486 (2022) ............................................... 51 & 52

*Ouart v. Fleming*
2010 WL 1257827 (W.D.Okla.) ..................................................... 27 & 50

*Parratt v. Taylor*
451 U.S. 527 (1981) .............................................................................. 26

*Phipps v. State*
841 P.2d 591 (Okla.Crim.App. 1992) ................................................... 31

*Redwood v. Ferry*
2006 WL 8445016 (C.D.Ill.) ................................................................. 28

*Rivera v. La Porte*
96 F.2d 691 (2d Cir. 1990) ................................................................... 30

*Romero v. Peterson*
930 F.2d 1502 (10th Cir. 1991) ................................................ 27, 42 & 44

*Ross v. Neff*
905 F.2d 1349 (10th Cir. 1990) .......................................................... 52

*Schaffer v. Salt Lake City Corp.*
814 F.3d 1151 (10th Cir. 2016) .............................................. 3, 32 & 42

*Screws v. U.S.*
325 U.S. 91 (1945) ................................................................. 29, 46 & 54

*Traver v. Meshriy*
627 F.2d 934 (9th Cir. 1980) ............................................................. 30

*U.S. v. Classic*
313 U.S. 299 (1941) ........................................................................... 27

*U.S. v. Pemberton*
94 F.4th 1130 (10th Cir. 2024) ......................................................... 51

*U.S. v. Sawyer*
92 P.3d 707 (Okla.Crim.App. 2004) ................................................. 31

*U.S. v. Walker*
74 F.4th 1163 (10th Cir. 2023) ......................................................... 51

*U.S. v. Walsh*
194 F.3d 37 (2d Cir. 1999) ................................................................ 27

*Utopia Entertainment v. Claiborne*
2006 WL 758709 (W.D.La.) ............................................................... 48

*Vanderlinden v. City of Warren*
2025 WL 27972786 (E.D.Mich.) ........................................................ 48

*West v. Atkins*
487 U.S. 42, 108 S.Ct. 2250 (1988)............................................... 27-29

*White Mountain Apache Tribe v. Bracker*
448 U.S. 136 (1980) .................................................................. 26 & 52

*White v. York Int'l Corp.*
45 F.3d 357 (10th Cir. 1995) ............................................................. 26

## STATUTES

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. §§ 1331 ............................................................................1

28 U.S.C. §§ 1343 ............................................................................1

42 U.S.C. § 1983 .......................................................................1 & 26

OKLA. CONST. ART. II, § 12 .................................................3, 49 & 56

OKLA. STAT. tit. 11 § 34-103(C) ......................................................49

OKLA. STAT. tit. 21 § 1362 ..........................................16, 18, 20 & 36

OKLA. STAT. tit. 21 § 1435 ..........................................16, 18, 20 & 36

OKLA. STAT. tit. 21 § 1760 ..........................................16, 18, 20 & 36

OKLA. STAT. tit. 37 § 8 ...............................................16, 18, 20 & 36

OKLA. STAT. tit. 74 § 1221 ......................................................49 & 56

## RULES

10th Cir. R. 28.2(C)(1) .......................................................................1

FED.R.APP.P. 4(a)(1) ..........................................................................2

FED.R.CIV.P. 56 ........................................................................24 & 33

FED.R.CIV.P. 72...............................................................................34

## OTHER AUTHORITIES

14 C.J.S. Civil Rights § 403 (2025)..................................................31

1990 OK AG 32, 1991 WL 567868........................................50 & 56

2000 OK AG 58...................................................................50 & 55

## STATEMENT OF RELATED CASES

Pursuant to 10th Cir. R. 28.2(C)(1), Plaintiff/Appellant Barbara Barrick ("Appellant") states that there are no prior or related appeals.

## JURISDICTIONAL STATEMENT

This action arises under 42 U.S.C. § 1983.[1] All of the acts upon which Appellant's claims are based occurred within the judicial district of the Eastern District of Oklahoma.  The District Court had jurisdiction over Appellant's case below pursuant to 28 U.S.C. §§ 1331 and 1343.  This Court now has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

On September 29, 2025, the Honorable John F. Heil, III entered his *Opinion and Order* [2] granting the two summary judgment motions previously filed by Defendants/Appellees Matthew Kasbaum ("Kasbaum") and Quentin Lee ("Lee"), and by Defendant/Appellee Mark Hannah ("Hannah").  Later that day, having disposed of all parties' claims, the District Court entered its *Judgment*[3] terminating the case.

---

[1]    *See* Appx., Vol. 1,  0032-0033, ¶¶ 31 & 32
[2]    *See* Attachment "A" to this brief; *see also* Appx., Vol. 20,  3952
[3]    *See* Attachment "B" to this brief; *see also* Appx., Vol. 20,  3963

Pursuant to Fed.R.App.P. 4(a)(1), Appellant timely filed her *Notice of Appeal*[4] on October 10, 2025.

**SUMMARY OF ARGUMENT**
**AND**
**<u>STATEMENT OF ISSUES PRESENTED FOR REVIEW</u>**

A. The District Court erred in granting summary judgment in favor of Defendants.

1. The District Court erred in holding that McCurtain County Sheriff Deputies Matthew Kasbaum and Quentin Lee -- along with Oklahoma Department of Wildlife Conservation Game Warden Mark Hannah -- were not acting under color of state law during their encounter with Decedent Bobby Barrick on March 13, 2022 (which took place after Kasbuam and Lee were dispatched by the McCurtain County Sheriff to investigate possible violations of Oklahoma law).

   In particular, the District Court erred, *inter alia*:

   a. by relying on the premise that "state courts generally have no

---

4     Appx., Vol. 20, 3964

jurisdiction [over] Indians for conduct committed in Indian Country";

b. in finding that any law enforcement authority exercised by Defendants during their encounter with Barrick was "derived from the Choctaw Nation, not the State of Oklahoma"; and

c. in holding that Defendants had "official duties … as tribal officers" (in violation of Okla. Const. Art. II § 12, which prohibits state law enforcement officers from holding more than one such office at a time);

2. The Court erred in denying Plaintiff the right to jury trial on the factual component of whether Defendants were acting under color of state law[5], and acted as the trier of fact in violation of the explicit requirements of the United States Supreme Court as stated in *Anderson v. Liberty Lobby*. In particular, the District Court:

a. failed to conduct an intensely "fact-bound inquiry" as required for resolving the "color of law" issue, and instead resorted to a one-size-fits-all "simplistic solution" focusing exclusively on a

---

[5]   Whether a defendant was acting under color of state law presents a "mixed issue of law and fact." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1156 (10th Cir. 2016.)

single "determinative factor":  the perceived interplay between Barrick's "status as a member of the Choctaw Nation," Defendants' status as state law enforcement officers holding tribal cross-commissions, and the location of the encounter;

b.   ignored -- and baldly dismissed as not "material" – all of the additional facts set forth by Plaintiff (which Defendants in no way attempted to dispute) bearing directly on the issue of whether Defendants were acting under color of state law;

c.   impermissibly   disregarded   facts   demonstrating   that Defendants were acting under color of state law <u>at all times</u> throughout their encounter with Barrick, irrespective of any temporary, simultaneous   manifestation of limited tribal authority during the encounter;

d.   effectively found that Defendants ceased to be state actors (*i.e.* that all state color was nullified) and instead acted exclusively as tribal officers by utilizing some degree of expanded authority available to them under the cross-deputization agreement;

e.   otherwise failed to accept as true Plaintiff's properly supported facts;

f.   failed to draw all reasonable inferences in the Plaintiff's favor;

g.   failed to disregard evidence favorable to Defendants which a jury would  not be required to believe;

h.   impermissibly drew inferences in Defendants' favor; and

i.   impermissibly weighed the contested evidence by evaluating the credibility of witnesses.

## STATEMENT OF FACTS
## RELEVANT TO ISSUES PRESENTED FOR REVIEW

Most of the facts and arguments contained in the summary judgment briefs involved issues related to the reasonableness of the force used by Defendants on Decedent Bobby Barrick.  The Court, however, decided both summary judgment motions after examining, and based solely upon, a single issue – whether Defendants were acting under color of state law.  Accordingly, only the facts pertaining to that one issue are set forth below.

## A. Background / Conditions Warranting Protective Measures

1.   The encounter between Decedent Bobby Barrick ("Decedent"), county deputies Matthew Kasbaum ("Kasbaum") and Quentin Lee

("Lee"), and state game warden Mark Hannah ("Hannah") took place "at Lori's Corner Store in Eagletown, [Oklahoma,] which is within the boundaries of the Choctaw Reservation[,]" in the store parking lot, and on Highway 70.[6]

2.  Before the arrival of law enforcement, Decedent had been severely assaulted by one or more individuals (who were using boards as weapons) and appeared to be "pretty injured." Once on scene, MCSO Deputy Kasbaum placed Decedent in the back of Deputy Lee's marked vehicle <u>for Decedent's own **protection**</u>, to "deescalate the anger towards [Decedent] from the large crowd" nearby who were "threatening [Decedent with] violen[ce]" (at least one of whom yelled "I wish I had a gun" and "I'm going to kill this mother*cker," and several of whom were making comments about "taking [Decedent's] money," "kicking [Decedent] in the head," and "putt[ing Decedent] in a wheelchair"), and to keep the crowd from being able to get to Decedent. In the *Investigator Supplement* he prepared, MSCO Investigator Richard Williamson similarly noted that Kasbaum "placed [Decedent] in the back of a patrol unit to detain him for

---

[6]    Appx., Vol. 20, 3882.

[Decedent's] **protection.**"     The deputies' purpose in later attempting to remove Decedent from Lee's patrol unit was to "get [Decedent] the medical attention he needed." [7]


## B. KASBAUM, LEE, STOREY, AND HANNAH WERE ACTING UNDER COLOR OF STATE LAW

3.    For over twenty (20) years, Defendant Mark Hannah has been employed by the Oklahoma Department of Wildlife Conservation, "a constitutional agency within the State of Oklahoma."   On the evening of March 13, 2022, Hannah held the position of Game Warden, by virtue of which he was "a sworn peace officer for the State of Oklahoma."[8]

4.    The Choctaw Nation and the Oklahoma Department of Wildlife Conservation are signatories to a *Deputation Agreement* that allows individual state officers to be cross-deputized, and pursuant to

---

[7]     Appx., Vol. 20, 3770 (¶ 1); *see also* Vol. 4, 0998-0999 (115:18 – 117:5); 1010 (163:17 - 164:7); 1032 (251:10 – 252:10); and 1031-1032 (248:24 – 249:3); Vol. 5, 1042; 1094 (176:2-25); 1090 (159:1-4); 1103 (209:11-20); Vol. 7, 1527;  *see also* Vol. 2, 0324 (p. 7, ¶ 21); 0331-0332 (pp. 14-15, ¶ 56); 0424 (258:15-19); 0428 (264:4); 0457 (76:12-15); 0510 (198:18-21); Vol. 3, 0600 (20:2-6); Vol. 4, 0866-0867 (9:23 – 10:3); Vol. 10, 2092 (58:20 – 59:4); 2093 (61:14-20)

[8]     Appx., Vol. 5, 1169 (139:18-22); 1186 (207:21 – 208:3; 211:18-21)

which Defendant Hannah was, in fact, cross-deputized. The aforementioned *Deputation Agreement* and Hannah's individual cross-deputization with the Choctaw Nation were both in effect on March 13, 2022.[9]

5.  The McCurtain County law enforcement officials who were dispatched to Lori's Corner Store on the evening of March 13, 2022 -- *i.e.*, Deputies Matthew Kasbaum, Quentin Lee, and Kevin Storey -- were all cross-deputized with the Choctaw Nation.[10] The *Deputation Agreement* under which MCSO Deputies Kasbaum, Lee, and Storey were cross-deputized is identical to the *Agreement* between the Choctaw Nation and the Oklahoma Department of Wildlife Conservation governing Hannah's cross-deputization.[11]

6.  The Choctaw Nation's *Deputation Agreement* with MCSO and ODWC was "entered into … in accordance with the Oklahoma Interlocal Cooperation Act, and the State-Tribal Relations Act, which provide for cooperative agreements to <u>promote better law</u>

---

[9]   Appx., Vol. 9, 1904; *see also* Vol. 5, 1165-1166 (124:25 – 126:7); Vol. 10, 2147-2148 (Resp. to Interrogatory No. 21)

[10]  Appx., Vol. 2, 0323 (¶ 17); Vol. 3, 0588; Vol. 4, 1023 (214:4-17); 1095 (177:22 – 178:14)

[11]  Appx., Vol. 9, 1851 (18:12 – 19:16); 1904 (at 1906-1913); and Vol. 10, 2163 (at 2167-2175)

enforcement services" for **all** <u>parties</u> to the *Deputation Agreement*

and the citizens and communities they serve.[12]  As stated therein:

> In view if the checkerboard areas in Oklahoma, it is the express desire and intent of all parties to this Agreement to allow law enforcement officers to react immediately to observed violations of the law and other emergency situations in and outside of Indian country within the state of Oklahoma, … to eliminate the uncertainties that previously resulted in the reluctance of various law enforcement agencies to provide services in Indian country, … [and] to provide for efficient, effective, and cooperative law enforcement efforts …[.] Accordingly, all parties to this Agreement shall cooperate with each other to provide comprehensive and thorough law enforcement protection, including but not limited to effecting arrests, responding to calls for assistance from all citizens and also from other law enforcement officers, performing investigations, providing …other assistance, … and detention.[13]

7.    The "intent of [the Deputation] Agreement is to provide for the cross

deputation of law enforcement officers employed by the tribes, the

State of Oklahoma, and political subdivisions of the State of

Oklahoma which are a party to [the] Agreement."  Thus, according

to the express terms of the *Deputation Agreement*, the cross-

deputization of Kasbaum, Lee, and Storey was **<u>wholly</u>** dependent

upon their status as "law enforcement officers employed by … [a]

---

[12]    Appx., Vol. 9, 1906; and Vol. 10, 2167
[13]    Appx., Vol. 9, 1907; and Vol. 10, 2168

9

political subdivision[] of the State of Oklahoma" (*i.e.*, McCurtain Co. / MCSO).[14]

8.   The   Choctaw Nation's *Deputation Agreement* with ODWC and MCSO states, in pertinent part:

> All parties to this Agreement recognize that when law enforcement officers arrest a criminal suspect, the officers may not know whether the suspect of the victim is an Indian or non-Indian, or whether the arrest or the suspected crime has occurred in Indian country, … and that therefore there is great difficulty in determining immediately the proper jurisdiction for the filing of charges.  **It is further recognized that the official jurisdiction determination will be made by a prosecutor or court from one of the various jurisdictions, <u>not by cross-deputized arresting officers</u>.**[15]

9.   Accordingly, no official jurisdictional determination was made at the time of Decedent's detention/arrest, and none of the cross-deputized officers who were involved (including Kasbaum, Lee, Storey, and Hannah) made -- nor were they permitted to make -- such a determination.[16]

---

[14]    Appx., Vol. 9, 1905-1906; and Vol. 10, 2167-2168
[15]    Appx., Vol. 9, 1906; Vol. 10, 2168; *see also* Vol. 9, 1855 (33:11-23)
[16]    Appx., Vol. 9, 1906; *see also* Vol. 4, 1023 (214:22 – 215:5); Vol. 5, 1104 (213:2-4; 214:4 – 215:10); 1166 (127:18 – 128:17); Vol. 9, 1855 (33:11-23); *see generally* Vol. 5, 1115 (5:17 – 6:4)

10. Moreover, seventeen (17) months after Decedent's death, Kasbaum, Lee, and Storey **still** had not determined whether they had been "acting under color of state law" when they detained / arrested Decedent.[17]

11. The Choctaw Nation's *Deputation Agreement* with ODWC and MCSO treats tribal members who have been detained or arrested by cross-commissioned state law enforcement officers as detainees / prisoners in the "custody" of the state law enforcement agency that effectuated the arrest (as opposed to the tribe on behalf of which the arrest was purportedly made), stating in pertinent part:

> C. In the event an Indian detainee or prisoner under the jurisdiction of the Tribe requires medical treatment, **the law enforcement agency with custody** may transport the detainee or prisoner to the nearest Indian Health Service or the appropriate Tribal health care facility.[18]

12. At the time of Barrick's arrest, Alicia Manning was the third highest ranking member of MCSO, was one of four administrators, held the rank of Captain, oversaw all of MCSO's criminal investigations, was "responsible for anything that happens there" [at MCSO], and was

---

[17]    Appx., Vol. 1, 0031-0032 (¶¶ 21, 24 & 27); 0109 (¶ 21); 0125 (¶ 24); 0140 (¶ 27)

[18]    Appx., Vol. 9, 1910-1911; and Vol. 10, 2172-2173

subject to, and familiar with, the *Deputation Agreement* between the Choctaw Nation and MCSO deputies.[19]

13. Manning testified that when making an arrest, MCSO's cross-deputized personnel "wear both hats" (*i.e.*, "the state's hat" and "the tribe's hat"), and "don't even have to worry about whose hat [they're] wearing," because "that's for the prosecutor to decide later," and because the issue of jurisdiction "only becomes relevant ['later'] when you're filing charges."[20]

14. MCSO's policy and procedure manual provides that "[t]he office of County Sheriff was created by article XVII, section 2 of the Oklahoma Constitution, and that Office is vested with the authority to uphold the laws of the **state**."[21]

15. Under MCSO's express policies, MSCO "deputies are, **at all times**, considered to be Sheriff's Office employees," "their **primary responsibility** is to the maccurtain (sic) County Sheriff's Office," and each of them is permitted, by virtue of "the scope of his authority"

---

[19]    Appx., Vol. 9, 1851 (18:7 - 19:16; 20:4-6 & 13-17); 1852 (21:3-5; 21:15 - 22:2); *see also* Vol. 5, 1066 (61:9-10)

[20]    Appx., Vol. 9, 1854-1855 (32:14 – 34:2); *see also* Vol. 5, 1104 (214:23 – 215:10)

[21]    Appx., Vol. 19, 3721

as an MCSO deputy, to "make reasonable inquiries, conduct investigations, and arrest on probable cause."[22]

16.  MCSO's policy and procedure manual expressly mandates that MCSO deputies "will use Department time, equipment, and personnel for **departmental** business only."[23]

17.  MCSO's manual also states that "[i]t is the policy of this Office to provide assistance to **other** law enforcement agencies whenever possible."[24]  Harmonizing this language with the above-quoted prohibition (against using MCSO time, equipment, or personnel for non-MCSO business), it is clear that as a matter of MCSO policy, the **"assistance [that MCSO provides] to other law enforcement agencies"** constitutes the "**Departmental** business" of **MCSO itself**, is one of the official duties that MCSO deputies are expected to perform, and a basic job responsibility to which all MCSO personnel are expected to adhere.  This policy is also consistent with the mandate that MCSO deputies "use the authority of their positions to accomplish the task[s] **required by [MCSO]**,"

---

[22]    Appx., Vol. 19, 3729, 3733 & 3739
[23]    Appx., Vol. 19, 3734
[24]    Appx., Vol. 19, 3723

and that whenever any MCSO deputy provides assistance to an outside agency, "that officer will [still] be **governed** and protected by the **policies and procedures** of **this** office" (*i.e.*, MCSO). [25]

18.  According to MCSO's policy and procedure manual, the "statutory responsibilities" of MCSO deputies under 19 O.S. § 516 include the duty "to keep and preserve the peace" in McCurtain County, "to quiet[ and] suppress all affrays," and to "apprehend[] or secur[e] any persons for felony breach of the peace."[26]

19.  Several other duties and powers that MCSO deputies are authorized to carry out and exercise are expressly enumerated in MCSO's policy and procedure manual, and include "[t]ransporting prisoners," "[p]erform[ing] follow up investigations on criminal cases," "prevent[ing] crime" and "respond[ing] quickly to calls for assistance" in "primarily unincorporated areas of [McCurtain] County," "[c]omplet[ing] initial investigations of criminal acts when responding to calls for assistance," "arrest[ing] all offenders against

---

[25]    Appx., Vol. 19, 3723, 3734
[26]    Appx., Vol. 19, 3739

the laws of the State." And "protect[ing]" citizens "against violence."[27]

20. Under MCSO's policies and procedures, deputies must "work **cooperatively** with all segments of … Government to provide a safe environment and preserve the peace," while "[u]tilizing the authority in safeguards of the constitution of the United States and freedoms cited in the Bill of Rights [and] the laws and statutes of the State of Oklahoma."[28]

21. The fact that Hannah, Kasbaum, Lee, and Storey were cross-deputized does not relieve them from having to refrain from using constitutionally unreasonable force.[29]

22. Pursuant to MCSO's policies and procedures, "[a] Response to Resistance form" is the form that a supervisor is required to prepare "whenever an officer of this agency utilizes reportable force … **in the performance of their duties**" as an MCSO deputy. In turn, "reportable force" is when any of the eight "force options"[30] --

---

[27]    Appx., Vol. 19, 3721, 3732 & 3739
[28]    Appx., Vol. 19, 3721
[29]    Appx., Vol. 5, 1176 (167:20 – 168:3)
[30]    Appx., Vol. 19, 3747 (¶ C(a)(i)-(viii))

including "Electronic Control Devices," "Batons," and "Deadly Force" -- are "used by an officer to compel compliance from a subject in conformance with the officer's official duties, whether on or off duty."[31]

**LEE**

23. On March 13, 2022, Lee was working his scheduled shift as a MCSO deputy.[32]  Lee was dispatched to investigate possible violations of Oklahoma law, including under 21 O.S. §§ 1362, 1435 & 1760 and 37 O.S. § 37-8.[33]

24. Lee arrived on the scene driving a marked Ford F-150 (issued to him by MCSO) with the emergency lights engaged.  Lee was wearing a tan uniform shirt with MCSO patches on each shoulder, an outer carrier with "Sheriff" across the chest, and his MCSO-issued body cam.[34]  By virtue of Lee's "visual appearance" in his MCSO uniform

---

[31]    Appx., Vol. 19, 3747 (¶C(b)(ii))
[32]    Appx., Vol. 11, 2203
[33]    Appx., Vol. 11, 2203; *see also* Vol. 8, 1751-1753
[34]    Appx., Vol. 11, 2203; *see also* Vol. 5, 1052 (7:22 – 8:3); 1090 (157:20-21); 1112-1113; 1138 (14:17 – 15:10); 1177 (169:3-18 & 170:21-24); Vol. 6, 1215 (16:15-18)

and arrival in a vehicle bearing MCSO identifiers, it was obvious to those on the scene that Lee had the "authority of law."[35]

25. At all times during the arrest of Barrick and related on-site investigation, Lee held himself out as a MCSO deputy. All the authority that Lee displayed was that of the McCurtain County Sheriff, and at **no** time during the encounter did Lee present himself as a tribal officer or make the determination that this was a tribal matter.[36]

26. Pursuant to MCSO policies and procedures, Lee was "at all times considered to be [a] Sheriff's Office employee[]," and any "use [by Lee of McCurtain County Sheriff] Department time, equipment, and personnel [was] for [MCS] departmental business only."[37]

27. Lee and Kasbaum investigated MCSO's "own crimes" (including Barrick's suspected crimes) themselves, separate from any criminal investigation conducted or handled by tribal police.[38]  In so doing,

---

[35]  Appx., Vol. 19, 3742 (¶ B(a))

[36]  *See* Fact No. 24, *supra*; Appx., Vol. 5, 1104 (213:2-4); 1177 (169:3-18 & 170:21 – 171:4)

[37]  Appx., Vol. 19, 3734 & 3739

[38]  Appx., Vol. 4, 0829 (¶ 6); 1032 (249:16 – 250:1; 250:5-16); 1036 (267:10-23); Vol. 5, 1054 (15:13-16); 1101 (203:10 – 204:11); Vol. 11, 2260-2268; *see also* Vol. 5, 1198

they asked witnesses to provide handwritten statements on pre-printed MCSO forms.[39]

28. Lee's two formal statements regarding the arrest of Barrick consisted of:

(a) Lee's typewritten statement (in which Lee referenced his involvement as a "Deputy … of the McCurtain County Sheriff's Office," and signed in his capacity as a MCSO deputy using his MCSO identification number)[40], and

(b) the *McCurtain County Sheriff's Office Response to Resistance Form* that Lee completed (because he had used **reportable force … in the performance of [his] duties**" as an MCSO deputy) [41], which was subsequently reviewed by MCSO Lt. Richard Williamson.[42]

## STOREY

29. On March 13, 2022, Storey was working his scheduled shift as a MCSO deputy.[43]   Storey was dispatched to investigate possible

---

[39]    Appx., Vol. 5, 1054 (15:13-20); 1095-1096 (180:23 – 181:1); *see also* Vol. 6, 1390; Vol. 7, 1521; 1523; Vol. 11, 2252 & 2255-2258

[40]    Appx., Vol. 5, 1106

[41]    Appx., Vol. 5, 1107; *see also* Fact No. 22, *supra*

[42]    Appx., Vol. 5, 1112

[43]    Appx., Vol. 11, 2207

violations of Oklahoma law, including under 21 O.S. §§ 1362, 1435 & 1760 and 37 O.S. § 37-8.[44]

30. Storey arrived on scene in a marked Ford Taurus issued by MCSO.[45]

31. Storey was wearing a green polo shirt with an embroidered MCSO badge on the left chest and a hat with the word "Sheriff" across the front.[46]

32. At all times during the arrest of Barrick and related on-site investigation, Storey held himself out as exercising the authority of a MCSO deputy.[47]

33. Pursuant to MCSO policies and procedures, Storey was "at all times considered to be [a] Sheriff's Office employee[]," and any "use [by Storey of McCurtain County Sheriff] Department time, equipment, and personnel [was] for [MCS] <u>departmental</u> business **only**."[48]

34. Storey's formal statement regarding the Barrick arrest was prepared on MCSO letterhead and signed by Storey in his capacity as a MCSO deputy and using his MCSO identification number.[49]

---

[44]    *See* Appx., Vol. 11, 2207; *see also* Vol. 8, 1751-1753

[45]    Appx., Vol. 11, 2207

[46]    Appx., Vol. 11, 2207

[47]    *See* Fact Nos. 15 & 16, *supra*; Appx., Vol. 5, 1177 (170:21 – 171:4)

[48]    Appx., Vol. 19, 3734 & 3739

[49]    Appx., Vol. 5, 1134

### KASBAUM

35. On March 13, 2022, Kasbaum was working his scheduled shift as a MCSO deputy.[50]  Kasbaum was dispatched to investigate possible violations of Oklahoma law, including under 21 O.S. §§ 1362, 1435 & 1760 and 37 O.S. § 37-8.[51]

36. Kasbaum arrived on scene in a Chevrolet Tahoe (issued by MCSO).[52]

37. Kasbaum was wearing a black polo shirt with an embroidered MCSO badge on the left chest, and an overvest with "Sheriff" across the front and back.[53]

38. At all times during the arrest of Barrick and related on-site investigation, all the authority that Kasbaum held himself out as exercising was that of a MCSO deputy, and at **no** time during the encounter did Kasbaum present himself as a tribal officer.[54] According to Kasbaum, those present at the scene had no problem identifying him as a county deputy sheriff.[55]

---

[50]    Appx., Vol. 11, 2211
[51]    *See* Appx., Vol. 11, 2211; *see also* Vol. 8, 1751-1753
[52]    Appx., Vol. 11, 2211
[53]    Appx., Vol. 11, 2211
[54]    *See* Fact Nos. 36 & 37, *supra*; Appx., Vol. 5, 1177 (169:3-18 & 170:21 – 171:4)
[55]    Appx., Vol. 4, 0997 (111:24 – 112:2)

39. Pursuant to MCSO policies and procedures, Kasbaum was "at all times considered to be [a] Sheriff's Office employee[]," and any and all "use [by Kasbaum of McCurtain County Sheriff] Department time, equipment, and personnel [was] for [MCS] departmental business **only**."[56]

40. Kasbaum's two formal statements regarding the arrest of Decedent Bobby Barrick consisted of:

(a) Kasbaum's typewritten statement prepared on MCSO letterhead (which was signed by Kasbuam in his capacity as a MCSO deputy)[57], and

(b) the *McCurtain County Sheriff's Office Response to Resistance Form* that Kasbuam completed (because he had used reportable force … **in the performance of [his] duties**" as an MCSO deputy)[58], which was subsequently reviewed by MCSO Lt. Richard Williamson.[59]

**HANNAH**

---

[56]    Appx., Vol. 19, 3734 & 3739; Fact Nos. 15 & 16, *supra*
[57]    Appx., Vol. 5, 1042-1043
[58]    Appx., Vol. 5, 1044; *see also* Fact No. 22, *supra*.
[59]    Appx., Vol. 5, 1049

41. In response to the allegation in Plaintiff's *Complaint* that the acts in which Hannah engaged ("in using force against [Decedent Bobby Barrick]") "were incidental to some service being performed for [his] employer" (*i.e.*, the **Oklahoma Department of Wildlife Conservation),** Hannah "admit[ted] that he was acting within the scope of his employment."[60]

42. The various aspects of Hannah's employment with ODWC were governed by the *ODWC Employee Handbook* and the *ODWC Law Enforcement Division General Orders Written Directives Handbook*. Among other things, while acting within the scope of his employment as a state Game Warden, Hannah was subject to ODWC's use-of-force policy, under which "[a]ny force [Hannah] used [was required to] be in accordance with state and federal law, Department training, and Department policy."[61]

43. Hannah claims that prior to using force upon Barrick, he had reason to believe that Barrick had violated one or more laws of the State of

---

[60]    Appx., Vol. 1, 0043 (¶ 94); 0159 (¶ 94); Vol. 5, 1167 (129:23 – 130:24)
[61]    Appx., Vol., 5, 1143 (33:18 – 34:16); 1184-1185 (200:23 – 201:19); Vol. 10, 2141-2142 (Resp. to Interrogatory No. 12)

Oklahoma.[62]   Hannah assisted in carrying out the arrest to enforce what he perceived as violations of State law.[63]

44.   Hannah arrived to the scene in a state vehicle bearing Oklahoma Department of Wildlife Conservation insignia.[64]

45.   At all times during the encounter, Hannah wore his state warden's uniform and was displaying the state warden's insignia.[65]

46.   At all times during his use of force upon Barrick and related on-site investigation, Hannah held himself out as an ODWC warden only. Everything that Hannah displayed reflected his authority as a Game Warden acting within the scope of his employment with the Oklahoma Department of Wildlife Conservation, and at **no** time during the encounter did Hannah present or announce himself as a tribal officer or make the determination that this was a tribal matter.[66]

---

[62]   Appx., Vol. 5, 1165 (122:12 – 123:12); 1169 (138:11 – 140:20); 1170 (141:9-14 & 141:19 – 142:14); Vol. 8, 1751-1753; *see also* Vol. 10, 2143-2144 (Resp. to Interrogatory No. 15)

[63]   Appx., Vol. 5, 1176 (168:19-23)

[64]   Appx., Vol. 5, 1137-1138 (12:24 – 13:5); 1167 (130:25 – 131:2); 1177 (169:13-18)

[65]   Appx., Vol. 5, 1167 (131:3-4); 1177 (169:19 – 170:20)

[66]   Appx., Vol. 5, 1166 (127:18 – 128:17); 1177 (169:3-18 & 170:21 – 171:4); *see also* Fact Nos 44 & 45, *supra.*

47.  Hannah's only official report of the incident was the statement he was prepared "**for** the ODWC" in compliance with its general orders. Hannah typed out his report on a *Game Warden Incident Statement* form (issued by the ODWC Law Enforcement Division), signed the report as a state "Game Warden," and turned it in to the ODWC. Indeed, Hannah was "expected to fill out [the *Incident Statement*] in [his] role as [game] warden at the Oklahoma Department of Wildlife Conservation." [67]  Hannah did not prepare a written report for, nor was he ever interviewed by, Choctaw Nation police or investigators.[68]

**STANDARDS GOVERNING COURT'S
EVALUATION OF EVIDENCE
UNDER RULE 56**

"Under Rule 56, [a] movant must demonstrate that he is entitled to a summary judgment beyond a reasonable doubt." *Florom v. Elliott Mfg.*, 867 F.2d 570, 574 (10th Cir. 1989); *citing Madison v. Desert Livestock Co.*, 574 F.2d 1027, 1037 (10th Cir. 1978).  Summary judgment

---

[67]  Appx., Vol. 5, 1167 (132:9-11); 1177 – 1178 (171:5 – 173:6 & 174:21 – 175:11); 1198

[68]  Appx., Vol. 5, 1168 (134:22-25)

is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Luke v. Hospital Shared Services, Inc.*, 2013 WL 1136937 *1 (10th Cir.); *citing* FED.R.CIV.P. 56(a).

An issue of fact is material if it could affect the outcome of the case under the governing law. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). A "dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*; *see also Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (holding that "[a] dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way").[69]

---

[69]    In ruling on a motion for summary judgment, courts must construe "pleadings and documentary evidence … liberally and in favor of the party opposing the motion," and must otherwise view the factual record, including any reasonable inferences drawn from it, in the light most favorable to the non-movant. *Harman v. Diversified Medical Investment Corp.*, 488 F.2d 111, 113 (10th Cir. 1973); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 528 (10th Cir. 1994); *Calhoun v. Gaines*, 982 F. 2d 1470, 1472 (10th Cir. 1992).

Thus, **even if there are no material facts in dispute,** summary judgment must be **denied** if there are **different inferences that may be drawn from the undisputed facts.** *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 647 (10th Cir. 1992) (holding summary judgment to be inappropriate "when reasonable jurors might disagree, even if the judge would find for the moving party"). Indeed, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate

## ARGUMENTS AND AUTHORITIES

**I. The District Court erred in granting summary judgment against Plaintiff on her 42 U.S.C. § 1983 claim on the basis that McCurtain County Sheriff Deputies Matthew Kasbaum and Quentin Lee -- along with Oklahoma Game Warden Mark Hannah -- were "acting under color of tribal law" during their encounter with Decedent Bobby Barrick on March 13, 2022.**

The *de novo* standard of review is applicable. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

### A.    Applicable Law

To maintain an action under 42 U.S.C. § 1983 against each of the three Defendants, Plaintiff must show that: (1) the conduct complained of was committed by a person acting under the color of *state* law; and (2) this conduct deprived Decedent Bobby Barrick of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535 (1981).  "Section 1983 regulates state

---

inferences from the facts are jury functions, not those of a judge ruling on a motion for summary judgment … [whose] function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Morgan v. Ramsey*, 2013 WL 869046 (N.D.Okla. 2013); *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

and local government conduct, as distinct from **purely** private [or purely non-state] conduct" *Awnings v. Fullerton*, 2016 WL 3906623 *3 (D.Neb.) (emphasis added).  Therefore:

> [T]he only proper defendants in a Section 1983 claim are those who represent the state in **some** capacity[.] … The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have **exercised power possessed by virtue of state law** and made possible only because the [defendant] is **clothed with the authority of state law**.[70]

---

[70]  It is important to note that "[t]his general rule … came from a case that set out to determine whether certain **private** entities could act under the color of state law." *Garcia v. Corrections Corp. of America, Inc.*, 2016 WL 10587963 *2 (D.N.M.); *citing West v. Atkins*, 487 U.S. 42, 47-48 (1988).  "The concern focused on the line between **private** conduct and **governmental** conduct under § 1983, **not** on the line between state conduct and federal conduct" or tribal conduct. *Id.*; *citing West*, 487 U.S. at 47-50.  "And to the latter, the Supreme Court and the Tenth Circuit to this day have offered only minimal guidance as to where courts should demarcate this line." *Id.*

For example, in *Romero v. Peterson*, 930 F.2d 1502, 1503-05 (10th Cir. 1991), this Court remanded a case to district court "for further factfinding proceedings" to determine whether police officers were acting under color of tribal law or federal law when they carried out an arrest.  In so doing, the Tenth Circuit encouraged the district court to "consider the following relevant, but not exclusive, list of factors" pertinent to whether defendants were federal or tribal actors:
(1)    "the sources of funding for their law enforcement activities";
(2)    "the extent of federal regulation of tribal law enforcement activities";
(3)    "the interdependence of the tribe and [federal law enforcement]";
(4)    "the responsibility for defendants' supervision";
(5)    "whether defendants were wearing [federal] uniforms, carrying [federal] weapons, using a [federal] vehicle, or acting pursuant to the authority of [federal] badges"; and
(6)    "[details of] the cross-deputization."

*Ouart v. Fleming*, 2010 WL 1257827 *7 (W.D.Okla.); *citing E.F.W. v. St. Stephen's Indian H.S.*, 264 F.3d 1297, 1305 (10th Cir. 2001).  "[T]he Supreme Court has broadly interpreted the color of law requirement." *U.S. v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999); *quoting U.S. v. Classic*, 313 U.S. 299, 326 (1941).

The "state action" requirement in a § 1983 claim is satisfied when the party charged with an alleged constitutional deprivation "may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 937 (1982).  "[S]tate employment is generally sufficient to render the defendant a state actor." *Id.* at 936 & n. 18.  "Thus, a state employee generally acts under color of state law when, while **performing in his official capacity** or **exercising his official responsibilities**, he abuses the position given to him by the state." *West v. Atkins*, 108 S.Ct. 2250, 2251, 2254 & 2258 (1988) (reiterating that "generally, a public employee acts under color of state law while acting in his official capacity"[71] **or** when engaging in conduct "**clothed with the authority**

---

[71]    "[A]cts [that a police officer typically performs] within the **scope of [his] employment**" generally "constitute acts performed in [the officer's] **official capacity**." *Redwood v. Ferry*, 2006 WL 8445016 *8 & n. 5 (C.D.Ill.).

of **state law**"); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (holding "[t]he involvement of a state official ... plainly provides the state action essential to [a § 1983 claim], whether or not the actions of the police were officially authorized"). Indeed, the "lack of **actual** state authority" does not automatically render a defendant incapable of acting "under color of state law." *Hall v. Witteman*, 569 F.Supp.2d 1208, 1222 (D.Kan. 2008); *Screws v. U.S.*, 325 U.S. 91, 111 (1945) (holding "[i]t is clear that under 'color' of law means under 'pretense'[72] of law").

Furthermore, "the fact that a state employee's role parallels [his role in some other capacity] is not, by itself, reason to conclude that the former is not acting under color of state law in performing his duties." *West*, 108 S.Ct. at 2259 & n. 15. Rather, where -- as here -- a defendant "is **possessed of state authority** and **purports**[73] **to act under that authority**, his authority is state action," and "[i]t is irrelevant that he might have taken the same action had he acted in a purely [non-state]

---

[72] "Pretense" means "mak[ing] something that is not the case appear true." *See* https://www.scribd.com/doc/307402072/Word-Meanings. "Thus, one who is without actual authority, but who purports to act according to official power, may also act under color of state law." *Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3rd Cir. 1994); *citing Screws*, 325 U.S. at 111.

[73] "Purport" means "to have the often specious appearance of being." *See* https://www.merriam-webster.com/dictionary/purport.

capacity or that the particular action which he took was not authorized by state law." *Griffin v. State of Maryland*, 84 S.Ct. 1770, 1772-73 (1964).

A plaintiff may also prove that "[a]n action [was taken] under color of state law [by producing evidence that] the state's role in the action [wa]s 'significant.'" *Kauth v. Manuel*, 2025 WL 870906 *4 (E.D.Cal.); *citing Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991). Under that approach, "[t]he **extent** of state involvement in the action is a question of fact." *Lopez*, 939 F.2d at 883; *citing Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983).

Ultimately, the question of whether a law enforcement officer acted under color of state law turns on "the nature of the act being performed," and whether "the acts [in question were] **related** to the performance of police duties"); *Azua v. Overman*, 2001 WL 37124914 *2 (D.N.M.); *citing Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1429 (10th Cir. 1984)[74]; *see*

---

[74]    In *Lusby,* the Tenth Circuit cited several cases that treat police-type duties and actions as sufficient evidence that a defendant, though not on duty for the police department at the time of his actions, was acting as an on-duty police officer under color of law. 749 F.2d at 1430 & n. 4; *citing Traver v. Meshriy,* 627 F.2d 934, 938 (9th Cir. 1980) (action under color of state law when bank guard **responded to problem as police officer**, **identified himself as such**, and **showed his police identification**). "Manifestations of police authority may [also] include **flashing a police badge**, … **indicating that the officer is on official police business**, attempting to make an arrest[,] **placing an**

*also Monroe v. Pape*, 365 U.S. 167, 172 (1961) (holding that the Fourteenth Amendment was enforceable "against those who carry a badge of authority of a State and represent it in **some** capacity"); and *Norton v. Liddel*, 620 F.2d 1375, 1379-80 (10th Cir. 1980). Put another way, to determine if an officer was cloaked with the state's authority when he engaged in a particular act, "courts ask whether the officer's actions are consistent with actions generally taken by a police officer." *Jackson-Gilmore*, 2005 WL 3110991 at *10; *citing Griffin*, 378 U.S. at 135.[75]

---

individual under arrest[,]" or "**use of a police car.**" *Jackson-Gilmore v. Dixon*, 2005 WL 3110991 *10 (E.D.Pa.); *Rivera v. La Porte*, 96 F.2d 691, 696 (2d Cir. 1990); and *Barna*, 42 F.3d at 816; *citing Lusby*, 749 F.2d 1423).

Other factors one may consider when assessing whether an officer was acting "under color of state law" include the **existence of a regulation** addressing when officers are considered to be on duty or functioning as a department employee,  the officer's **garb**, **duty status**, **use of police radio**, or **use of a service arm**, **weapon**, **handcuffs**, or **other traditional law-enforcement tools**. 14 C.J.S. Civil Rights § 403 & n. 6 (2025); *citing Gueits-Colon v. De Jesus*, 177 F.Supp.2d 128, 135 (D.P.R. 2001). *See also U.S. v. Sawyer*, 92 P.3d 707, 710 (Okla.Crim.App. 2004) (**asking a member of the public to sign form with police division name on it**); *Phipps v. State*, 841 P.2d 591, 593-94 & n. 1 (Okla.Crim.App. 1992) (**subjective belief of suspect** based on outward indicia); *see also Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) (same).

[75]    In *Griffin,* the U.S. Supreme Court held that that a county deputy sheriff, who also worked as a security guard for a private amusement park, "**purported to exercise the authority of a deputy sheriff**"

As such, "[c]ourts [must] look to **all** of [an] officer's acts, **and to <u>no</u> <u>one act</u> in particular**, in context, to determine whether [the] officer was acting in his official capacity and whether the officer **invoked police authority**." *Id.*; *citing Barna*, 42 F.3d at 818; *David v. City & Cnty of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) (holding "[t]he under color of law determination **rarely depends on a <u>single identifiable fact</u>**"); *Barreto-Rivera v. Medina-Vargas,* 168 F.3d 42, 45 (1st Cir. 1999) (warning that "courts must avoid simplistic solutions," and that "[n]o single, easily determinable factor will control" determination); *Lugar*, 457 U.S. at 939 (holding that color of law determination is a "necessarily fact-bound inquiry").

**The issue of whether Defendants acted under color of state**

---

because, *inter alia*, "[h]e **wore a sheriff's badge** and **consistently identified himself as a deputy sheriff** rather than as an employee of the park," and following the arrest, "**filled out a form titled 'Application for Warrant by Police Officer'** [which] **stated … [t]hat he is a member of the Montgomery deputy sheriff Department.**" *Id.* at 1771-73. The Supreme Court further held that "[t]hough an amended warrant was filed stating that petitioners had committed an offense because they entered the part after an 'agent' of the park told them not to do so, this change has little, if any, bearing on the **character of the authority which [the deputy] <u>initially</u> purported to exercise**." *Id.* at 1772-73. The concurring opinion joined in this holding, reasoning that at the very least, under the facts presented, "the State must be recognized as a **joint** participant in the challenged activity." *Id.* at 1884.

law presents a "<u>mixed</u> <u>question of fact and law</u>." *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1156 (10th Cir. 2016).   Where -- as here -- a rational juror could resolve the factual component of the "color of law" issue either way, summary judgment is improper.   *Luke v. Hospital Shared Services, Inc.*, 2013 WL 1136937 *1 (10th Cir.); *citing* FED.R.CIV.P. 56(a).   *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

**B. The District Court's conclusion that Defendants "were not acting under color of state law" was not the product of an intensely "fact-bound inquiry," but rather relied on a single "determinative factor," completely ignoring dozens of undisputed, well-supported facts giving rise to a triable issue.**

In responding to Defendants' summary judgment motions, Plaintiff separately set forth thirty-two (32) additional facts that bore upon the specific issue of whether Defendants Kasbaum, Lee, and Hannah (and former Defendant Kevin Storey) were acting under color of state law when they responded to the incident at Lori's Corner Store, conducted an investigation into what they purportedly suspected were violations of state law, detained Decedent to protect him from violent bystanders, and, in the process of purportedly attempting to get him medical help, used

constitutionally unreasonable force upon Decedent.[76]  Defendants did not dispute **<u>any</u>** of these facts. FED.R.CIV.P. 56(c).[77]  Nevertheless, in finding that Defendants "were not acting under color of state law," the Magistrate who first took up the summary judgment motions considered only five (5) of the above-referenced facts[78], inexplicably ignoring the other twenty-seven (27) (rather than accepting Plaintiff's properly supported facts as true). *See, e.g., Murril v. M&M Mars Co.*, 2006 WL 618898 *1 (C.D.Ill.) (recognizing that court must accept a non-movant's facts where, as here, "the non-movant supports those facts with materials of evidentiary quality").  The Magistrate also failed to draw all reasonable inferences in Plaintiff's favor[79], impermissibly made credibility determinations[80], and otherwise weighed and disregarded material evidence. [81]  *National American Ins. Co. v. American Re-Insurance Co.*, 358 F.3d 736, 742 (10th Cir. 2004) (holding that "on a motion for summary judgment we cannot evaluate credibility nor can we weigh evidence").

---

[76]    Appx., Vol. 20, 3782 – 3787 (¶¶ 95-126); 3828 – 3832 (¶¶ 95-126)
[77]    Appx., Vol. 20, 3849 (¶ III); 3869 (¶ B)
[78]    Appx., Vol. 20, 3883 (***citing* Fact Nos. 109, 118, 119, 124 & 125)**
[79]    *See, e.g.,* Appx., Vol. 20, 3784 (¶ 103); *Hiner v. Deere & Co.*, 340 F.3d 1190, 1192-93 (10th Cir. 2003).
[80]    *See, e.g.,* Appx., Vol. 20, 3783-3784 (**¶¶ 100 & 101); 3786 (¶ 122)**
[81]    *See, e.g.,* Appx., Vol. 20, 3784 (¶ 102)

When asked by Plaintiff to review the Magistrate's *Report and Recommendation* under FED.R.CIV.P. 72(a), the District Court similarly disregarded Plaintiff's well-supported facts without explanation. They were neither mentioned nor substantively addressed in the District Court's "Factual Summary," and all summarily determined to be immaterial to the color of law issue.[82]

Instead, the District Court found that three facts -- and **only** three facts -- were material and necessary to consider in determining that Defendants "were not acting under color of state law": Decedent's "status as a member of the Choctaw Nation," Defendants' status as cross-commission holders, and "the location in Indian country."[83] In adopting this blanket rule, the Court failed to conduct an intensely fact-bound, totality of the circumstances-style examination of the issue (as required by the U.S. Supreme Court and the Tenth Circuit). *See, e.g., Lugar,* 457 U.S. at 939; *David*, 101 F.3d at 1353. It also completely disregarded facts which, in the aggregate, clearly give rise to a triable issue.

The additional, well-supported facts presented by Plaintiff (which

---

[82]    Appx., Vol. 20, 3953-3955 and 3958-3959.
[83]    Appx., Vol. 20, 3959.

the Court must accept as true) clearly establish that during their encounter with Decedent on March 13, 2022, Kasbaum and Lee were acting within the scope of their employment and in their "official capacity" as MCSO deputies.  Specifically, on the evening of March 13th, Kasbaum and Lee were both working their scheduled shifts as MCSO deputies when the MSCO dispatcher sent them to Eagletown to investigate possible violations of Oklahoma law.  According to Defendants' expert witness, the information communicated to Kasbaum and Lee caused them to suspect that Decedent had violated several state criminal statutes, including 21 O.S. §§ 1362, 1435 & 1760 and 37 O.S. § 37-8.  With his emergency lights engaged, Lee arrived on the scene in the Ford F-150 issued to him by MCSO (conspicuously marked with MCSO and "Sheriff" decals).  Kasbaum separately arrived on the scene in his MCSO-issued vehicle.  Kasbaum was wearing a black shirt (on the front of which was embroidered an MCSO badge) and an overvest with "Sheriff Special Response Team" prominently written across the front and back.  Similarly, Lee wore a uniform shirt with MCSO patches on each shoulder, and an outer carrier with "Sheriff" across the chest.  After placing Barrick in the back of Lee's MCSO patrol vehicle (to protect

Decedent from being attacked by a crowd of bystanders), Kasbaum and Lee began conducting their own investigation of Decedent's suspected crimes and, in so doing, asked witnesses to provide handwritten statements on pre-printed MCSO forms. After Decedent was removed from Lee's patrol vehicle, his ankles were fastened together using the leg irons that Kasbaum carried with him while on duty as a MCSO deputy (which, in turn, he was trained to use during state CLEET training).[84]

At all times during the detention, arrest, and attempted medical treatment of Decedent and their related on-site investigation, Kasbaum and Lee (a) exclusively held themselves out as exercising the authority of a McCurtain County Sheriff deputies; (b) were conducting "departmental business **only**" (in responding to the call and thereafter effectuating Decedent's arrest "us[ing] Department time, equipment, and personnel"); (c) were on the clock and performing their duties as MCSO deputies (which are expressly enumerated in MCSO's policy and procedure manual); (d) were exercising their "official responsibilities" as delineated in MCSO's written policies by assisting another agency; and (e) at all times remained "**governed** and protected by [MCSO's] policies

---

[84]    Appx., Vol. 4, 0986 (68:9-19); 0988 (74:16-17); Vol. 5, 1082 (128:12-17)

and procedures" while dealing with tribal **and** non-tribal criminal suspects on tribal land.  Indeed, inasmuch as they provided assistance until tribal officers arrived, Deputies Kasbaum, Lee, and Storey were -- pursuant to MCSO's express written policies -- "at all times considered to be Sheriff's Office employees" whose "primary responsibility [wa]s to the maccurtain (sic) County Sheriff's Office."

Without a doubt -- and irrespective of whether the *Deputation Agreement* may also have been temporarily triggered on the evening of March 13th -- Kasbaum, Lee, and Storey each performed their official duties as MCSO deputies (including "provid[ing] assistance to [an]other law enforcement agenc[y]) continually and without interruption throughout their encounter with Decedent and Decedent's assailants.

Following the encounter, Kasbaum and Lee both prepared formal, narrative incident reports (one of which was typed on official MCSO letterhead) in which they identified themselves as MSCO deputies, and that they signed as MCSO deputies.  They also each completed a MCSO *Response to Resistance Form,* as required by the policies and procedures of the Sheriff's Department any time an officer "use[s] reportable force … **in the performance of [his] duties**" as an MCSO deputy)).  Likewise,

MCSO Lt. Richard Williamson conducted a supplemental investigation (which he memorialized on an official *MCSO Investigator Supplement* form), and reviewed Kasbaum and Lee's MCSO *Response to Resistance Forms* (which Williamson -- also pursuant to MCSO policy —-had a duty to complete since "reportable force" had been used by Kasbaum and Lee in their capacity as MCSO deputies.

Neither Kasbaum nor Lee made an official determination of jurisdiction at the time of Decedent's arrest; indeed, none of the law enforcement officers who effectuated Decedent's arrest (including Kasbaum and Lee) were even permitted to make such a determination. According to the sworn testimony of MCSO Cpt. Alicia Manning, Kasbaum and Lee "w[ore] **both** hats" (*i.e.*, "the state's hat" and "the tribe's hat") at all times during their encounter with Decedent, and did not "even have to worry about whose hat [they were] wearing." Indeed, seventeen (17) months after Bobby Barrick's death, Defendants expressly stated that they **still** "lack[ed] sufficient information to either admit or deny" whether Kasbaum, Lee, and Storey (or any of them) were "acting under color of state law" during their arrest of Barrick on March 13, 2022.

Turning to the remaining Defendant, Hannah expressly conceded,

under oath, that on the evening of March 13th, he was acting within the scope of his employment as an ODWC law enforcement officer when, and after allegedly forming a reasonable suspicion that one or more violations of Oklahoma law had been committed and/or were in progress, he traveled to Lori's Corner Store in Eagletown for the purpose of offering assistance to the MCSO deputies who had been dispatched there.  Once there, Hannah -- who had arrived in a marked patrol vehicle issued to him by the state, was wearing his state uniform (on which a badge identifying Hannah as an ODWC warden was conspicuously embroidered), and who, at all times throughout the encounter, outwardly displayed the insignia and authority of a state warden -- assisted MCSO deputies with their arrest of Barrick in an effort to enforce what Hannah perceived to be violations of state law.

Following the encounter, Hannah prepared a single, formal, narrative incident report "for the ODWC" in compliance with ODWC's general orders.  Hannah typed out his report on a *Game Warden Incident Statement* form (issued by the ODWC Law Enforcement Division), signed the report as a state "Game Warden," and turned the report in to the ODWC.  Notably, Hannah did not prepare a written report for, nor was

he ever interviewed by, Choctaw Nation police or investigators. **Furthermore, like his co-Defendants, neither at the time of Decedent's arrest, nor at any time thereafter,** did Hannah ever make a determination as to whether the state or the tribe would have had jurisdiction over the matter.

Plaintiff has come forward with more than enough evidence upon which a rational juror could find that Defendants (a) were always "represent[ing] the state in **some** capacity," (b) were "clothed with the authority of state law" throughout the encounter (c) were "state employee[s] … exercising [their] official responsibilities" as such, (d) operated under the pretense of state color **only** (as demonstrated by the prominent display of countless, visible indicia of state law enforcement authority), (e) were being paid by -- and at all times remained subject to the rules and supervision of, and otherwise wholly governed by -- their state employers, (f) never removed their state "hats," (g) investigated the possible state-law crimes of Decedent's non-tribal assailants, (h) engaged in acts that neither triggered nor required the exercise of any cross-deputization powers (*e.g.,* taking steps to protect Decedent from further violent attack, attempting to medically evaluate Decedent, etc.), and (i)

even when restraining a suspected tribal member, were still performing acts "related to the performance of [their state] police duties" and "consistent with actions generally taken by a [state] police officer."

Clearly, the foregoing facts preclude summary judgment on Defendants' argument that "they were not acting under the color of state law" because -- at the very least – such facts raise a triable issue as to **whether Defendants' use of force upon Decedent Bobby Barrick was cloaked in any pretense of state authority.** *See Romero v. Peterson*, 930 F.2d 1502 (10th Cir. 1991) (remanding excessive force case for further fact finding as to whether cross-deputized officers were federal actors or tribal actors, and recommending that the district court consider, *inter alia*, the source of funding for the officers' law enforcement activities, whether the officers were wearing federal uniforms, carrying federal weapons, using a federal vehicle, or acting pursuant to the authority of federal badges, who was responsible for supervising the officers, and whether cross-deputized officers acted in a "dual capacity"); *Schaffer*, 814 F.3d at 1156 (whether Defendants acted under color of state law presents a "mixed question of fact and law"); *see also Haines v. Fisher*, 82 F.3d 1503, 1509 (10th Cir. 1996) (holding that the determination of whether one is acting

within the scope of employment is generally a question of fact).

Finally, even if the Court were to accept Defendants' bald claim that they were "acting within the scope of their cross-deputation by the Choctaw Nation … when they interacted with Decedent," summary judgment would still be inappropriate.  It is well-established that where -- as here -- police officers are cloaked in multiple jurisdictions, and the **totality of the circumstances** raises an inference that the officers' actions were **<u>not</u>** clearly delineated as "purely" tribal, the **display of <u>state</u> authority** by a tribal officer will permit the Court to exercise jurisdiction over the subject matter. *Evans v. McKay*, 869 F.2d 1341 (9th Cir. 1989).[85]  Indeed, as set forth in greater detail below, the **degree** of

---

[85]    In *Evans*, the plaintiffs brought Section 1983 claims against individual police officers arising out of the execution of orders of the Blackfoot Tribal Court.  "The tribal court orders were executed, however, by police officers of the City of Browning who also happen[ed] to be agents of the Bureau of Indian Affairs," and who were "empowered … to provide law enforcement protection to the residents of the City and to enforce city ordinances." *Id.* at 1347-48.  Initially, the lower court found that "the Section 1983 claims against the individual police officers … were beyond the jurisdiction of the federal courts … because any alleged deprivation of the [plaintiffs'] civil rights were accomplished under the color of tribal law." *Id.* at 1347.  The Court of Appeals, however, reversed the lower court's ruling, holding:

> The allegedly unconstitutional arrests were made **pursuant to a City of Browning ordinance** prohibiting the obstruction of justice.  While these law enforcement officers may be said to have

state involvement in Decedent's arrest presents a triable issue of fact precluding summary judgment and warranting reversal. *Haines*, 82 F.3d at 1509; *Romero*, 930 F.2d at 1506-08.

## C. The district court erred in finding that simultaneously "wearing two hats" (state color and tribal color) is not, in and of itself, sufficient evidence of "state color" to support a Section 1983 claim.

Although the District Court below ultimately held that Defendants "were operating under Tribal law" during their detention / arrest of Decedent Bobby Barrick, it nevertheless appeared to concede (consistent with the evidence that Plaintiff presented in opposition to summary judgment) that Defendants **did**, in fact, "wear both hats" (*i.e.*, state color and tribal color) throughout their encounter with Decedent. Specifically, the trial court "acknowledg[ed] that the officers may wear two hats simultaneously," presumably even at the point when they were

---

been acting pursuant to Tribal Court orders during the incidents in question, **they were also allegedly and arguably acting in their capacity as City of Browning police officers**. … In their third amended complaint, the [plaintiffs] expressly alleged that "[t]he city police acted under color of state law in arresting [Plaintiffs] without a warrant." Given this explicit allegation of official state authority, coupled with the "peculiar" law enforcement situation as it exists on the reservation, we conclude that the [plaintiffs] have sufficiently pleaded [an] action under color of state law[.]

attempting to place Decedent into custody.[86]  Indeed, Plaintiff has come forward with facts (supported by an abundance of testimony and other evidence) from which a juror could reasonably conclude that **Defendants were acting under color of state law <u>at all times</u>** throughout the above-referenced incident -- *irrespective* of whether there was also some temporary manifestation of tribal color during the encounter **(including MCSO's policies providing that when assisting other law enforcement agencies, MCSO deputies remain "governed … by the policies and procedures of [MCSO]")]**

Importantly, it does not matter that Defendants may also have been exercising some tribal color when they mounted Decedent while he was handcuffed behind his back and prone on the ground.  Although the approach of the District Court was to ignore all state color if there was a "primacy" of tribal color, that approach conflicts with the plain language of Section 1983.  The statute creates liability for "every person" who violates rights "under color of" state law – not "under **exclusive** color of state law" or "under primary color of state law." 42 U.S.C. 1983.  It is, therefore, irrelevant that Defendants' actions under color of state law

---

[86]    Appx., Vol. 20, 3961-3962.

may have been simultaneously under color of tribal law or that their state and tribal authority was intertwined. See *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 399-400 (1979); *see also*, *e.g., Johnson v. Orr*, 780 F.2d 386, 392 & n.11 (3rd Cir. 1986); *Nesmith* v. *Fulton*, 615 F.2d 196, 200-201 & n.7 (5th Cir. 1980); *Maynard v. City of Chicago*, 755 F.Supp.3d 1067, 1072 (N.D.Ill. 2024) (holding that police officer "may also have been motivated by personal interests does not foreclose the inference that she acted under color of state law"); *Martinez v. Harroun*, 2024 WL 422785 *6 (D.Colo.) (Section 1983 relief unavailable when violation stems from **purely** personal [or, by analogy, **purely** tribal or **purely** federal] action with **no** objective indicia of state color); *Screws v. U.S.*, 325 U.S. 91 (1945) (same, holding that **purely** personal pursuit is not attributable to the state). After all, Defendants were cross-deputized for the very purpose of granting them simultaneous state and tribal power.

Under Section 1983, the only question is whether Plaintiff has presented any evidence that Defendants acted under **any** color of state law when they subjected Decedent to positional asphyxia. Where, as here, such evidence has been produced, summary judgment is inappropriate.

### D. In granting summary judgment, the court below impermissibly weighed evidence when it found that the "primacy" of tribal color outweighed all the state color Defendants were simultaneously exercising and prominently displaying.

In the proceedings below, Plaintiff's Section 1983 claim was summarily disposed of based on the following rationale:

> In seeking answers to the questions posed by this case, the [court] considered whether an officer's jurisdictional authorization based on his status as a cross-commissioned officer removes all authority as a state actor or agent, or whether he retains that state authority while also exercising Tribal authority, *i.e.*, whether officers may wear only one "hat" at a time, or wear two "hats" simultaneously. The [court] finds that the question is one of primacy, not numerosity.

> The overriding question here, however, is whether the officers were acting under color of tribal law or state law, or both, *i.e.*, *which* official duties take precedence.[87]

The court went on to enter summary judgment against Plaintiff, holding that since Decedent was a tribal member on tribal land, the "tribal color" exercised by Defendants as cross-commissioned officers must have taken precedence over and outweighed any state color they were simultaneously exercising. In so doing, however, the court improperly weighed evidence and invaded the province of the jury by resolving a

---

[87]    Appx., Vol. 20, 3888, 3890-91.

disputed fact question . *See, e.g., Marquez v. Toledo Davila*, 2008 WL 11638980 *1 (D.P.R.) (holding that if evidence, even when weak, "raises a triable issue regarding whether [a defendant] acted under color of state law, … the court [may] not engage in improper weighing of the evidence on the under color of law issue, [and] the question must be put to a jury); *Grant v. John Hancock Mut. Life Ins. Co.*, 183 F.Supp.2d 344, 356 (D.Mass. 2002) (where there is conflicting evidence as to whether police officer was acting under color of state law for purposes of § 1983 claim, it is not for district court to engage in its own weighing of evidence but, rather, issue is appropriately put to jury); *Lopez v. Dept. of Health Svc.*, 939 F.2d 881, 883 (9th Cir. 1991) ("extent of state involvement in the action is a question of fact"); *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1982) (same); *Utopia Entertainment v. Claiborne*, 2006 WL 758709 *1 (W.D.La.) (genuine issues of fact regarding the manner and degree to which sheriff … and his employees used their authority under" color of state law were for factfinder to decide); *Vanderlinden v. City of Warren*, 2025 WL 27972786 *6 (E.D.Mich.) ("at the summary judgment stage, [since] the Court may not make credibility determination or weight the evidence, … the court finds there is an issue of material fact whether

defendant … acted under color of state law such that he may be a state actor for purposes of § 1983, [thus precluding] summary judgment").

Accordingly, summary judgment was improper.

**E. The District Court erred in holding that, during their encounter with Decedent, "neither Kasbaum, Lee, or Hannah were exercising power possessed by virtue of state law and made possible only because [they were] clothed with the authority of state law."**

The District Court effectively held that if Defendants exercised any tribal authority during the detention and arrest of Decedent, it resulted in the total absence of state color. The very nature of the cross-deputation, however, is that state and tribal authority must mutually co-exist.  Defendants could not be cross-deputized with the tribe if they were not already state law enforcement officers.  In other words, in order to exercise **<u>any</u>** tribal authority temporarily, Defendants had to simultaneously and consistently maintain their powers state law enforcement officers – powers conferred onto them by state law. *See also, generally,* 11 O.S. § 34-103(C).

Additionally, the cross-deputation agreement in this case is to be applied in accordance with the State-Tribal Relations Act. 74 O.S. § 1221. A state law enforcement officer may enforce tribal law on lands within

tribal jurisdiction pursuant to a tribal-state cooperative agreement under the STRA without offending Art. II, § 12 of the Oklahoma Constitution, though, only because it creates no new tribal office but only **increases the authority** of the state officer to enforce tribal laws. 1990 OK AG 32, 1991 WL 567868 * 8; *see also* 2000 OK AG 58, ¶ 14.

Finally, a cross-deputation agreement alone is insufficient to transform a state officer into a tribal actor. *See Ouart v. Fleming*, 2010 WL 1257827 *7 (W.D.Okla.) (holding that "the existence of a cross-commission agreement with a state agency, without more, does not transform a tribal officer into a state actor").

**F. The District Court erred in holding, as a matter of law, that "in the absence of tribal authority, state law enforcement officers do not have jurisdiction to arrest Indians in Indian country."**

In granting summary judgment, the District Court held that "while [state] law enforcement officers may maintain state law enforcement power" throughout an encounter, a cross-commissioned deputy's act of arresting a tribal member on tribal land is an exercise of pure tribal law and cannot have any state law component. The District Court's holding is erroneous for at least two reasons.

According to the District Court, arresting a tribal member on tribal land is purely tribal as a matter of law because, without a cross-commission or some other "authority of tribal law," state law enforcement officers "do not have jurisdiction to arrest Indians in Indian country." The District Court's conclusion is based on an incorrect statement of law.

In *U.S. v. Walker*, 74 F.4th 1163 (10th Cir. 2023), this Court held:

> Prior to the Supreme Court's decision in *Oklahoma v. Castro-Huerta*, --- U.S. ---, 142 S.Ct. 2486 (2022), there was a general belief that Oklahoma lacked jurisdiction over crimes committed by Indians or against Indians in Indian country. *See McGirt v. Oklahoma*, --- U.S. ---, 140 S. Ct. 2452, 2479 (2020) ("States are ... free to apply their criminal laws in cases of non-Indian victims and defendants, including within Indian country."). However, in *Castro-Huerta*, the Supreme Court recognized Oklahoma has concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country. *See Castro-Huerta*, 142 S.Ct. at 2491.

*Id.* at 1176 & n. 2.    The following year, in *U.S. v. Pemberton*, 94 F.4th 1130 (10th Cir. 2024), this Court held:

> [A]s a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 636 (2022).  Indeed, "the Constitution allows a State to exercise jurisdiction in Indian country" because "Indian country is part of the State, not separate from the State." *Id.*  This jurisdiction is not limited by location, by race, or by any other category. *See id.*  As a result, "unless preempted, States have jurisdiction over crimes committed in Indian country." *Id.* at 2494.

*Id.* at 1141-42.

In the past, this Court assumed that the General Crimes Act preempted state jurisdiction over crimes in Indian country. This Court declared that states presumptively lack jurisdiction in Indian country. *See*, *e.g.*, *Hackford v. Utah*, 845 F.3d 1325, 1327 (10th Cir. 2017); *Ross v. Neff*, 905 F.2d 1349, 1352 (10th Cir. 1990). The Supreme Court'a decision in *Castro-Huerta,* however, specifically rejects any presumption against state jurisdiction *and* rejects any application of the General Crimes Act to oust state jurisdiction over Indians. *See* 142 S. Ct. at 2494, 2495 n.2.

"[U]nder the General Crimes Act, therefore, both the Federal Government and the State have concurrent jurisdiction to prosecute crimes committed in Indian country." *City of Tulsa v. O'Brien*, --- P.3d ---, 2024 WL 5001684 *4(Okla.Crim.). "To the extent that [the] State lacks prosecutorial authority over crimes committed by Indians in Indian country, that would not be a result of the General Crimes Act." *Id.* at *5. Instead, as the Supreme Court explained, any lack of state prosecutorial authority over Indians arises from so-called *Bracker* balancing. *See* 142 S. Ct. at 2495; *citing White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142-43 (1980). The *Bracker* balancing test "considers tribal

interests, federal interests, and state interests." *Id.* at 2501.

Finally, in *Deo v. Parish*, 541 P.3d 833 (Okla.Crim. 2023), the Oklahoma Court of Criminal Appeals, applying *Castro-Huerta*, ultimately found it was "no longer convinced that Congress has preempted Oklahoma State Courts' subject matter jurisdiction." *Id.* at 842. The Court went on to hold that Congress has chosen to exercise authority over territorial and personal jurisdiction when it makes laws in relation to jurisdiction over crimes committed by Indians in Indian Country. *Id.* Once these territorial and personal jurisdiction "components are satisfied" by findings that a criminal defendant is an Indian, and his/her crime occurred in Indian Country, the *Bracker* balancing test must be applied to determine if State personal and territorial jurisdiction are preempted. *Id.* In short, the determination that the state lacks jurisdiction is not a matter of black letter law, and cannot be made without conducting the *Bracker* balancing test, which the District Court did not do in finding that Defendants were not acting under state law.

Secondly, the Court's ruling that a cross-commissioned deputy's act of arresting a tribal member on tribal land cannot involve any state color

component overlooks the fact that such an act serves state interests as well as tribal interests. The *Deputation Agreement* itself expressly states that its purpose is "to promote better law enforcement services" -- for **all parties** to the *Deputation Agreement* and the **citizens and communities they serve** both within and outside Indian Country.

Indeed, state and tribal agencies come together through cross-deputization agreement to pursue goals that further both state and tribal interests. As the language from the *Deputation Agreement* makes evident, cross-deputization recognizes the common benefit of pooling state and tribal authority. Thus, the very concept of cross-deputation illustrates that state and tribal color are not mutually exclusive.

**G. The District Court erred to the extent it adopted the Magistrate's holding that Defendants had any "official duties" as "tribal officers," or that any activity addressed in the *Deputation Agreement* took precedence over the "official duties" Defendants continuously performed as state law enforcement officers throughout their encounter with Decedent.**

In his *Report and Recommendation*, Magistrate Jackson quoted from *Screws v. U.S.*, 325 U.S. 91, 111 (1945) (which held that the "[a]cts of officers who undertake to perform their official duties" amounts to state action) and *David v. City & Cnty. Of Denver*, 101 F.3d 1344, 1353

(10th Cir. 1996) (which held that "one must examine the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties"). Opining, however, that these holdings "appear[] to be an incomplete statement of the law for our context" in *this* case, Magistrate Jackson posited that "the issue is not **whether** an officer's conduct is related to **official duties**, but rather **<u>which</u> official duties**" -- state or tribal -- "the officer's conduct falls under." (further stating, in similar fashion, that "[t]he overriding question here … is whether the officers were acting under color of tribal law or state law, or both, *i.e.*, *which* **<u>official duties</u>** t[ook] precedence"). Thus, the *Report and Recommendation*'s ultimate conclusion (*i.e.*, that "Kasbaum, Lee, and Hannah were acting under Tribal authority") - adopted by the District Court - necessarily reflects a finding that the "official duties" of Defendants "as tribal officers" took precedence in this case.   This finding, however, rests on the erroneous premise that Defendants had **<u>any</u>** "official duties" as "tribal officers."

The phrase "official duties" refers to one's "official act[s]," and "means whatever is done under color of or by virtue of [one's] office." *Alford v. McConnell*, 27 F.Supp. 176 (N.D.Okla. 1939).  In other words,

the term "official duties" refers to those acts reasonably required to be performed by virtue of, and within the scope of, the functions of one's office of employment.  In Oklahoma, state, county, and municipal law enforcement officers are considered to be "office" holders. 2000 OK AG 58, ¶ 4.  Furthermore, under OKLA. CONST. ART. II, § 12, law enforcement officers are prohibited from holding more than one such office at a time.  Therefore, a county law enforcement officer may not simultaneously hold the "office" of tribal law enforcement officer.

Exercising authority under a cross-deputization agreement, however, does **not** turn a county or state law enforcement officer into a "tribal officer." *See, e.g.,* 22 Okl. Op. Atty. Gen. 71, 1991 WL 567868 at * 8, ¶ 3 (holding that "[a] state law enforcement officer may enforce tribal law on lands within tribal jurisdiction pursuant to a tribal-state cooperative agreement under 74 O.S. § 1221 without offending without offending Art. II, § 12 of the Oklahoma Constitution where" – such as here – "the agreement creates no new office but only **increases the authority of state and local officers** to enforce tribal laws").  It necessarily follows, then, that if Defendants only held one "office" (as state law enforcement officers), then the only "official duties" they had

(and exercising at the time of their encounter with Decedent) were the duties of state -- not tribal -- officers.

## STATEMENT CONCERNING ORAL ARGUMENT

Appellants request oral argument. This case is complex, involving a highly fact-dependent inquiry and a very important issue of first impression. Oral argument will assist this Court in understanding the issues and theories, which cannot be fully explained in a limited brief.

Respectfully submitted,

/s/ Christopher L. Camp
**Christopher Lincoln Camp, OBA #18541**
**CAMP LAW FIRM**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma 74133**
**Telephone: (918) 200-4871**
**Facsimile: (918) 340-6799**
**E-mail: camplawfirm@gmail.com**

**and**

**D. Mitchell Garrett, Jr., OBA #20704**
**GARRETT LAW**
**320 South Boston Avenue, Suite 825-G**
**Tulsa, Oklahoma 74103**
**Telephone: (918) 221-6190**
**Facsimile: (918) 340-6799**
**E-mail: mitchell@garrettlawcenter.com**

**Attorneys for Plaintiff/Appellant**

57

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ■ this document contains <u>11,738</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ■ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word (Version  16.15)</u> in <u>14-point</u> font size of the <u>Centruty Schoolbook</u> type style, or

   ☐ this document has been prepared in a monospaced typeface using _____ with _____ characters per inch in the _____ type style.

**Date:** <u>January 14, 2026</u>          /s/ Christopher L. Camp_____

                                                **Christopher L. Camp, OBA #18541**
                                                **CAMP LAW FIRM**
                                                **7122 South Sheridan Road, Suite #2-382**
                                                **Tulsa, Oklahoma  74133**
                                                **Telephone: (918) 200-4871**
                                                **E-mail: camplawfirm@gmail.com**

                                                **Attorney for Appellant**

## <u>CERTIFICATE OF DIGITAL SUBMISSION</u>

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, and according to the program are free of viruses.


/s/ Christopher L. Camp

**Christopher L. Camp, OBA #18541**

## CERTIFICATE OF SERVICE

I, Christopher L. Camp, hereby certify that on January 14, 2026, I electronically transmitted the foregoing *Appellant's Opening Brief (Corrected)* to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Alejandra J. Brigida, Esq.
Jessica James Marie Curtis, Esq.
Robert Lafferandre, Esq.
Sheila G. Jessee, Esq.
Kevin L. McClure, Esq.
Devan A. Pederson, Esq.
Jamison C. Whitson, Esq.
Randall J. Wood, Esq.

/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**

# Attachment 1

# *Opinion and Order*
[Dkt. # 233]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **BARBARA BARRICK as Special Administrator of the Estate of Bobby Dale Barrick,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-CV-129-JFH-GLJ** |
| **BOARD OF COUNTY COMMISSIONERS OF MCCURTAIN COUNTY, OKLAHOMA, et al.,** | |
| **Defendants.** | |

## OPINION AND ORDER

Before the Court is the Report and Recommendation of United States Magistrate Judge Gerald L. Jackson. Dkt. No. 224. The Magistrate Judge recommends that the Motion for Summary Judgment and Brief in Support of Defendants Matthew Kasbaum and Quentin Lee [Dkt. No. 165] and the Motion for Summary Judgment and Brief in Support of Defendant Mark Hannah [Dkt. No. 167] be granted. *Id*. Plaintiff Barbara Barrick ("Plaintiff") filed an objection to the Report and Recommendation. Dkt. No. 226. Defendants Kasbaum and Lee and Defendant Hannah filed responses in opposition to Plaintiff's objection. Dkt. Nos. 227 and 228. After seeking leave from the Court, Plaintiff filed a reply. Dkt. No. 231. For the following reasons, Plaintiff's objection is overruled, the Report and Recommendation is accepted and adopted by this Court, and Defendants' motions for summary judgment are granted.

## PROCEDURAL BACKGROUND

Plaintiff, as Special Administrator of the Estate of Bobby Dale Barrick, filed this case on April 20, 2023 alleging claims of excessive force and wrongful death arising under 42 U.S.C. § 1983 against Defendant Matthew Kasbaum, Defendant Quentin Lee, and Defendant Mark Hannah,

along with three other defendants.  Dkt. No. 2.  The other defendants have since been dismissed from the case and only the claims against Defendants Kasbaum, Lee, and Hannah remain.  *See* Dkt. Nos. 22, 48, 50.  Defendants Kasbaum, Lee, and Hannah filed motions for summary judgment.  Dkt. Nos. 165, 167.  Plaintiff filed responses in opposition to the motions, and then amended responses.  Dkt. Nos. 197, 198, 203, 204.  Defendants Kasbaum, Lee, and Hannah then filed replies.  Dkt. Nos. 214, 217.  The Magistrate Judge set the motions for summary judgment for hearing.  Dkt. Nos. 218, 220.  A hearing was held on June 11, 2025 and the Magistrate Judge took the motions under advisement.  Dkt. No. 221.  On July 9, 2025, the Report and Recommendation was issued recommending that the motions for summary judgment be granted, finding that Plaintiff could not maintain an action under § 1983 because Defendants were not acting under color of state law.  Dkt. No. 224.  Plaintiff timely filed an objection to the Report and Recommendation on July 23, 2025.  Dkt. No. 226.  Defendants Kasbaum, Lee, and Hannah filed responses to Plaintiff's objection on August 6, 2025.  Dkt. Nos. 227, 228.  Plaintiff filed her reply on August 15, 2025.  Dkt. No. 231.

## FACTUAL BACKGROUND

The undisputed material facts of this case are as follows.[1]  On March 13, 2022, in Eagletown, Oklahoma, located in the Eastern District of Oklahoma and within the boundaries of Choctaw Nation, Defendant Kasbaum, a Sergeant with the Muskogee County Sheriff's Office, responded to a call at 4:30 a.m. to help Bobby Dale Barrick ("Barrick") with his truck that was stuck in mud.  Dkt. No. 165 at 10.  While Barrick appeared to be under the influence of some

---

[1]  The Court notes that Plaintiff does not make specific objections to the Magistrate Judge's factual findings.  Nonetheless, the Court sets forth its own factual findings upon review of the record.

intoxicating substance, Defendant Kasbaum did not arrest Barrick because his vehicle was immobilized and he was otherwise cooperative. *Id*.

That same evening, Barrick was dropped off at Lori's Corner Store in Eagletown, Oklahoma. *Id*. Although the store was closed, Barrick ran in through the back door. *Id*. Contractors, who were working inside the store at the time, chased Barrick as he broke through the glass front door of the store and ran out onto Highway 70. Dkt. No. 165 at 10-11. On Highway 70, Barrick got into the cab of an occupied semi-tractor trailer rig. *Id*. at 11. The truck driver shut down the rig and Barrick exited the cab of the truck. *Id*. Barrick then approached a vehicle behind the semi-tractor trailer occupied by a woman and children. *Id*. Barrick punched at the car window, grabbed onto the side view mirror, and then ultimately jumped onto the car as the woman drove. Dkt. No. 165 at 11. With Barrick still on top of the vehicle, the woman drove her vehicle into the parking lot of Lori's Corner Store. *Id*. The contractors then gained control of Barrick and hog-tied him with his hands behind his back and his ankles bound together. *Id*. at 11-12.

The Muskogee County Sheriff's Office ("MCSO") was notified of the incident and Defendants Kasbaum and Lee were dispatched to the scene. *Id*. at 12. In addition to being MCSO officers, Defendants Kasbaum and Lee were also cross-commissioned officers with the Choctaw Nation. Dkt. No. 165 at 14. Defendant Kasbaum and Lee arrived on the scene in MCSO vehicles and wearing MCSO uniforms. Dkt. No. 203 at 28-29. Upon arriving to the scene, Defendants Kasbaum and Lee saw that Barrick had been hog-tied and was yelling for help shouting, "they're going to kill me." Dkt. No. 165 at 12-13. Defendants Kasbaum and Lee removed Barrick's bindings and handcuffed Barrick. *Id*. at 13. Barrick was then able to stand and speak with the officers. Dkt. No. 165 at 13. Defendant Kasbaum requested Emergency Medical Services ("EMS") to respond to the scene as it was apparent that Barrick had some injuries related to being

3

hog-tied. *Id.* Officers then located Barrick's Choctaw Nation Membership Card in his pocket, confirming his status as an Indian. *Id.* Defendant Kasbaum and Lee then placed Barrick in the back of Defendant Lee's patrol vehicle while they continued their investigation. *Id.* at 14.

Defendant Hannah, an Oklahoma Game Warden and Tribal Police Officer of the Choctaw Nation with a Special Law Enforcement Commission, then arrived on the scene. Dkt. No. 165 at 14. Defendant Hannah arrived in his state issued vehicle wearing his Oklahoma Game Warden uniform. Dkt. No. 203 at 29-30. Once Defendant Hannah arrived, he and Defendants Kasbaum and Lee attempted to remove Barrick from the back of Defendant Lee's patrol vehicle to be seen by an Emergency Medical Technician ("EMT"). *Id.* at 15-17. During this time, Barrick was noncompliant and combative with the officers, and the officers attempted various methods to subdue him and remove him from the vehicle. *Id.* Barrick then became unconscious and EMS was able to assess him and transport him to McCurtain Memorial Hospital where he was placed on a ventilator before he was transferred to Paris Regional Medical Center where he ultimately died. Dkt. No. 165 at 19-20. Barrick's cause of death was listed as acute respiratory failure due to acute kidney injury, with contributing factors of bipolar disorder, schizophrenia, and hypertension. *Id.* at 20.

## DISCUSSION

### I.    Standard of Review for Report and Recommendation

After a Report and Recommendation has been issued, "a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b). The Court "must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with

4

instructions." *Id.*; *see also*, 28 U.S.C. § 636(b)(1).  However, any objections not properly raised are waived for purposes of review by the District Court.  *Klein v. Harper*, 777 F.3d 1144 (10th Cir. 2015); *Silva v. United States*, 45 F.4th 1134 (10th Cir. 2022).  An objection to a recommendation is properly raised if it is both timely and specific.  *United States v. One Parcel of Real Property Known as 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996).  An objection is sufficiently specific if it "enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute."  *Id.*; *see e.g., Lopez v. Colorado*, No. 19-CV-0684-WJM-MEH, 2020 WL 1074756, at *1 (D. Colo. Mar. 6, 2020).[2]  "In the absence of a proper objection, the district court may review a magistrate judge's recommendation under any standard it deems appropriate."  *Davis v. GEO Grp. Corr., Inc.*, No. CIV-16-00462-PRW, 2023 WL 2536727, at *1 (W.D. Okla. Mar. 16, 2023) (citing *Summers v. State of Utah*, 927 F.2d 1165, 1167-68 (10th Cir. 1991)).  The Court also notes that "[m]ere regurgitation of original arguments does not trigger the Court's obligation to perform de novo review."  *United States v. Kirby*, No. 23-CR-026-JFH, 2023 WL 3956685, at *2–3 (E.D. Okla. June 12, 2023).

## II.    Plaintiff's Objections

Generally, Plaintiff objects to the Magistrate Judge's finding that Plaintiff cannot maintain a viable claim under 42 U.S.C. § 1983 because Defendants were acting under Tribal authority, rather than under color of state law.  Dkt. No. 226 at 2-3.  Section 1983 creates a federal cause of action for damages for violations of federal law committed by individuals acting "under color of state law."  42 U.S.C. § 1983.  The "under color of state law" requirement is "a jurisdictional requisite for a § 1983 action." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (citing *Polk*

---

[2] "Unpublished opinions are not precedential, but may be cited for their persuasive value."  10th Cir. R. 32.1(A), 28 U.S.C.; *see also United States v. Austin*, 426 F.3d 1266, 1274 (10th Cir. 2005).

*County v. Dodson*, 454 U.S. 312, 315 (1982)). Acting "under color of state law" requires that the defendant in a § 1983 action exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id*. (quoting *West v. Atkins*, 487 U.S. 42, 48-49 (1988)). "A § 1983 action is unavailable for persons alleging deprivation of constitutional rights under color of tribal law." *Burrell v. Armijo*, 456 F.3d 1159, 1174 (10th Cir. 2006) (internal citations omitted). Therefore, as identified by the Magistrate Judge and as argued by the parties, the relevant question here is whether Defendants were acting under color of state law or Tribal law during the relevant time period.

Under this general objection to the Magistrate Judge's finding that Defendants were not acting under color of state law, Plaintiff sets forth five (5) particular objections. The Court will address each of these objections in turn below.

### a. Plaintiff's First Objection

Plaintiff first objects that "[t]he Magistrate Judge's finding that Defendants 'were not acting under color of state law' was not the product of an intensely 'fact-bound inquiry' [but rather] it relied on a single 'determinate factor,' and completely ignored over two dozen highly pertinent facts." Dkt. No. 226 at 6. As noted earlier, Plaintiff does not dispute the Magistrate Judge's factual findings, but rather objects to the Magistrate Judge's failure to consider all facts before it. Dkt. No. 226 at 6. Specifically, Plaintiff states that in her response to Defendants' summary judgment motions she set forth thirty-two (32) additional facts that bear upon the issue of whether Defendants were acting under color of state law. *Id*. Plaintiff notes that in finding that Defendants were not acting under color of state law, the Magistrate Judge "considered only five (5)" of her stated facts, "inexplicitly ignoring the other twenty-seven (27)". *Id*. Plaintiff argues that this runs contrary to case law which requires the Magistrate Judge to accept all of her stated facts as true

6

and to draw all reasonable inferences in her favor. *Id.* at 6-7. This is not the correct standard applicable to this case.

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). When it applies this standard, the Court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). Plaintiff, as the nonmoving party, is afforded the benefit of the Court viewing the evidence and drawing inferences in the light most favorable to Plaintiff. The Court notes that the Magistrate Judge explicitly acknowledged this standard in the Report and Recommendation. Dkt. No. 224 at 3. The Court is not required, however, to accept all of Plaintiff's stated facts as true. Rather, the law is that when the nonmoving party fails to file a response to a motion for summary judgment, the nonmoving party waives the right to controvert the facts asserted in the summary judgment motion and the Court "should accept as true all material facts asserted and properly supported in the summary judgment motion." *Reed v. Bennett*, 312 F.3d 1190, 1195, (10th Cir. 2002). This clearly does not apply here.

The Court further notes that the standard is whether a genuine dispute exists about a *material* fact, not whether a dispute exists as to any fact alleged by the parties. "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)). Additionally, Plaintiff does not point to, nor is this Court aware of, any controlling law which states that a single fact cannot be outcome-determinative in deciding a motion for summary judgment.

Upon an independent review of all the facts before the Court, the Court finds that the facts indisputably show that Defendants were acting in a law enforcement capacity—or under the color of some law. The relevant question, however, is *what* color of law Defendants were acting—state or Tribal.

When carrying out an arrest of an Indian in Indian country, law enforcement officers necessarily act under color of Tribal law by virtue of cross-deputization agreements. This is because a state law enforcement officer has no jurisdiction to arrest an Indian in Indian country. *See e.g., Ross v. Neff*, 905 F.3d 1349, 1353 (10th Cir. 1990). While facts highlighted by Plaintiff—such as how Defendants were dressed, what vehicles they drove, or how they were dispatched to the scene—are relevant to establish that Defendants were acting in a law enforcement capacity, they do not establish the particular authority Defendants were acting under. Rather, the material facts necessary to establish this are Barrick's status as an Indian, the location in Indian country, and the cross-deputization of Defendants. Because Defendant was an Indian, the arrest took place in Indian country, and Defendants were cross-deputized, Defendants were necessarily acting under color of Tribal law in effecting Barrick's arrest. For these reasons, the Court overrules Plaintiff's objection.

### b. Plaintiff's Second Objection

Second, Plaintiff objects that the Magistrate Judge erroneously relied upon the premise that "state courts generally have no jurisdiction to try Indians for conduct committed in Indian Country." Dkt. No. 226 at 7. In support of this contention, Plaintiff cites to *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) for the proposition that "a state has jurisdiction over all of its territory, including Indian country." *Id*. Plaintiff further argues that *Castro-Huerta* leaves the issue

8

undecided of whether a state's jurisdiction to prosecute Indians for crimes under the General Crimes Act is preempted. *Id*.

The Court does not find that the Magistrate Judge's statement of law is erroneous. It is well established that, except in limited circumstances, the state does not have criminal jurisdiction in Indian country. *See McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020) (citing *Negonsott v. Samuels*, 507 U.S. 99, 102-103 (1993)); *see also Ross*, 905 F.2d at 1353 ("The Supreme Court has expressly stated that state criminal jurisdiction in Indian country is limited to crimes committed 'by non-Indians against non-Indians . . . and victimless crimes by non-Indians.'") (internal citation omitted). *Castro-Huerta* did not overrule *McGirt*, but rather established concurrent state and federal jurisdiction for crimes committed by non-Indians against Indians in Indian country. *See Castro-Huerta,* 597 U.S. at 656. There is no factual dispute as to Barrick's status as an Indian or that the events occurred in Indian country and, therefore, the Court finds that this argument is of no effect. Accordingly, this objection is overruled.

### c. Plaintiff's Third and Fifth Objection

Plaintiff's third and fifth objections are related. In her third objection, Plaintiff challenges the Magistrate Judge's finding that Defendants' law enforcement authority was "derived from the Choctaw Nation, not the State of Oklahoma." Dkt. No. 226 at 7. In support of this objection, Plaintiff argues that "[t]his premise erroneously presupposes that the existence of any tribal color necessarily results in the removal of all state color," citing to her fifth objection. *Id*. Plaintiff's fifth objection relates to the Magistrate's holding that Defendants were not "exercising power possessed by virtue of state law and made possible only because [they were] clothed with the authority of state law." Dkt. No. 226 at 8. Specifically, Plaintiff states that the Magistrate Judge "effectively held that if Defendants exercised any tribal authority, it result[ed] in the total absence

of state color." *Id*. Plaintiff argues that this is erroneous because to hold any Tribal authority, Defendants had to maintain state law enforcement power, noting that Defendants "could not be cross-deputized with a tribe if they were not already state law enforcement officers." *Id*.

While being a state law enforcement officer may be a prerequisite for cross-deputization, the authority to arrest Indians in Indian country is not derived from state law, but from Tribal law. Stated another way, in the absence of Tribal authority, state law enforcement officers do not have jurisdiction to arrest Indians in Indian country. Therefore, while law enforcement officers may maintain state law enforcement power, they necessarily exercise Tribal authority when arresting an Indian in Indian country. Here, Defendants only had authority to arrest Barrick—an Indian in Indian country—under the authority of Tribal law. The Court concurs that this authority was derived from the Choctaw Nation, not the State of Oklahoma. Accordingly, the Court further finds that in arresting Barrick under Tribal authority, Defendants were not exercising power possessed by virtue of state law and made possible only because they were clothed with the authority of state law. For these reasons, Plaintiff's third and fifth objections are overruled.

### d. Plaintiff's Fourth Objection

Finally, Plaintiff objects to the Magistrate Judge's holding that Defendants cannot "wear two hats" simultaneously, arguing that it is both factually and legally erroneous. Dkt. No. 226 at 8. However, this is not what the Magistrate Judge held. While acknowledging that the officers *may* wear two hats simultaneously, the Magistrate Judge found that "the question is one of primacy, not numerosity." Dkt. No. 224 at 11. Specifically, the Magistrate Judge found that the overriding question is which official duties—those of Tribal or state law—took precedence. *Id*. at 12.

Again, regardless of whether Defendants maintained state law authority, Defendants, in arresting an Indian in Indian country, were operating under Tribal law.  Under these undisputed facts, the Court concurs that Tribal law took precedence.  For this reason, this objection is also overruled.

## CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's objection [Dkt. No. 226] is OVERRULED, the Report and Recommendation is ACCEPTED AND ADOPTED, and the Motion for Summary Judgment and Brief in Support of Defendants Matthew Kasbaum and Quentin Lee [Dkt. No. 165] and the Motion for Summary Judgment and Brief in Support of Defendant Mark Hannah [Dkt. No. 167] are GRANTED.

Dated this 29th day of September 2025.

JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE

# Attachment 2

## *Judgment*
[Dkt. # 234]

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

**BARBARA BARRICK AS SPECIAL
ADMINISTRATOR OF THE ESTATE OF
BOBBY DALE BARRICK,**

        **Plaintiff,**

v.

        **Case No. 23-CV-129-JFH-GLJ**

**BOARD OF COUNTY
COMMISSIONERS OF MCCURTAIN
COUNTY, OKLAHOMA, ET AL.,**

        **Defendants.**

## JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58(a), and consistent with the Opinion and Order filed contemporaneously herewith, the Court issues its separate judgment finally disposing of this case. IT IS HEREBY ORDERED that judgment is entered in favor of Defendant Matthew Kasbaum, Defendant Quentin Lee, and Defendant Mark Hannah and against Plaintiff Barabara Barrick, as Special Administrator of the Estate of Bobby Dale Barrick.

Dated this 29th day of September 2025.

_____
JOHN F. HEIL, III
UNITED STATES DISTRICT JUDGE