No. 25-7082

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

BARBARA BARRICK, as Special Administrator of the
ESTATE OF BOBBY DALE BARRICK, deceased,
Appellant / Plaintiff

*v.*

DEPUTY MATTHEW KASBAUM;
DEPUTY QUENTIN LEE; and, WARDEN MARK HANNAH,
Appellees / Defendants.

Appeal from the United States District Court for the
Eastern District of Oklahoma
Case No. 23-CV-129-JFH-GLJ. Hon. John F. Heil, III

## CORRECTED RESPONSE BRIEF OF DEFENDANTS-APPELLEES
## MATTHEW KASBAUM AND QUENTIN LEE

Robert S. Lafferrandre, OBA No. 11897
Randall J. Wood, OBA No. 10531
Sheila G. Jessee, OBA No. 33071
Jessica James Curtis, OBA #35140
PIERCE COUCH HENDRICKSON
BAYSINGER & GREEN, L.L.P.
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
*Attorneys for Matthew Kasbaum and Quentin Lee*

**March 24, 2026**

**ORAL ARGUMENT IS REQUESTED**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** .................................................................................................. i

**TABLE OF AUTHORITIES** ....................................................................................... iii

**STATEMENT OF PRIOR OR RELATED APPEALS** ............................................ 1

**RESPONSE BRIEF OF DEFENDANTS/APPELLEES DEPUTIES MATTHEW KASBAUM AND QUENTIN LEE** ................................................ 1

**JURISDICTIONAL STATEMENT** .......................................................................... 1

**STATEMENT OF THE ISSUES** ............................................................................... 2

**STATEMENT OF THE CASE** .................................................................................. 3

    **A. The Events of March 13, 2022** ...................................................................... 3

    **B. Procedural History** ........................................................................................ 5

    **C. Facts Most Relevant to This Appeal** ........................................................ 10

**SUMMARY OF THE ARGUMENT** ....................................................................... 12

**STANDARD OF REVIEW** ...................................................................................... 14

**ARGUMENTS AND AUTHORITIES** .................................................................... 15

    I.   **THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT IN FAVOR OF THE DEPUTIES, AS THEY WERE NOT ACTING UNDER THE COLOR OF STATE LAW** ................................ 16

        **A.**   **Tribes are Sovereign Nations Whose Powers Cannot Be Diminished By the States** ....................................................... 16

        **B.**   **42 U.S.C. § 1983 Was Enacted to Address State Action** ............... 20

C.      State Officers Lack Authority Over Indians in Indian Country and Cannot Act Under Color of State Law During Such Encounters 25

D.      The Cross-Commission Agreement Makes it Clear the Deputies were Acting Pursuant to Tribal Law, Not State Law ........................ 32

II.    THE ESTATE'S ARGUMENTS FAIL BECAUSE THE DEPUTIES' ACTUAL AUTHORITY CONTROLS AND THE ONLY ACTUAL AUTHORITY IN THIS CASE WAS TRIBAL .......................... 34

A.      Apparent Authority Cannot Create Color of State Law Where Actual Authority is Exclusively Derived From a Single Source ... 34

i.      The Color of State Law Inquiry Requires Power Actually Possessed by Virtue of State Law ........................ 35

ii.     The Estate Cannot Use Apparent Authority to Prove Actual Authority, And Even if it Could, it Would Not Demonstrate State Authority in This Case ........................ 39

B.      The District Court Properly Recognized the Primacy of Tribal Authority in Concluding that Governance Rests Exclusively with the Tribe ........................ 43

i.      Officers With Dual Commissions May Only Act Under One Sovereign's Authority at a Time; The Relevant Authority for the Situation Controls ........................ 44

ii.     The Deputies Could Only Have Been Exercising Tribal Authority in This Case ........................ 47

III.   THERE IS NO QUESTION OF FACT ........................ 49

CONCLUSION ........................ 51

CERTIFICATES ........................ 55

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Amoakohene v. Bobko*,
   792 F. Supp. 605 (N.D. Ill. 1992).................................................................45

*Bordeaux v. Lynch*,
   958 F. Supp. 77 (N.D.N.Y. 1997)..............................................................45

*Bressi v. Ford*,
   575 F.3d 891 (9th Cir. 2009) ....................................................................48

*Burrell v. Armijo*,
   456 F.3d 1158 (10th Cir. 2006) ...................................................... 22, 35

*Chapoose v. Hodel*,
   831 F.2d 931 (10th Cir. 1987) ..................................................................47

*Cuyler v. Sullivan*,
   446 U.S. 335 (1980)..................................................................................51

*District of Columbia v. Carter*,
   409 U.S. 418 (1973)....................................................... 20, 21, 53

*Dry v. City of Durant*
   No. 99-7137, 2000 WL 1854140 (10th Cir. Dec. 19, 2000) ....................... 39, 40

*Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero*,
   426 U.S. 572 (1976)..................................................................................47

*Fernandes v. City of Broken Arrow*,
   No. 16-CV-0630-CVE-FHM, 2017 WL 471561 (N.D. Okla. Feb. 3, 2017)  43, 44

*Fisher v. Dist. Ct.*,
   424 U.S. 382 (1976)..................................................................................17

*Fletcher v. United States*,
   116 F.3d 1315 (10th Cir. 1997) ................................................................18

*Griffin v. Maryland*,
   378 U.S. 130 (1964)..................................................................................38

*Guerrero v. Scarazzini*,
  274 Fed. Appx. 11 (2d Cir. 2008)..............................................................................45

*Haaland v. Brackeen*,
  599 U.S. 255, 143 S. Ct. 1609 (2023)........................................................ 22, 23

*Holtz v. Oneida Airport Hotel Corp.*,
  826 F. App'x 573 (7th Cir. 2020) ..............................................................................22

*Johnson v. Orr*,
  780 F.2d 386 (3d Cir. 1986) ........................................................................ 45, 46

*Jones ex rel. Murray v. Norton*,
  No. 2:09-CV-00730-TC-SA, 2010 WL 2990829 (D. Utah July 26, 2010)..........27

*Jones v. Norton*,
  3 F. Supp. 3d 1170 (D. Utah 2014)...........................................................................27

*Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*,
  523 U.S. 751 (1998).....................................................................................................19

*Knopf v. Williams*,
  884 F.3d 939 (10th Cir. 2018) ...................................................................................15

*Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*,
  440 U.S. 391 (1979)..................................................................................... 45, 46

*Lindke v. Freed*,
  601 U.S. 187 (2024)...................................................................................... 37, 38

*Lugar v. Edmondson Oil Co.*,
  457 U.S. 922 (1982)........................................................................ 35, 36, 37, 38

*Majors v. City of Clarksville*,
  113 Fed. Appx. 659 (6th Cir. 2004)..........................................................................45

*Martinez v. Harroun*,
  2024 WL 422785 (D. Colo. 2024)..............................................................................45

*McClanahan v. State Tax Comm'n of Arizona*,
  411 U.S. 164 (1973).....................................................................................................17

iv

*McGirt v. Oklahoma,*
    591 U.S. 894 (2020)....................................8, 13, 14, 19, 25-33, 36, 40, 48, 51, 52

*Michigan v. Bay Mills Indian Community,*
    572 U.S. 782 (2014)....................................................... 16, 17, 18, 19

*Monroe v. Pape,*
    365 U.S. 167 (1961)................................................................ 21, 36

*Morton v. Mancari,*
    417 U.S. 535 (1974)........................................................................23

*Negonsott v. Samuels,*
    507 U.S. 99 (1993)..........................................................................25

*Nesmith v. Fulton,*
    615 F.2d 196 (5th Cir. 1980) ......................................................... 45, 46

*New Mexico v. Mescalero Apache Tribe,*
    462 U.S. 324 (1983)........................................................................17

*Nieto v. Kapoor,*
    268 F.3d 1208 (10th Cir. 2001) .........................................................51

*Oklahoma v. Castro-Huerta,*
    597 U.S. 629 (2022)................................................................ 28, 29, 30

*Pike v. United States,*
    868 F. Supp. 2d 667 (M.D. Tenn. 2012) .............................................45

*Plains Commerce Bank v. Long Family Land & Cattle Co.,*
    554 U.S. 316, 128 S. Ct. 2709 (2008)................................................22

*R.J. Williams Co. v. Ft. Belknap Hous. Auth.,*
    719 F.2d 979 (9th Cir. 1983) .........................................................35

*Rice v. Olson,*
    324 U.S. 786 (1945)........................................................................19

*Rice v. Rehner,*
    463 U.S. 713 (1983)........................................................................19

v

*Romero v. Peterson*,
930 F.2d 1502 (10th Cir. 1991) ...................................................... 41, 42

*Romero v. Peterson,*
No. 93-2073, 1993 WL 375746 (10th Cir. Sept. 27, 1993)..................... 41, 42, 43

*Ross v. Neff,*
905 F.2d 1349 (10th Cir. 1990) .................... 13, 14, 15, 25, 26, 27, 29, 32, 36, 52

*Saint Francis Hospital, Inc. v. Azar*,
476 F. Supp.  (2020) ..................................................................52

*Santa Clara Pueblo v. Martinez*,
436 U.S. 49 (1978)............................................................... 16, 19, 23

*Schaffer v. Salt Lake City Corp.,*
814 F.3d 1151 (10th Cir. 2016) ............................................. 14, 15, 51

*Screws v. United States,*
325 U.S. 91 (1945)............................................................... 36, 45, 46

*Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson*,
874 F.2d 709 (10th Cir. 1989) .............................................................26

*Solem v. Bartlett,*
465 U.S. 463 (1984).......................................................................25

*Tax Comm'n v. Sac & Fox Nation,*
508 U.S. 114 (1993).......................................................................40

*U.S. v. Martin*,
163 F.3d 1212 (10th Cir. 1998) .........................................................47

*U.S. v. Pemberton*,
94 F. 4th 1130 (10th Cir. 2024) ..................................................... 30, 31

*U.S. v. Walker*,
74 F. 4th 1163 (10th Cir. 2023) .........................................................30

*United States v. Baker*,
894 F.2d 1144 (10th Cir. 1990) .........................................................26

*United States v. Classic*,
  313 U.S. 299 (1941).......................................................................... 8, 20, 35

*United States v. Kagama*,
  118 U.S. 375 (1886)................................................................................17

*United States v. Patterson*,
  No. CR-20-71-RAW, 2021 WL 633022 (E.D. Okla. Feb. 18, 2021) ..................27

*United States v. Wheeler*,
  435 U.S. 313 (1978)......................................................................... 17, 18

*Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*,
  790 F.3d 1000 (10th Cir. 2015) ........................................................ 25, 26, 27

*Walden v. City of Duncan*,
  No. CIV-23-1075-PRW, 2025 WL 2701504 (W.D. Okla. Sept. 22, 2025) .......8, 9

*West v. Atkins,*
  487 U.S. 42 (1988)........................................................................... 20, 37

*Williams v. Lee*,
  358 U.S. 217 (1959)................................................................................17

*Worcester v. Georgia*,
  31 U.S. 515 (1832)................................................................................17

*Ysleta Del Sur Pueblo v. Texas*,
  596 U.S. 685, 142 S. Ct. 1929 (2022)................................................................22

**Statutes**

18 U.S.C. § 13................................................................................25

25 U.S.C. § 1321................................................................................26

25 U.S.C. §§ 1301–1303................................................................................23

28 U.S.C. § 636................................................................................7

28 U.S.C. § 1291................................................................................2

28 U.S.C. §§ 1331 and 1343 ...............................................................................1

42 U.S.C. § 1983 .......................5 - 9, 12 - 17, 19 - 25, 34, 35, 37, 39, 45 - 48, 51, 53

U.S. Constitution, Article I, §8, cl. 3 ................................................................18

**Rules**

Fed. R. App. P. 32(a)(5) ....................................................................................56

Fed. R. App. P. 32(a)(6) ....................................................................................56

Fed. R. App. P. 32(a)(7)(B) ..............................................................................56

Fed. R. App. P. 32(f) .........................................................................................56

Fed. R. Civ. P. 56(a) .........................................................................................15

## STATEMENT OF PRIOR OR RELATED APPEALS

Appellees adopt the "STATEMENT OF RELATED CASES" found at p. 6 of Appellant's Opening Brief.

## RESPONSE BRIEF OF DEFENDANTS/APPELLEES DEPUTIES MATTHEW KASBAUM AND QUENTIN LEE

Appellees, Deputy Matthew Kasbaum ("Deputy Kasbaum"), and Deputy Quentin Lee ("Deputy Lee"), submit this Response Brief to the Opening Brief filed by Appellant, Barbara Barrick ("The Estate").

## JURISDICTIONAL STATEMENT

The Appellees agree the District Court has jurisdiction over any federal claim, pursuant to 28 U.S.C. §§ 1331 and 1343. (App. Vol. 1 at 032-33).[1] However, Appellees deny such federal claims can proceed past the jurisdictional bar since the Deputies were not acting under color of state law. (App. Vol. 2 at 0334-335; App. Vol. 20 at 3952).

On September 22, 2025, the Honorable John F. Heil, III, entered summary judgment in favor of the Deputies. (App. Vol. 20 at 3952-3963). The Estate filed a timely notice of appeal. (App. Vol. 20 at 3964).

---

[1] References to the Appellant's submitted Appendix shall be abbreviated as "App. Vol."

1

This Court has jurisdiction under 28 U.S.C. § 1291 because the appeal is taken from a final decision of a United States District Court within the Tenth Circuit, the United States District Court for the Eastern District of Oklahoma.

## STATEMENT OF THE ISSUES

The specific issues on appeal are as follows:

1.      Whether the District Court correctly held Deputies Kasbaum and Lee, as well as Game Warden Mark Hannah ("Appellees"), were not acting under color of state law when they encountered a Choctaw citizen in Indian country, pursuant to tribal authority conferred upon the Appellees through cross-deputization agreements with the Choctaw Nation. (App. Vol. 20 at 3959).

2.      Whether any reasonable jury could conclude the cross-deputized Defendants were acting under color of state law during their encounter with a tribal citizen in Indian country. (App. Vol. 20 at 3957-3958).

Although each issue is distinct, the overarching question is whether the Deputies were acting under color of tribal or state law during the arrest of Bobby Barrick, a tribal citizen, and while in Indian country. (App. Vol. 20 at 3959). As explained below, because the Deputies' power to arrest Barrick existed only by virtue of tribal authority through a cross-deputation agreement, they were acting under color of tribal law, **not state law**.

## STATEMENT OF THE CASE

This case concerns an interaction between Bobby Barrick, a Choctaw Indian, and cross-commissioned Deputies, occurring on tribal land on March 13, 2022. (App. Vol. 1 at 0233-34; App. Vol. 2 at 0403, 0517; App. Vol. 3 at 0590, 0592; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954; Doc. 43, page 8). Because the Deputies were duly appointed as Tribal officers of the Choctaw Nation, they had the authority and power through the cross-deputation agreement to "react immediately to observed violations of the law and other emergency situations in and outside of Indian country within the state of Oklahoma." (App. Vol. 10 at 2168). The cross-deputation agreement also vests the Deputies with the power to enforce "[a]ll federal laws applicable within Indian country, and specifically the signatory Tribes' Indian country […]" (App. Vol. 10 at 2170). The Estate's accusations that Appellees used excessive force resulting in Barrick's later death do not directly impact the question before the Court today. However, a brief synopsis of the incident is appropriate.

### A. The Events of March 13, 2022

On March 13, 2022, Bobby Barrick—a registered member of the Choctaw Nation—engaged in a series of erratic acts in Eagletown, Oklahoma, within the Choctaw Tribe's jurisdiction. (App. Vol. 1 at 0232-0234; App. Vol. 2 at 0323; App. Vol. 20 at 3881-3882, 3955).

Earlier that morning, Deputy Kasbaum responded to assist Barrick after his vehicle became stuck in the mud. Although Barrick appeared to be under the influence of an unknown substance, Barrick was cooperative. Because Barrick's vehicle was immobilized and he posed no immediate threat, he was not arrested. (App. Vol. 2 at 0320; App. Vol. 20 at 3953).

Later that day, events escalated dramatically. High on meth, Barrick ran into a convenience store that had been closed for remodeling, shattered a glass door, fled onto nearby Highway 70, and attempted to highjack a semi-tractor trailer. After the driver shut the engine off, Barrick exited the semi and jumped onto a passing vehicle occupied by a woman and her children. Throughout the episode, Barrick shouted that people were trying to kill him. The contractors and others in the area ultimately subdued Barrick by binding his wrists and ankles together. (App. Vol. 2 at 0320-322; App. Vol. 20 at 3954).

Deputies Kasbaum and Lee were dispatched to the scene, which was approximately 35-40 minutes away from the McCurtain County Sheriff's Office ("MCSO"). EMS was also requested. (App. Vol. 2 at 0322; App. Vol. 20 at 3954).

Upon arrival, the Deputies observed Barrick restrained and yelling. They applied handcuffs, removed the restraints, and attempted to stabilize the situation while awaiting medical assistance. (App. Vol. 2 at 0322-323; App. Vol. 20 at 3954). Within minutes of being on the scene, the Deputies located Barrick's Choctaw

Nation membership card in his pocket. (App. Vol. 2 at 0323; App. Vol. 20 at 3955). There is no dispute Barrick was a tribal citizen, and the events occurred within the Choctaw Tribe's jurisdiction. (Doc. 43, pp. 5-6, 35; App. Vol. 20 at 3953; App. Vol. 20 at 3955, 3960). Game Warden Hannah—also a commissioned Choctaw Nation Tribal Police Officer—arrived on the scene after learning of the disturbance. (App. Vol. 5 at 1165-1166; App. Vol. 9 at 1904; App. Vol. 10 at 2147-2148; App. Vol. 20 at 3955).

It is undisputed that Barrick continued to struggle, yell, and physically resist efforts to restrain and medically evaluate him. During the encounter, Barrick became unresponsive. EMS immediately transported Barrick to a hospital, where he tested positive for meth. He was later transferred to another facility and ultimately died. The medical examiner listed the cause of death as acute respiratory failure due to acute kidney injury, with contributing conditions including bipolar disorder, schizophrenia, and hypertension. (App. Vol. 20 at 3955).

### B. Procedural History

The Estate filed this action against the Board of County Commissioners of McCurtain County, Oklahoma ("BOCC"), McCurtain County Sheriff Kevin Clardy ("Sheriff"), in his official capacity, as well as Deputy Kasbaum, Deputy Lee, Deputy Kevin Storey ("Deputy Storey"), and Game Warden Hannah. The Estate brought claims under 42 U.S.C. § 1983 against the officers for the alleged use of excessive

force, and alleged failure to intervene/stop the use of excessive force against Barrick. The Estate also brought municipal liability claims under § 1983 against the BOCC and the Sheriff.[2]

Game Warden Hannah filed a Motion for Judgment on the Pleadings, arguing Plaintiff could not bring a § 1983 action against him because he was not acting under color of state law during the incident with Barrick. (App. Vol. 1 at 0216-237). However, because the Complaint was silent as to whether Barrick was a member of any Tribe, regarding the cross-deputation agreement, and Game Warden Hannah's cross-commission, the District Court denied this Motion. (App. Vol. 2 at 0290-297, 310).

Following discovery, each of the remaining Defendants[3] filed Motions for Summary Judgment. In their Motions, the Defendants argued the Estate cannot bring a § 1983 claim against the Defendants because § 1983 requires one to be acting under color of state law, and the Deputies were acting under *tribal* law during their encounter with Barrick. (App. Vol. 2 at 0311-767). Since they acted pursuant to their tribal authority, vested in them under the cross-commission agreement, the

---

[2] Upon motion by the BOCC, the District Court dismissed the Estate's municipal claims against the BOCC, as the claims against it and the Sheriff were duplicative. (App. Vol. 1 at 0189-195).

[3] The Estate failed to respond to the Sheriff and Deputy Storey's respective Motions for Summary Judgment and proceeded to voluntarily dismiss its claims against them on June 11, 2025. (App. Vol. 20 at 3875-3878).

Deputies contended Barrick could not establish a viable claim under § 1983. (App. Vol. 2 at 0334-335). It is undisputed Barrick was a Choctaw Indian. (Doc. 43, pp. 5-6, 35; App. Vol. 20 at 3953, 3955, 3960). The encounter occurred on tribal land, and at the time, the Deputies were cross-commissioned with the Choctaw Nation, which authorized them as, <u>tribal officers,</u> to make arrests in Indian country within or near the jurisdiction of the Choctaw Nation Tribe. (App. Vol. 1 at 0232-233; App. Vol. 2 at 0323, 0403, 0517; App. Vol. 3 at 0590, 0592; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954; Doc. 43, pp. 5-6, 8, 35). Without this cross-commissioned status, the Deputies **would not** have had the power to seize or arrest Barrick. (App. Vol. 20 at 3960). Thus, the Deputies were acting under color of **tribal law,** not state law.

The District Court referred the matter to Magistrate Judge Jackson pursuant to 28 U.S.C. § 636. After full briefing and oral argument, the Magistrate issued a detailed Report and Recommendation identifying the relevant question in this case to be "whether the officers were acting under the color of tribal law or state law, or both, *i.e., which* official duties took precedence." (App. Vol. 20 at 3879-94) (emphasis in original). Judge Jackson ultimately concluded because the deputies had jurisdiction to arrest Barrick only by virtue of their cross-commissions as Tribal officers of the Choctaw Nation, the Deputies were exercising authority only possessed by virtue of tribal law. (App. Vol. 20 at 3891-3892). As such, the deputies

7

were not, and could not have been exercising power "possessed by virtue of state law and made possible only because the [alleged] wrongdoer is clothed with the authority of state law;" therefore, there was no § 1983 claim. (App. Vol. 20 at 3892 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The Magistrate recommended summary judgment be granted in favor of the Deputies on this threshold jurisdictional ground. (App. Vol. 20 at 3892).

Following the Magistrate's Report and Recommendation, Judge Wyrick, of the United States District Court for the Western District of Oklahoma, issued an Order on an almost identical issue in *Walden v. City of Duncan*, No. CIV-23-1075-PRW, 2025 WL 2701504 (W.D. Okla. Sept. 22, 2025).[4] In his Order, Judge Wyrick outlined the evidence relevant to the color of law issue, finding: (1) Walden is an Indian; (2) he was arrested on Chickasaw Nation lands; (3) the arresting officer, Officer Archer, was a Chickasaw Lighthorse Special Law Enforcement Commissioned officer at the time of the arrest; and, (4) the Chickasaw Reservation remains Indian country. *Id.* at \*2. As such, Officer Archer "**was incapable** of wielding the power of state law against Walden," pursuant to *McGirt v. Oklahoma*, 591 U.S. 894, 898 (2020), and any authority Officer Archer did exercise over

---

[4] *Walden v. City of Duncan* is currently pending before this Court on appeal.  No. 25-6153.

Walden was pursuant to the authority granted to him by the Chickasaw Nation. *Id.* at *2. (emphasis added).

The question then became whether Officer Archer could be said to have arrested Walden under color of state law, even though he had no legal authority to do so under state law. *Id.* at *2. Judge Wyrick considered the traditional definition of acting under color of state law for purposes of § 1983, which requires a defendant exercise power possessed by virtue of state law and made possible because the defendant was clothed with the authority of state law. *Id.* at *2. Judge Wyrick reasoned Officer Archer was not acting under color of state law because his authority to arrest Walden in Indian country existed **solely** by virtue of his Chickasaw Lighthorse Special Law Enforcement Commission. *Id.* at *2. The Deputies gave notice of Judge Wyrick's Order to the District Court on September 23, 2025. (App. Vol. 20 at 3941-51).

On September 29, 2025, Judge Heil adopted the Report and Recommendation and entered judgment in favor of the Deputies. (App. Vol. 20 at 3952-3963). Judge Heil concluded the Officers necessarily acted under the color of tribal law, not state law, because the officers' only lawful authority over Barrick derived from their tribal commissions. (App. Vol. 20 at 3961). Thus, the Estate's claims failed as a matter of law because § 1983 does not provide a remedy for actions taken under tribal law. (App. Vol. 20 at 3952-3962). Judge Heil addressed each of the Estate's objections

9

in detail, including the Estate's "two hats" argument. (*i.e.,* the argument Deputies could be exercising both state and tribal authority). Judge Heil found even if the deputies could wear two hats simultaneously, the issue is still which authority is primary and legally operative. (App. Vol. 20 at 3961-3962). Because state authority was legally unavailable, Judge Heil correctly found tribal authority was necessarily exclusive and controlling. (App. Vol. 20 at 3961).

This appeal followed.

**C. Facts Most Relevant to This Appeal:**

The Estate devotes nearly 40 pages to irrelevant factual recitations and policy excerpts which do not speak to the core issue before the Court today, which is whether the Deputies were acting pursuant to their authority as tribal officers or state officers. The *undisputed* material facts relevant to such a question are as follows:

- Lori's Corner Store, where this incident occurred, is located in Eagletown, Oklahoma, and is located within the jurisdiction of the Choctaw Nation of Oklahoma. (App. Vol. 1 at 0232-233; App. Vol. 2 at 0323; App. Vol. 20 at 3955).

- The MCSO has a Deputation Agreement with the Choctaw Nation of Oklahoma, which authorizes MCSO officers to provide law enforcement services and to make arrests in Indian country within the boundaries of the Choctaw Nation. This agreement was in place at the time of this incident. (App. Vol. 2 at 0403, 0517; App. Vol. 3 at 0590, 0592; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954; Doc. 43, page 8).

- At the time of this incident, Barrick was a member of the Choctaw Tribe. (Doc. 43, pp. 5-6, 35; App. Vol. 20 at 3953, 3955, 3960).

- Deputies Kasbaum, Lee, and Game Warden Hannah were each cross-commissioned officers with the Choctaw Nation at the time of this incident. Their status as cross-commissioned officers empowered them to "enforce [a]ll federal laws applicable within Indian country, and specifically the signatory tribes' Indian country […]." (App. Vol. 2 at 0403, 0517; App. Vol. 3 at 0588-590, 0592; App. Vol. 4 at 0824; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954-3955; Doc. 43, page 8).

The Cross-Deputation Agreement makes unmistakably clear any authority exercised by state officers over Indians in Indian country is derived exclusively from the Choctaw Nation, not the State of Oklahoma. (App. Vol. 10 at 2163-2176). The agreement expressly states it is the Choctaw Nation alone that deputizes and commissions the officers in question. Specifically, the agreement states:

> The Tribes have enacted tribal resolution(s) to authorize(s) the appropriate entity or individual to enter into this Agreement on the Tribe's behalf and to authorize the Tribal Law Enforcement Officers, and/or Officers of the State of Oklahoma, and its political subdivisions, under a BIA Special Law Enforcement Commission (SLEC) issued through the Secretary of the Interior, to enforce federal laws in Indian country. Pursuant to an appropriate tribal resolution, any of the law enforcement agencies will also be **authorized to enforce tribal law**.

(App. Vol. 10 at 2167).

Further, the agreement makes it clear the commissioned officer's authority arises from the Tribe's inherent sovereign power, not state statute, and commissioned officers are treated as Bureau of Indian Affairs ("BIA") officers.

11

> Such commissions shall grant the officers the same law enforcement authority as that of officers of the entity issuing the commission […]. (App. Vol. 10 at 2168).

> A commission issued by the BIA under this agreement shall not be used to invoke any State of Oklahoma authority. (App. Vol. 10 at 2170).

> Officers holding SLEC's are treated as BIA police officers for enforcing Federal laws. (App. Vol. 10 at 2171).

Finally, the agreement provides that its purpose is to authorize state law enforcement officers to assist the BIA in its duties. (App. Vol. 10 at 2167).

Therefore, to determine the source of the authority under which the Deputies were acting, this Court need not look any further than these facts. During the encounter with Barrick, the Deputies were acting under color of tribal law, not State law. This directly defeats the Estate's § 1983 claim.

## SUMMARY OF THE ARGUMENT

The District Court correctly granted summary judgment because the Estate cannot satisfy § 1983's threshold requirement that the Deputies acted "under color of state law." The undisputed facts are dispositive: the Deputies encountered Barrick, a tribal citizen, on Indian land, pursuant to authority delegated exclusively by the Choctaw Nation under a cross-deputization agreement. (App. Vol. 2 at 0403, 0517; App. Vol. 3 at 0590, 0592; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954-3955; Doc. 43, page 8). State officers have no inherent authority to exercise criminal jurisdiction over Indians in Indian country, a principle

12

long settled and reaffirmed in *McGirt*. The Tenth Circuit has likewise confirmed states lack independent authority to enforce their own laws over Indians on Indian land. *Ross v. Neff*, 905 F.2d 1349, 1353 (10th Cir. 1990). State authority, therefore, cannot furnish the basis for an arrest of an Indian on tribal land. The only authority capable of empowering this arrest was the tribal authority granted to the Deputies by the Choctaw Nation through the cross-commission agreement.

The distinction of where the Deputies derived their authority is dispositive under § 1983, as it undoubtedly only applies to officials acting "under color of state law," a fact Barrick does not dispute. Yet Barrick asks this Court to find the Deputies were acting under color of state law for the purpose of a § 1983 claim, based on their "apparent" state authority, and the theory the Deputies were acting simultaneously under both state and tribal law. Both arguments fail. Apparent authority is irrelevant because the controlling question is the actual source of authority exercised. There is also no legal support for the assertion the Deputies could have been acting pursuant to both authorities at once. The Deputies' actions inside the Choctaw Nation were rooted exclusively in the Choctaw Nation's grant of authority. Thus, the color of state law requirement of § 1983 cannot be met.

The Estate's attempt to reframe clearly immaterial facts as "disputes" is a transparent effort to avoid summary judgment. Crowd hostility, medical concerns, officer motivations, and handwritten statements have nothing to do with the source

13

of authority the Deputies exercised. The Estate uses volume in place of substance, but Rule 56 does not reward such distractions.

The Estate's remaining arguments manufacture disputes where none exist. The Estate concedes the Deputies were cross-deputized while on tribal land, and while engaging with a tribal citizen.  (App. Vol. 2 at 0403, 0517; App. Vol. 3 at 0590, 0592; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954-3955; Doc. 43, page 8). Under *Ross* and *McGirt* that concession ends the inquiry. Rule 56 requires a genuine dispute as to a material fact, not merely any fact, and the source of the Deputies' authority is the only fact that matters here. Because the State had no jurisdiction to give, it could not have been the source of any power exercised. The Estate's entire § 1983 claim collapses because it cannot satisfy the single most basic element of its claim—state action.  The District Court evaluated all material facts and correctly concluded none created a triable issue, reaching the only conclusion the law and undisputed facts allow.

The judgment below should be affirmed.

### **STANDARD OF REVIEW**

The Tenth Circuit reviews a district court's grant of summary judgment *de novo*, using the same legal standard applied below. *Schaffer v. Salt Lake City Corp.,* 814 F.3d 1151, 1155 (10th Cir. 2016). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant

14

is entitled to judgment as a matter of law." *Id*. (citing Fed. R. Civ. P. 56(a). In applying this standard, the Court "view[s] the facts in the light most favorable to the non-moving party and resolve[s] all factual disputes and reasonable inferences in [his] favor." *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018) (internal quotation marks omitted).

## ARGUMENTS AND AUTHORITIES

This case turns on a single dispositive fact: the Deputies acted pursuant to their tribal authority during this encounter with Barrick, an Indian, in Indian country. This Court has long recognized state law enforcement officers have no jurisdiction to arrest an Indian in Indian country. *See, e.g, Ross*, 905 F.3d at 1353. Because the Deputies' authority derived from their tribal cross-commission status, they could not have acted under color of state law for the purposes of a § 1983 claim. The Estate claims there are factual issues that make summary judgment inappropriate. However, there are only three relevant facts, all of which are undisputed. The Deputies were cross-commissioned officers with the Choctaw Nation of Oklahoma. Further, Barrick was an Indian, and the encounter took place in Indian country. Because the only authority legally available to the Deputies was tribal, they could not have been acting under the color of state law for the purpose of a § 1983 claim.

**I.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT IN FAVOR OF THE DEPUTIES, AS THEY WERE NOT ACTING UNDER THE COLOR OF STATE LAW**

The Estate's case is fundamentally defective because it cannot establish the first irreducible requirement of a § 1983 claim: that the Deputies acted under color of state law. Despite devoting nearly 40 pages to its Statement of Facts, the Estate **<u>never</u>** identifies a single action taken by the Deputies that could have been lawfully exercised under state authority against a tribal citizen inside Indian country. The absence of state jurisdiction is not a detail. It is dispositive.

The importance of tribal sovereignty, the limited scope of § 1983, the absence of state authority over Indians in Indian country, and the unambiguous terms of the Cross-Deputation Agreement all point to the same conclusion: the Deputies were acting pursuant to tribal authority, not state authority, and § 1983 cannot reach their conduct. Each of these principles independently forecloses the Estate's claim, and together they leave no doubt the District Court reached the only conclusion the law and undisputed facts allow.

**A. Tribes are Sovereign Nations Whose Powers Cannot Be Diminished By The States**

A review of the foundation doctrines of federal Indian law reinforces the status of Indian Tribes as sovereigns. Tribes continue to exist as "separate sovereigns pre-existing the Constitution." *Michigan v. Bay Mills Indian Community,* 572 U.S. 782, 788 (2014) (quoting *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 56 (1978)). The

16

Tribes' sovereign powers include "'the power of regulating their internal and social relations.'" *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 332 (1983) (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886)). Tribes are recognized as "distinct independent political communities" with their own laws, customs, and governance. *Worcester v. Georgia*, 31 U.S. 515, 557 (1832). Tribal powers "exist by reason of their original tribal sovereignty." *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978).

It is equally well settled that subjecting Indians in Indian country to state jurisdiction would impermissibly intrude on tribal sovereignty. As the Supreme Court explained, "to allow the exercise of state jurisdiction [over Indians] would undermine the authority of the Tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves." *Williams v. Lee*, 358 U.S. 217, 223 (1959). Likewise, the Supreme Court has held "[s]tate court jurisdiction plainly would interfere with the [Tribal] powers of self-government" by placing Indians "in Indian country […] subject to a forum other than the one they have established for themselves." *Fisher v. Dist. Ct.*, 424 U.S. 382, 387-88 (1976) (per curiam). Thus, the principle of Tribal self-government necessarily entails a "concomitant jurisdictional limit on the reach of state law." *McClanahan v. State Tax Comm'n of Arizona,* 411 U.S. 164, 171 (1973).

17

These basic principles operate alongside Congress' exclusive constitutional authority over Indian affairs. The Constitution codifies federal supremacy over Indian affairs. U.S. Constitution, Article I, §8, cl. 3 provides "[t]he Congress shall have Power […] to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The governing rule is "unless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Bay Mills*, 572 U.S. at 788 (quoting *Wheeler*, 435 U.S. at 200).

The Estate cites to the Oklahoma Constitution and an Attorney General opinion as supporting its argument Appellees were acting under color of state law. But Indian tribes are not bound by state constitutions or attorney general opinions. Tribal sovereignty operates independently of state authority and is a matter of federal law. *Bay Mills*, 572 U.S. at 789. The Tenth Circuit recognizes tribes are "unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *Fletcher v. United States*, 116 F.3d 1315, 1324, n. 12 (10th Cir. 1997). This principle establishes tribal governments exercise powers flowing from their inherent sovereignty rather than from the federal or state constitutions. Thus, neither the Oklahoma Constitution nor the Attorney General's opinion have the authority to diminish the Choctaw Nation's sovereignty.

A "fundamental commitment of Indian law is judicial respect for Congress's primary role in defining the contours of tribal sovereignty." *Bay Mills*, 572 U.S. at

18

803 (citing *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 758-60 (1998); *Santa Clara Pueblo*, 436 U.S. at 60; Cohen's *Handbook of Federal Indian Law* § 2.01[1] at 110 (2012 ed.)). Moreover, as the Supreme Court has made clear, "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Rice v. Rehner*, 463 U.S. 713, 719 (1983) (internal citations omitted). "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." *McGirt,* 591 U.S. at 928 (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945)). The Supreme Court in *McGirt* held the state cannot try Indians for conduct on their lands absent "clear expression of the intention of Congress." *McGirt*, 591 U.S. at 929. This is a well settled rule of federal law solidifying Congress's exclusive constitutional authority over Indian tribes. "Although Congress has plenary authority over tribes, courts will not lightly assume Congress in fact intends to undermine Indian self-government." *Bay Mills*, 572 U.S. at 790.

Tribes retain authority to regulate conduct, maintain law and order, and protect the health and welfare of tribal members and those who enter Indian country. This means Tribes retain all powers of self-government unless they voluntarily relinquish them by treaty, or Congress **"clearly"** takes them away. Neither states, nor courts can diminish tribal sovereignty. Only Congress may do so.

**B. 42 U.S.C. § 1983 Was Enacted to Address State Action**

The Estate's claim fails at the threshold because § 1983 imposes an absolute jurisdictional prerequisite: the Defendants must have acted under color of state law. The Estate admits § 1983 only applies to state action. Nevertheless, it tries to use § 1983 as a broad tort remedy to address the tribal action in this case. Its scope is explicitly limited to wrongs committed "under color of state law." The text Congress enacted stated liability attaches only when a Defendant acts **"under color of any statute, ordinance, regulation, custom, or usage of any State […]."** 42 U.S.C. § 1983 (emphasis added). This language was deliberate and makes clear the statute was designed to give individuals a federal cause of action when a state-empowered official violated federal constitutional rights. The Supreme Court has long defined such action "under color of state law" as the exercise of power "**possessed by virtue of state law** and made possible only because the wrongdoer is clothed with the authority of state law." *West v. Atkins,* 487 U.S. 42, 49 (1988) (emphasis added) (quoting *United States v. Classic,* 313 U.S. at 326).

Section 1983 traces back to § 1 of the Civil Rights Act of 1871, which was enacted after the Civil War to address the "the unwillingness or inability of the state governments to enforce their own laws against those violating the civil rights of others." *District of Columbia v. Carter,* 409 U.S. 418, 426 (1973). Specifically, it was intended to address state actors in the post-Civil War South's refusal to protect

20

the constitutional rights of newly freed African Americans. Congress ultimately viewed § 1983 as a mechanism "to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, state laws might not be enforced" and constitutional rights might be denied. *Id.* at 429 (quoting *Monroe v. Pape*, 365 U.S. 167, 180 (1961). Prior to § 1983, there was no remedy available to right such wrongs.

The Supreme Court's decision in *Carter*, emphasizes § 1983 is restricted to state action. *Carter,* 409 U.S. at 424. The Court in *Carter* explained § 1983 was enacted to enforce the Fourteenth Amendment, which only applies against the state or those acting under the color of its authority. *Carter*, 409 U.S. 423-24. The Supreme Court further explained the Fourteenth Amendment only applied to actors clothed with state authority—not federal actors, private actors, or any other actors. In *Carter*, the Plaintiff attempted to bring a § 1983 action based on the actions of officers in the District of Columbia. The Supreme Court rejected the claim outright, explaining because the "District of Columbia was not a 'State' within the meaning of the Fourteenth Amendment, neither the District, nor its officers are subject to its restrictions." *Id.* at 424. Thus, even though the District of Columbia is a governmental entity composed of U.S. citizens, its officials were not subject to § 1983 because their authority was not derived from a State. *Id.* The history and the Court's interpretation of § 1983 make clear it is a remedy for the abuse of state

21

authority. It was not designed to provide a federal cause of action for any exercise of any non-state governmental power.

This distinction is especially important in this case, as this case arises within the context of tribal sovereignty. Tribes are not arms of the state; but instead, are their own distinct sovereign entities whose authority continues, except when expressly limited by Congress. *See, Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327, 128 S. Ct. 2709 (2008) ("Indian tribes are 'distinct independent political communities.'"); *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 689, 142 S. Ct. 1929 (2022) (internal citations omitted) ("Native American Tribes possess 'inherent sovereign authority over both their members and their territories.'"); *Haaland v. Brackeen*, 599 U.S. 255, 272, 143 S. Ct. 1609 (2023) ("In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as 'plenary and exclusive.'") (internal citations omitted).

Thus, § 1983 was not enacted to serve as a mechanism for individuals to sue tribal officers for alleged violations of constitutional rights. The Tenth Circuit is clear on this issue, as it has explicitly stated § 1983 "is unavailable for persons alleging deprivation of constitutional rights under tribal laws." *Burrell v. Armijo*, 456 F.3d 1158, 1174 (10th Cir. 2006). Officers do not act under color of state law when they manage tribal affairs. *Holtz v. Oneida Airport Hotel Corp.*, 826 F. App'x 573, 575 (7th Cir. 2020), *reh'g denied* (Nov. 10, 2020).

Congress's enactment of the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301–1303, further illustrates the distinction. Rather than subject tribes or tribal officers to § 1983, Congress created a separate framework to provide certain constitutional protections within tribal governance. The purpose of ICRA was to "secur[e] for the American Indian the broad constitutional rights afforded to other Americans," while simultaneously promoting the "well-established federal policy of further Indian self-government." *Santa Clara*, 436 U.S. at 62 (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). The ICRA framework provides a limited federal remedy, habeas corpus, in order to balance the interests of individuals and avoid undue interference with tribal self-governance. *Id*. at 64-68.

When viewed together, the history and text of § 1983 and the enactment of the ICRA demonstrates § 1983 extends only to state action. When federal remedies are extended to the point they impact tribal governance, Congress does so explicitly and within narrow parameters. Had Congress wanted to include cross-commissioned officers within the scope of § 1983, it had plenary power to do so. *Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023). Illustrating Congress' power to expand § 1983, after *Carter*, Congress amended the language of § 1983 to include the District of Columbia. Here, Congress has not included tribal authority within the scope of § 1983. Instead, it limited it to action taken under color of state law.

23

Accordingly, when an officer acts pursuant to tribal authority—even if that officer is simultaneously employed by a state agency—he does not act "under color of state law" for purposes of § 1983. This is especially true when the officer's authority to enforce laws against Indians in Indian country exists solely by virtue of tribal authority granted to the officer by the Tribe through a cross-deputization agreement. To hold otherwise would expand § 1983 beyond its historical purpose by imposing liability where no state authority was exercised, effectively transforming every cross-commission into a basis for federal suit, despite the officer's actions being undertaken solely under tribal law.

The fact the Deputies were employed by MCSO is not enough to establish a § 1983 claim. In *Carter*, the officials were government employees and exercised government functions but were not acting under "state" authority. Similarly, the Deputies were employed by the State, but the authority they exercised when interacting with Barrick came exclusively from their tribal commissions while acting in a Sovereign jurisdiction where state authority does not exist. Because Oklahoma law did not confer any authority (as further explained in Section C) on the Deputies to act against an Indian (Barrick) in Indian country (Eagletown, Oklahoma), the Deputies could not have been acting under color of Oklahoma law. This ends the inquiry.

*Carter* is dispositive: if there is no state authority, there can be no action taken under color of state law. If there is no action under color of state law, there can be no § 1983 claim.

## C. State Officers Lack Authority Over Indians in Indian country and Cannot Act Under Color of State Law During Such Encounters

The District Court correctly noted the Deputies only had the authority to arrest Barrick, an Indian, in Indian country due to the authority vested in them by the Choctaw Nation. (App. Vol. 20 at 3879-3894, 3952-3962). As such, the authority they were acting could only have been tribal. The Estate argues the court applied an incorrect statement of law. This claim is unsupported. The State's lack of criminal jurisdiction over Indians in Indian country is not unsettled or in question. It is one of the bedrock principles in Indian law and has been repeatedly affirmed.

"State courts generally have no jurisdiction to try Indians for conduct committed in 'Indian country.'" *McGirt,* 591 U.S. at 898 (citing *Negonsott v. Samuels,* 507 U.S. 99, 102-103 (1993)); *see also, Ross,* 905 F.2d at 1353 (10th Cir. 1990) ("The Supreme Court has expressly stated state criminal jurisdiction in Indian country is limited to crimes committed 'by non-Indians against non-Indians […], and victimless crimes by non-Indians.'") (quoting *Solem v. Bartlett,* 465 U.S. 463, 465 n. 2 (1984) (citing to 18 U.S.C. § 13)). In *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000 (10th Cir. 2015), state and county officials prosecuted tribal members for crimes inside reservation boundaries. The

Tenth Circuit found such an imposition of state power inflicts irreparable injury. *Ute*, 790 F.3d at 1005. The Court held where "states seek to enforce state law against Indians in Indian country, '[t]he presumption and the reality […] are that federal law, federal policy, and federal authority are paramount.'" *Id.* at 1008-1009 (*citing Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel. Thompson*, 874 F.2d 709, 713 (10th Cir. 1989)).

While *McGirt* specifically held States lack jurisdiction to try Indians for conduct created in Indian country, *Ross* held a deputy sheriff had no jurisdiction to arrest an Indian in Indian country. *Ross*, 905 F.2d at 1352. The Tenth Circuit found where there has been no express delegation of jurisdiction to the State by the Tribe or by Congress, the sheriff and subordinate police officers had no jurisdiction to arrest the plaintiff. *Id*. (citing *United States v. Baker*, 894 F.2d 1144, 1146 (10th Cir. 1990)). Thus, the Court in *Ross* found the arrest of an Indian in Indian country is unconstitutional because "[a] warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause." *Id.* at 1354.

> Indian country is subject to exclusive federal or tribal criminal jurisdiction except as otherwise expressly provided by law. Congress has granted general criminal jurisdiction to some states over Indian country within their borders, but *no such provision has been made for Oklahoma*. Congress has also provided, now in 25 U.S.C. § 1321, a statutory method by which a state, with the consent of the tribe, can assume jurisdiction over Indian country. *Oklahoma, however, has not*

26

> *acted to assume jurisdiction by this method* [...] *because the state of Oklahoma has neither received by express grant nor acted pursuant to congressional authorization to assume criminal jurisdiction over this Indian country*, Adair County, its sheriff, and its subordinate police officers had no jurisdiction to arrest [an Indian for a crime in Indian country].

*Ross*, 905 F.2d at 1352 (emphasis added; some internal quotes and citations omitted).

Similarly, in *Jones v. Norton*, the court found any seizure by state or municipal law enforcement officers of an Indian in Indian country was "unreasonable as a matter of law," absent a cross-deputation agreement authorizing such seizure or exigent circumstances. *Jones v. Norton*, 3 F. Supp. 3d 1170, 1185–86 (D. Utah 2014), aff'd, 809 F.3d 564 (10th Cir. 2015). *See also, United States v. Patterson*, No. CR-20-71-RAW, 2021 WL 633022, at *3 (E.D. Okla. Feb. 18, 2021), Aff'd, No. 21-7053, 2022 WL 17685602 (10th Cir. Dec. 15, 2022) ("In light of the *McGirt* decision, there is no doubt that the state court lacked jurisdiction to issue the search warrant in this case and, in the absence of a properly effectuated cross-deputization agreement, that Deputy Youngblood lacked jurisdictional authority to arrest Defendant."); (*Jones ex rel. Murray v. Norton*, No. 2:09-CV-00730-TC-SA, 2010 WL 2990829, at *3 (D. Utah July 26, 2010) (Detective did not have jurisdiction to seize Murray on the Uintah-Ouray Reservation).

Because state officers lack jurisdiction to enforce state laws against Indians in Indian country, many tribes, such as the Choctaw Nation, have entered into cross-commission agreements vesting individual state law enforcement officers with the

27

authority to enforce tribal law within tribal land **as tribal officers.** Indeed, the

Deputation Agreement states as much:

> Such commissions shall grant the officers the same law
> enforcement authority as that of officers of the entity issuing
> the commission […].

(App. Vol. 10 at 2168). The agreement specifically states the cross-deputation is to

authorize state law enforcement officers to assist the Bureau of Indian Affairs **in its**

**duties**. (App. Vol. 10 at 2167). In addition, the cross-commission cards issued by

the Choctaw Nation indicate the Deputies have been sworn in as tribal Police

Officers for the Choctaw Nation of Oklahoma. App. Vol. 3 at 0588-590; App. Vol.

4 at 0824).

The Estate repeatedly cites *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022)

as if it expanded state power over tribal citizens. It did not. *Castro-Huerta* only

applies to non-Indian defendants. In *Castro-Huerta*, the defendant (a non-Indian)

was charged with committing child abuse against an Indian in Indian country.

In *Castro-Huerta,* the defendant argued, following *McGirt*, the Federal

Government's jurisdiction over him was exclusive, and the State lacked jurisdiction

to prosecute him. The question before the Supreme Court was specific: does a State

have concurrent jurisdiction with the Federal Government to prosecute crimes

committed by ***non-Indians*** against Indians in Indian country. *Castro-Huerta*, 597

U.S. at 635. (emphasis added). The Supreme Court ultimately held the State and

28

Federal Governments have concurrent jurisdiction to prosecute ***non-Indians*** who commit crimes against Indians in Indian country. *Id.* at 656. Nothing in *Castro-Huerta* authorizes state jurisdiction over crimes committed by Indians in Indian country. By repeatedly invoking *Castro-Huerta* without acknowledging its explicit limitation to non-Indian Defendants, the Estate presents a materially misleading argument. *Castro-Huerta* has no effect whatsoever on this case because Barrick was, without dispute, an Indian who was committing crimes in Indian country. The District Court also rejected the Estate's reliance upon *Castro-Huerta*. As the District Court concluded, *Castro-Huerta* applies only to non-Indian Defendants. State jurisdiction over Indians in Indian country remains barred. Because Barrick was an Indian, the District Court correctly found the rules of *McGirt* and *Ross* apply. (App. Vol. 20 at 3879-3894, 3952-3962).

The Estate also cites *Castro-Huerta* as holding that under the General Crimes Act, both the State and the Federal Government have concurrent jurisdiction over crimes committed in Indian country. While the Supreme Court in *Castro-Huerta* did find concurrent jurisdiction could exist, the Supreme Court was explicit that concurrent jurisdiction applied only to a Non-Indian Defendant committing crimes in Indian country. Nothing in *Castro-Huerta* dealt with concurrent jurisdiction over Indians who committed a crime in Indian country. In fact, the Supreme Court explicitly confirmed this issue was **not** before them. In footnote 2, the Supreme

29

Court stated "[t]o the extent that a State lacks prosecutorial authority over crimes committed by Indians in Indian country (a question not before us) […]." *Castro-Huerta*, 597 U.S. at 640, f.n. 2.

The Estate's reliance upon *U.S. v. Walker*, 74 F. 4th 1163 (10th Cir. 2023), and *U.S. v. Pemberton*, 94 F. 4th 1130 (10th Cir. 2024), is also misplaced. The Estate argues the District Court's conclusion that state law enforcement officers do not have jurisdiction to arrest Indians in Indian country is based on an incorrect statement of law. (Doc. 43, p. 60). Once again, the Estate misunderstands the law. In *Walker*, the defendants were initially charged in state court. However, following the Supreme Court's decision in *McGirt*, the State dismissed its charges, and the defendants were indicted by a federal grand jury. Neither of the defendants argued jurisdiction was improper, nor did the Court consider this issue. Instead, the defendant in *Walker* was merely challenging the constitutionality of the statute under which he was convicted. In a single footnote, the Tenth Circuit noted prior to *Castro-Huerta*, there was a general belief the State lacked jurisdiction over crimes committed by Indians, or against Indians in Indian country. The Court noted that in *Castro-Huerta*, the Supreme Court recognized the State has concurrent jurisdiction over crimes committed by non-Indians against Indians in Indian country. The Estate mistakenly cites to this single footnote as part of the Court's holding. However, jurisdiction to prosecute was not an issue in this case. Instead, the Court merely noted why the

30

Defendants' state charges had been previously dismissed. This is pure dicta, and does nothing to support the Estate's argument the District Court erred in granting summary judgment to the Deputies.

Similarly, *Pemberton* does nothing to advance the Estate's argument. The defendant in *Pemberton* was initially charged and convicted in State Court prior to *McGirt.* Following the Supreme Court's decision in *McGirt,* Pemberton sought to have his conviction vacated, as he was a tribal member who committed a crime in Indian country. While state habeas proceedings were pending, Pemberton was indicted in federal court. Pemberton moved to suppress evidence and statements gathered throughout the state investigation since neither the county, nor the state had jurisdiction to investigate, arrest, or interrogate Indians in Indian country. The Tenth Circuit affirmed the District Court's denial of suppression of evidence because the investigation took place in 2004, 16 years prior to *McGirt,* and it was the prevailing factual and legal landscape at the time that the State did have authority to investigate. Although *McGirt* later held the State did not have this authority, the officers were acting consistently with the belief of what the law was believed to be at that time. Thus, the Tenth Circuit affirmed the denial of Pemberton's request to suppress the evidence gathered on tribal lands by state officers. *Pemberton*, 94 F. 4th at 1134-35. Nothing in *Pemberton* changes the analysis in the instant case. Instead, it reinforces the District Court's finding the Deputies were entitled to summary judgment.

31

While none of the Estate's cited authorities answer the question of who has authority to prosecute Indians for crimes committed in Indian country, the Supreme Court has already emphatically answered this question. In *McGirt*, the Supreme Court held "[s]tate courts generally have no jurisdiction to try Indians for conduct committed in 'Indian Country'" *McGirt,* 591 U.S. at 898. The Court has never retreated from *Ross* or *McGirt*.

Here, the Estate admits Barrick was a tribal citizen who was committing crimes in Indian country. Applying *McGirt*, the answer is clear: Oklahoma lacks jurisdiction over crimes committed by Indians (Barrick) in Indian country (Eagletown, Oklahoma). Thus, if Oklahoma lacked authority to enforce state law against Barrick, then it could not have delegated such authority to the Deputies. Accordingly, the Deputies could not have possibly been acting pursuant to state authority during their encounter with Barrick. The District Court recognized this. The Estate refuses to.

## D. The Cross-Commission Agreement Makes it Clear the Deputies were Acting Pursuant to Tribal Law, not State Law.

The law is clear where the Deputies' source of authority originated. The cross-deputation agreement is also abundantly clear: any authority exercised by state officers over Indians in Indian country derives exclusively from the Choctaw Nation, not the State of Oklahoma. (App. Vol. 10 at 2163-2176). The agreement expressly states that the Choctaw Nation is the sovereign granting authority, and it is the

Choctaw Nation that deputizes the designated officers. (App. Vol. 10 at 2167). The agreement is explicit in stating that cross-commissioned officers are vested with the same authority as BIA officers. (App. Vol. 10 at 2168). It also specifically denounces the source of authority as being State authority:

> A commission issued by the BIA under this agreement shall not be used to invoke any State of Oklahoma authority. (App. Vol. 10 at 2170).

The agreement authorizes the cross-commissioned officers to: (1) enforce Choctaw Nation laws; (2) detain, arrest, transport, and investigate tribal members; (3) perform law enforcement duties within Indian country; and, (4) exercise tribal authority within Indian country. (App. Vol. 10 at 2163-2176). These powers exist **only** because of the Tribe's delegation of the Tribe's authority to the Deputies. They are not powers the State can confer, because Oklahoma lacks such authority. *McGirt,* 591 U.S. at 894.

The agreement also provides for the oversight of the cross-commissioned officers by the Choctaw Nation. The agreement provides that issuance and revocation of the commissions are at the "sole discretion of the issuing agency party to this agreement." (App. Vol. 10 at 2169-2170). The agreement also requires the cross-commissioned officers to comply with Choctaw Nation policies, procedures, and reporting requirements. (App. Vol. 10 at 2171). This confirms the Choctaw

33

Nation, not the State, controls the cross-commissioned officers when exercising the Tribe's delegated authority.

Nowhere in the agreement does the agreement incorporate or invoke Oklahoma authority. Instead, it explicitly states the authority being exercised is tribal authority, not State authority. (App. Vol. 10 at 2170, 2173). Thus, while the officer may retain state or county employment, the source of power over Indians in Indian country is exclusively tribal.

## II. THE ESTATE'S ARGUMENTS FAIL BECAUSE THE DEPUTIES' ACTUAL AUTHORITY CONTROLS, AND THE ONLY ACTUAL AUTHORITY IN THIS CASE WAS TRIBAL

The Estate relies on two theories to support its contention that the Deputies could have been acting under the color of state law. First, the Estate argues the Deputies' apparent authority meets the under color of state law requirement. Second, the Estate claims Deputies were acting pursuant to both state and tribal authority, and as such, a Section 1983 claim remains. Both of these issues were properly addressed and ultimately rejected by the District Court, as neither theory can overcome the fact that the only actual authority the Deputies had was granted by the Tribe, and § 1983 does not apply to such conduct.

### A. Apparent Authority Cannot Create Color of State Law Where Actual Authority is Exclusively Derived From a Single Source

The Estate asks this Court to consider a variety of factors, such as what the Deputies were wearing, what cars they were driving, and which employer they were

"on the clock for;" and claims they have presented "more than enough evidence" that a jury could find the Deputies were "cloaked" in the pretense of state authority. (Doc. 43, p. 51). But, this analysis skips a crucial first step: determining where the Deputies' actual authority originated. This step is essential because, without it, any individual could be subject to a § 1983 claim simply based on appearance, which is not, and never has been, the intention of § 1983. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). Skipping this step would subject Deputies acting within their tribal authority to § 1983 claims, which was never intended to reach tribal action. *Burrell,* 456 F.3d at 1174 (quoting *R.J. Williams Co. v. Ft. Belknap Hous. Auth.,* 719 F.2d 979, 982 (9th Cir. 1983)). In this case, the Deputies' actual authority did, and only could, stem from the authority granted to them by the Choctaw Nation. The source of authority is dispositive in this case, and this Court need not reach the question of whether the Deputies appeared to be clothed in state authority at all.

### i.   The Color Of State Law Inquiry Requires Power Actually Possessed by Virtue of State Law

The requirements of actual state authority of some kind traces back to the beginning of § 1983. The concept of action "under color of" state law was first articulated in *Classic*, in which the Supreme Court held "[m]isuse of power, **possessed** by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Classic*, 313 U.S. at 326 (emphasis added). The Supreme Court has continued to rely

35

on this foundational definition throughout the years and has made clear the power exercised **must** be possessed by virtue of state law. *See Screws v. United States,* 325 U.S. 91, 110 (1945)*, Monroe v. Pape,* 365 U.S. 167, 184 (1961), *West,* 487 U.S. at 49.

The color of state law inquiry, therefore, asks not just whether an officer holds a position with the state, but whether the challenged conduct was performed in the exercise of duties state law actually authorized. The answer in this case is no. As previously discussed, any actions taken by the Deputies with respect to Barrick were not authorized by the State, because the State has no criminal jurisdiction over Indians in Indian country, a principle repeatedly affirmed by this Court and the Supreme Court. *See Ross*, 905 F.2d at 1352–53; *McGirt*, 591 U.S. at 898 (2020). The only power the Deputies could have been acting pursuant to was the authority vested in them by their cross-commission with the Choctaw Nation.

The Estate asks this Court to consider factors beyond the source of authority, such as the cars the Deputies were driving, the uniforms they were wearing, and their employer. But the source of their authority is dispositive, as actual state authority of some kind is a prerequisite. *Lugar* establishes the framework confirming this. 457 U.S. at 922. In *Lugar*, the Supreme Court set forth a two-part test to determine what actions may be "fairly attributed to the State." *Id*. at 937. First, the deprivation must be caused by the exercise of a right or privilege having its source in state authority;

36

and, second, the party charged must be a person who may fairly be said to be a state actor. *Id*. In this case, the authority the Deputies exercised to act against Barrick had no source in state authority. Thus, the Estate cannot reach the second prong, and the superficial indicia it relies upon to attempt to overcome this flaw is insufficient.

The Supreme Court reaffirmed this framework most recently in its unanimous decision in *Lindke v. Freed*, 601 U.S. 187 (2024). In *Lindke,* the Court held a state official engages in state action under § 1983 only if he "(1) possessed actual authority to speak on the State's behalf on a particular matter, and (2) purported to exercise that authority" when performing the challenged conduct. *Id.* at 198. Critically, the Court held a state official's employment status "is not determinative," and the simple fact that a person works for the state alone does not resolve the color-of-state-law inquiry. *Id.* at 194. The inquiry must focus on whether actual authority over the specific challenged conduct was conferred by a "statute, ordinance, regulation, custom, or usage" of the State. *Id.* It further noted "the appearance and function" of the official's conduct "cannot make up for a lack of state authority at the first" step. *Id.*

The Supreme Court's reasoning in *Lindke* flows directly from the Court's prior "color of law" precedent. In fact, in this unanimous opinion, the Supreme Court outlined how the first prong of the test was grounded in its case law. *Id.* at 198. The Court cites to *West* for the "traditional definition" requiring power "**possessed by**

37

**virtue of state law** and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* (quoting *West*, 487 U.S. at 49) (emphasis added). The Court then cites *Lugar* for the principle that state action exists only when "the claimed deprivation has resulted from the exercise of a right or privilege **having its source in state authority**." *Id.* (quoting *Lugar*, 457 U.S. at 939). Finally, the Court also cites to *Griffin v. Maryland* for the proposition that the officer in that case was "possessed of state authority," and "purported to act under that authority," confirming even *Griffin*'s apparent-authority language requires actual state authority as a foundation. *Id.* (citing *Griffin v. Maryland*, 378 U.S. 130, 135 (1964)). *Lindke* thus stands as the Supreme Court's clearest and most recent restatement of a principle embedded in the law for over eighty years: actual authority over the specific challenged conduct must first exist before any other consideration is reached. That authority is wholly absent here. The uniforms the Deputies wore, the vehicles they drove, and their employer are the kind of considerations that should be saved for the second prong and cannot cure an absence of actual state authority. *Lindke*, 601 U.S. at 198. Where no state authority exists at the threshold, no combination of such factors can supply it.

38

**ii.    The Estate Cannot Use Apparent Authority to Prove Actual Authority, And Even if it Could, it Would Not Demonstrate State Authority in This Case**

As established above, the controlling question in this case is what authority the Deputies were exercising when they interacted with Barrick, an Indian, in Indian country. In this case, the only authority the Deputies could have been exercising is that granted to them by the Tribe through the cross-deputization agreement. Thus, the Court need not consider the factors outlined by the Estate regarding the authority they appeared to be exercising. However, even if this Court did choose to do so, the totality of the circumstances in this case still requires the same conclusion.

Even in cases where this Court has considered a broad range of factors beyond actual authority, the other factors, such as the subjective belief of parties or their indications of authority, cannot override the threshold requirement that one must have actual state authority for there to be a § 1983 claim. For instance, in *Dry v. City of Durant*, a case involving off-duty City of Durant police officers working for the Choctaw Nation as security guards, this Court noted, up front, it was uncontroverted the officers did not act pursuant to actual state authority. No. 99-7137, 2000 WL 1854140 (10th Cir. Dec. 19, 2000) (unpublished). Although this Court went on to analyze other factors, including objective indicia of authority and subjective factors, it ultimately concluded none of them were sufficient to create a genuine issue of fact as to whether the officers acted under color of state law. *Id. Dry* further supported

39

its conclusion with the "cardinal principal that Indian tribes are 'distinct political communities, having territorial boundaries, within which their authority is exclusive;'" and, as such, this Court could not infer the plaintiff believed the authority of the City of Durant extended to Indian country. *Id.* (*quoting Okla. Tax Comm'n v. Sac & Fox Nation,* 508 U.S. 114, 123 (1993)).

As officers in *Dry*, these Deputies were state-employed law enforcement officers acting in Indian country against a tribal citizen. Even more convincing than *Dry*, these Deputies were explicitly granted authority by the Choctaw Nation to act as tribal officers. The Estate, like the plaintiff in *Dry*, points to the Deputies' outward appearance and conduct as "evidence" of state authority. As in *Dry*, these factors do not make up for the fact that the Deputies did not, and could not, have exercised state authority in this case. Additionally, the tribal authority exclusivity referred to in *Dry* has only grown and expanded, especially considering the Supreme Court's affirmation of such principal and its extension of it in *McGirt*, further confirming Oklahoma's criminal jurisdiction does not reach Indians in Indian country. *McGirt,* 591 U.S. at 898. The uniforms the Deputies wore, the vehicles they arrived in, and who their employer was cannot change the source of where their actual authority was derived.

Even if this Court were to look beyond the source of the Deputies' authority and consider the factors the Estate wishes it to, the Estate still fails to show these

40

Deputies were acting under color of state law. The Tenth Circuit's own decisions in *Romero v. Peterson* supports this conclusion. *See Romero v. Peterson*, 930 F.2d 1502, 1504 (10th Cir. 1991); *Romero v. Peterson,* No. 93-2073, 1993 WL 375746 (10th Cir. Sept. 27, 1993). In *Romero I*, this Court was faced with the question of whether the facts in the record clearly established whether officers were acting as federal or tribal officers when they allegedly violated a man's civil rights on the Taos Indian Reservation. *Id*. at 1503-04. The plaintiff in *Romero* asserted the officers were acting under the color of federal law when they violated his constitutional rights, as they were cross-deputized by the Bureau of Indian Affairs and the Pueblo of Picuris; and, it was pursuant to this arrangement that they "were empowered to make arrests on the Pueblo of Taos." *Id*. at 1504. The Tenth Circuit remanded in this case because, based on the facts of the record before it, it could "not determine that defendants were federal actors, but [also could] not determine conclusively that defendants were not so acting." 930 F.2d at 1507. The Tenth Circuit identified a list of "relevant, but not exclusive" factors that might assist the district court in determining whether defendants were **federal actors**, such as:

(1) the sources of funding for their law enforcement activities;
(2) the extent of federal regulation of tribal law enforcement activities;
(3) the interdependence of the tribe and the BIA;
(4) the responsibility for defendants' supervision;
(5) whether defendants were wearing BIA uniforms, carrying BIA weapons, using a BIA vehicle, or acting pursuant to the authority of BIA badges; and,

41

(6) if the cross-deputization extended to the Pueblo of Taos.

*Id*. at 1507–08.

As an initial matter, the Appellees must point out that in *Romero I* the Court was faced with the question of whether officers were acting as **federal or tribal officers**, meaning the Court had to decide between two sources of authority, both of which could have been lawfully exercised on the Indian Reservation in question. *Id*. at 1503. Thus, there was a question of which authority the officers derived their actual authority from, and as such, the other factors considered were relevant. As already discussed in depth, that is not the case here. As such, *Romero* is not directly applicable as the Estate claims.

However, if the Court were to consider the *Romero* factors, the Estate would still not prevail. What the Estate omits is *Romero* returned to the Tenth Circuit after the district court conducted the exact inquiry that *Romero I* directed them to conduct. The district court concluded the officers in *Romero* were tribal officers because they made the arrest on the Taos Indian Reservation pursuant to the commissions from the Governor of Taos Pueblo; and, "[a]t the time of the alleged incident the officers were acting solely as tribal actors." *Romero II*, 1993 WL 375746, at *3.

The Deputies here, like the officers in *Romero*, had authority to act by virtue of the authority vested in them by the Choctaw Nation's Cross-Deputation Agreement, not the State of Oklahoma. This fact alone is determinative in this case.

42

The Estate seems to believe because the District Court in this case did not consider all the possible factors outlined in *Romero*, it must have erred. This conclusion reads *Romero* as a mandatory checklist rather than as guiding factors to be used if necessary. Such factors need not be considered in this case because, unlike in *Romero*, the jurisdictional facts are not ambiguous. The authority to arrest in Indian country existed only because the Tribe granted it to these Deputies through the cross-commission. Nothing in *Romero* requires remand where the undisputed record establishes which sovereign's authority was being exercised.

## B. The District Court Properly Recognized the Primacy of Tribal Authority in Concluding that Governance Rests Exclusively with the Tribe

The Estate argues the Deputies were simultaneously acting under both state and tribal authority, i.e. wearing "two hats," throughout their interaction with Barrick, and therefore, were always acting under color of state law. (Doc. 43, p. 54). The Estate further rejects the District Court's primacy-of-duties analysis, contending even a scintilla of evidence of state action is sufficient to defeat summary judgment. These arguments fail. Deputies cannot act for two sovereigns simultaneously; it is the duties actually governing the specific encounter that control the color of state law inquiry. *Fernandes v. City of Broken Arrow*, No. 16-CV-0630-CVE-FHM, 2017 WL 471561, at *3 (N.D. Okla. Feb. 3, 2017); *see also, West*, 487 U.S. at 49. The District Court properly applied this standard, looking to which primary duties the

43

Deputies were exercising during the encounter, and correctly concluded the only viable source of authority was that conferred by the Choctaw Nation.

### i. Officers With Dual Commissions May Only Act Under One Sovereign's Authority at A Time; The Relevant Authority for the Situation Controls

As a matter of law, officers holding dual commissions cannot exercise both Sovereigns' authority simultaneously. *Fernandes,* No. 16-CV-0630-CVE-FHM, at *3. Their actions in any specific instance are pursuant to, and made possible by, the authority of one sovereign, and courts have consistently treated officers assigned to dual roles as acting under color of one sovereign's law at a time. *Id.* This conclusion is directly in line with the definition of color of state law, and the reasoning it is the "source of the power, not the identity of the employer" that controls. *Id.*

In *Fernandes*, the Northern District of Oklahoma was faced with the issue of whether an officer could act under color of state and federal law simultaneously, and determined they could not. 2017 WL 471561 at *3. "In other words, [the officers] may act overall as dual agents, but their actions in any particular case are made pursuant to, and possible by, the authority of the state **or** federal government." *Id.* (emphasis in original). In reaching this conclusion, the Northern District relied on decisions of other federal courts on similar issues. For instance, the Court cited *Guerreo v. Scarazzini*, a decision out of the Second Circuit, in which the court noted that the civil claim against two officers who were federally deputized for their work

44

with the FBI Joint Organized Crime and Drug Enforcement Task Force was properly brought as a *Bivens* action, not a § 1983 claim. *Guerrero v. Scarazzini*, 274 Fed. Appx. 11, 12 n.1 (2d Cir. 2008). It cited numerous other decisions supporting its position that an individual cannot act under color of both state and federal law, including a Sixth Circuit case, and a variety of district court cases. *Majors v. City of Clarksville*, 113 Fed. Appx. 659, 659 (6th Cir. 2004) (interpreting a plaintiff's § 1983 claim against local officers acting as DEA task force agents as a *Bivens* claim); *Pike v. United States*, 868 F. Supp. 2d 667, 677–78 (M.D. Tenn. 2012) (holding that plaintiff's § 1983 claims against local officers assisting in a federal task force operation were "plainly Bivens claims"); *Bordeaux v. Lynch*, 958 F. Supp. 77, 84 & n.5 (N.D.N.Y. 1997) (holding that local officers assigned to DEA task force could not be sued under § 1983 because they were federal officers); *Amoakohene v. Bobko*, 792 F. Supp. 605, 608 (N.D. Ill. 1992) (holding that local officers arresting someone for a municipal code violation incident to activities in connection with a DEA task force, of which the officers were members, did not act under color of state law).

The Estate points to no authority that actually suggests an officer can simultaneously exercise state and tribal authority. The Estate cites *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391 (1979), *Johnson v. Orr*, 780 F.2d 386 (3d Cir. 1986), *Nesmith v. Fulton*, 615 F.2d 196 (5th Cir. 1980), *Martinez v. Harroun*, 2024 WL 422785 (D. Colo. 2024), and *Screws v. United*

*States*, 325 U.S. 91 (1945)[5], for the proposition the Deputies could have been simultaneously acting under the color of tribal and state law. However, an examination of these cases reveals they do not support such a proposition. *Lake County Estates* did not address dual authority or dual commissions, it held congressional approval of a state compact alone does not convert state action into federal action as the actions at issue were taken by the states involved in the compact and thus were "under color of state law." 440 U.S. 391, 399-400 (1979). *Johnson* and *Nesmith* both discuss issues in the National Guard context, which has a hybrid status with both state and federal characteristics, and both courts found state action by identifying which sovereign authority governed the specific conduct at issue. *Johnson,* 780 F.2d at 392, 391-393; *NeSmith,* 615 F.3d at 199-201. *Martinez* does not address dual authority at all and instead addresses whether an officer who was on leave was engaging in a purely personal pursuit, and, as such, was not acting under color of law. 2024 WL 422785 at *6. Finally, *Screws* simply established that § 1983 reaches officers misusing actual state power. 325 U.S. at 91. None of these cases support Plaintiff's argument. If anything, these cases again confirm the relevant inquiry is what the source of the authority was that allowed the alleged

---

[5] The Estate also ignores another key distinction between these cases and this case, which is that in each of these relevant cases both sovereign authorities being discussed could have been lawfully exercised over the conduct at issue. As already discussed ad nauseum, that is not the case here. The only authority that could have been lawfully exercised was Tribal authority.

46

actions to have been taken. In this case, only one source of authority could possibly have reached the specific conduct—the authority granted to these Deputies by the Choctaw Nation.

The Tenth Circuit and the Supreme Court have made clear for decades that § 1983 liability turns on the authority an officer was actually invoking, not the "hat" the Estate wishes the officer had been wearing.  This rule is settled.  When an officer acts under federal authority pursuant to a cross-deputation agreement, he is a federal actor.  *U.S. v. Martin*, 163 F.3d 1212, 1215 (10th Cir. 1998).  When an officer acts under territorial authority, he is a territorial actor.  *Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572 (1976). When an officer acts under tribal authority, he is a tribal actor.  *Chapoose v. Hodel*, 831 F.2d 931 (10th Cir. 1987).  When an officer acts under state authority, and only then, is he a state actor for § 1983 purposes.

### ii.    The Deputies Could Only Have Been Exercising Tribal Authority In This Case

The Estate ignores the above bedrock principle, and, instead, proposes a doctrine where an officer's clothing or employer transforms tribal conduct into state action.  But § 1983's history, text, and purpose all reject such appearance based theories.  Here, the only authority the Deputies can, and did, exercise was their tribal cross-deputization authority. When an officer can only exercise one authority, the answer is clear, and the Court need not engage in further factual analysis as the Estate

47

claims. The Ninth Circuit's decision in *Bressi v. Ford*, 575 F.3d 891 (9th Cir. 2009) supports this conclusion. In *Bressi*, a non-Indian sued four tribal officers under § 1983 after he was stopped and cited at a roadblock the officers had erected on a state highway crossing into the Indian reservation. 575 F.3d at 893. In such scenarios, when tribal officers stop individuals, they are limited to inquiring about whether they are Indian or non-Indian, and if they are non-Indian, they can detain the individual until state officers arrive. *Id*. at 896. However, **without** some form of state authorization, they cannot take any further action. *Id.* Thus, in *Bressi*, when the tribal officers' inquiries of the individual went beyond whether he was Indian or non-Indian, they began acting under the color of state law. *Id*. at 897.

*Bressi* illustrates it is the sovereign from which the officer is deriving his powers from at the moment of the alleged violation that is the authority the officer is acting under. The officers in *Bressi* were only liable under § 1983 because they were exercising authority **granted** to them by state law **against a non-Indian**. *Id*. at 897. As such, the inverse must be true, meaning the Deputies cannot be said to be acting under state law when the only reason they could arrest Barrick was due to the authority granted to them by the Choctaw Nation.

Even assuming, as the District Court did, that officers can sometimes wear two hats, that concept can only apply where both sovereigns possess concurrent authority. Here, there was no concurrent authority. Pursuant to *McGirt*, only the

48

tribes or the federal government possesses authority over tribal citizens on tribal land.  This is exclusive.  This is not a situation where officers are deciding between two legally available sources of authority.   One sovereign (the Tribe) had jurisdiction; the other (the State) did not. The Deputies' authority to act against Barrick existed solely because the Choctaw Nation conferred it. Without that, they had no authority whatsoever. The Estate's dual-authority theory assumes two functioning sources of power when only one existed here. The law made only one hat available to the Deputies—the tribal hat.

## III.   THERE IS NO QUESTION OF FACT

The Estate also criticizes the District Court for focusing on a "single determinative factor," and disregarding multiple "undisputed" facts. The Estate argues the District Court only found three facts as material and necessary when considering whether the Defendants were acting under color of state law: Barrick's status as a member of the Choctaw Nation, Defendants' status as cross-commissioned tribal officers, and the location in Indian country. (Doc. 43, p. 44). The Estate alleges the District Court disregarded all of the other facts put forth by the Estate such as the Deputies' employment, who issued their equipment, what their uniforms looked like, and whose forms they used to complete their reports.  None of the additional facts relate to or alter the legal question controlling the outcome: could

the State of Oklahoma lawfully authorize the Deputies to exercise state police powers over a Choctaw citizen while in the bounds of the Choctaw Nation?

As Judge Heil explained, the standard is whether a genuine dispute exists about a *material* fact, not whether a dispute exists as to any fact. (App. Vol. 20 at 3958). The Estate sets forth no case law or facts giving this Court a reason to disregard Judge Heil's reasoning as to why those facts need not be considered.

The Estate admits the Deputies were cross-commissioned pursuant to a Deputation Agreement with the Choctaw Nation, a separate, Sovereign Tribal nation. (App. Vol. 2 at 0403, 0517; App. Vol. 3 at 0590, 0592; App. Vol. 10 at 2163-2176; App. Vol. 20 at 3809, 3828 ¶ 95, 3882, 3886-3887, 3954-3955; Doc. 43, page 8). To argue a Court must consider all facts asserted by the Estate in her Response, despite their lack of relevance or lack of evidentiary support, is not the law, and the Estate's argument on this point should be disregarded. As the District Court acknowledged, there is no controlling law requiring the Court to consider non-relevant facts when considering summary judgment motions. (App. Vol. 20 at 3958). Further the District Court found there is no law holding a single factor cannot be determinative of summary judgment. *Id.* Here, the District Court relied on the material facts, all undisputed, in concluding the Deputies were acting under color of tribal law.

50

The Estate also argues that whether the Deputies were acting under color of state or tribal law is a mixed question of law and fact that should have been submitted to a jury. Tenth Circuit precedent on this point is not settled. Compare *Nieto v. Kapoor*, 268 F.3d 1208, 1215 (10th Cir. 2001) (color of state law is a question of law reviewed de novo), *with Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155 (10th Cir. 2016) (treating it as a mixed question). To the extent any ambiguity exists within this Circuit, the Supreme Court has resolved it: the question is one of law, not fact. *Cuyler v. Sullivan*, 446 U.S. 335, 342 & n.6 (1980).

In any event, in *McGirt*, the Supreme Court was explicit: **as a matter of law**, states do not have authority to take action against tribal citizens who are on tribal land. 591 U.S. at 898. It is undisputed that Barrick was a tribal citizen, that this incident took place in Indian County, and that the Deputies were cross-deputized.

The Court need not look any further than this. Because the State had no authority to delegate to the Deputies, there can be no question as to the source of their authority during this encounter. Accordingly, the question is a matter of law, not of fact, and the District Court did not err in granting summary judgment to the Deputies.

### CONCLUSION

While there might be other remedies available to the Estate or similarly situated Plaintiffs, it is not through 42 U.S.C. § 1983. Following the District Court's

51

Order granting summary judgment to Appellees in this case, the Choctaw Nation of Oklahoma's Senior Executive Officer Legal and Compliance explained, "[t]ribal members have many avenues to pursue justice, including through our robust Tribal court system.  Maintaining these avenues is an important part of expressing our sovereignty."  (App. Vol. 20 at 3921).

To the extent there is no remedy outside of Congressional or Tribal action, this Court need not look further than *McGirt:*

> In reaching our conclusion about what the law demands of us today, we do not pretend to foretell the future and we proceed well aware of the potential for cost and conflict around jurisdictional boundaries, especially ones that have gone unappreciated for so long. But it is unclear why pessimism should rule the day. With the passage of time, Oklahoma and its Tribes have proven they can work successfully together as partners. Already, the State has negotiated hundreds of intergovernmental agreements with tribes . . . And, of course, should agreement prove elusive, Congress remains free to supplement its statutory directions about the lands in question at any time. It has no shortage of tools at its disposal.

*McGirt*, 591 U.S. at 936-37 (internal citations omitted).  When a statute's plain language is clear, courts must apply it regardless of whether they believe Congress made the best policy choice. *Saint Francis Hospital, Inc. v. Azar*, 476 F. Supp. 1149 (2020).  *See also, Ross*: ("[w]e are bound to follow the law as we find it irrespective of the apparent 'void' this will leave in safeguarding the rights of the traveling public.")  *Ross*, 905 F.2d at 1353. (internal citations omitted).  Indeed, it is not

52

uncommon for there to be no remedy available under Section 1983. *Carter*, 409 U.S. at 433.

This appeal is an attempt to manufacture "state action" where the law provides none. The governing law is clear. The record is clear. The absence of state authority is clear. Appellant cannot escape the unavoidable truth: because the State of Oklahoma had no criminal jurisdiction over Barrick, the Deputies could not have acted under color of state law.

WHEREFORE, Deputies Matthew Kasbaum and Quentin Lee request this Court affirms the District Court's Judgment for them in all respects.

Appellees request oral argument. This case presents a novel issue that cannot be fully addressed in briefing. Oral argument would materially assist the Court.

Respectfully submitted,

s/ Sheila G. Jessee

s/ Jessica James Curtis
Robert S. Lafferrandre, OBA No. 11897
Randall J. Wood, OBA No. 10531
Sheila G. Jessee, OBA No. 33071
Jessica James Curtis, OBA #35140
PIERCE COUCH HENDRICKSON
 BAYSINGER & GREEN, L.L.P.
1109 North Francis Avenue
Oklahoma City, Oklahoma 73106
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
rlafferrandre@piercecouch.com
rwood@piercecouch.com
sjessee@piercecouch.com
jjamescurtis@piercecouch.com
***Attorneys for Defendants / Appellees***
***Matthew Kasbaum and Quentin Lee***

54

## CERTIFICATES

*Service*. I hereby certify that a copy of the foregoing **Response Brief of Defendants/Appellees Deputies Matthew Kasbaum and Quentin Lee** was served, on **March 24, 2026** via filing with the Clerk of Court using the CM/ECF System, on all counsel who are registered CM/ECF users and have entered their appearance in this appeal.

s/ Sheila G. Jessee<br>
Sheila G. Jessee

***Type-Volume and Typeface Limitations***. I hereby certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **12,997** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and,

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in fourteen-point Times New Roman font.

s/ Sheila G. Jessee
Sheila G. Jessee

Date: March 24, 2026

***Need For Separate Briefs.*** I hereby certify that it is necessary for Deputies Kasbaum and Lee to file a separate brief from Game Warden Hannah. Although aligned on the same side, the Appellees are employed by different governmental entities and are represented by separate counsel. Additionally, the cross-deputization agreements that each party is subject to is slightly different. As result, their defenses, legal positions, and potential liabilities are not identical, and a joint brief would not adequately address the distinct issues applicable to each Appellee.

s/ Sheila G. Jessee
Sheila G. Jessee

Date: March 24, 2026

57