CASE NO. 25-7082
UNITED STATES COURT OF APPEALS
THE TENTH CIRCUIT

---

BARBARA BARRICK,
as Special Administrator of the
ESTATE OF BOBBY DALE BARRICK, deceased,

Plaintiff/Appellant,

v.

DEPUTY MATTHEW KASBAUM,
DEPUTY QUENTIN LEE,
and WARDEN MARK HANNAH,

Defendants/Appellees.

---

On Appeal from the United States District Court
for the Eastern District of Oklahoma
Honorable John F. Heil, III, District Judge
District Court Case No. 23-CV-00129-JFH-GLJ

---

APPELLANT'S REPLY BRIEF

---

| | |
|---|---|
| **Christopher Lincoln Camp, OBA #18541** | **D. Mitchell Garrett, Jr., OBA #20704** |
| CAMP LAW FIRM | GARRETT LAW |
| **7122 South Sheridan Road, Suite #2-382** | **320 South Boston Avenue, Suite 825-G** |
| **Tulsa, Oklahoma  74133** | **Tulsa, Oklahoma 74103** |
| **Telephone: (918) 200-4871** | **Telephone: (918) 221-6190** |
| **Facsimile: (918) 340-6799** | **Facsimile: (918) 340-6799** |
| **E-mail: camplawfirm@gmail.com** | **E-mail: mitchell@garrettlawcenter.com** |

---

STATEMENT AS TO ORAL ARGUMENTS
Oral arguments are requested.

# TABLE OF CONTENTS

Arguments and Authority ……………………………………………………..2

I.     Appellees' Actions Throughout Their Encounter with Decedent Were Based Overwhelmingly on Their Apparent Authority as State Law Enforcement Officers ...................................................... 2

II.    The Tenth Circuit's Multi-Factor Romero Framework Controls. Thus, Remand for Factfinding Is the Proper Remedy ................... 9

    A.  Romero I Requires Multi-Factor Factfinding, Not Single-Factor Summary Judgment...................................................... 9

    B.  Romero II Validates the Process, Not a Shortcut Around It................................................................................... 12

    C.  Gallagher's Four-Test Framework Provides an Independent Source Establishing State Color .................. 12

III.   Lugar's State-Employment Presumption Survives a Tribal Commission ................................................................................ 13

IV.   The Remedy Gap Illuminates the Proper Interpretation ………….15

V.    The Dual-Commission / "Two Hats" Theory Is Well-Founded in Circuit Precedent and § 1983's Plain Text ................................... 17

    A.  The Cross-Commission Agreement's "State Authority" Disclaimer Does Not Eliminate State Color Already Vested by Employment ...................................................... 18

B.  The Fact That Tribes Control Commission Issuance Does Not Transform a State Employee into a Tribal Officer (Hannah Only) ........................................................... 19

C.  The Existence vel non of Alternative Remedies Is Not Immaterial — It Illuminates Congressional Intent (Hannah Only).................................................................. 20

VI.    The Color-of-Law Question Is a Mixed Question of Fact and Law That Could Not Be Resolved on Summary Judgment ......... 21

Conclusion ........................................................................................ 22

Certificate of Compliance  ............................................................... 25

Certificate of Digital Submission  ................................................... 26

Certificate of Service  ...................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986) ........................................................................ 21, 22

*Bressi v. Ford*
575 F.3d 891 (9th Cir. 2009) .................................................... 18

*Crowe v. ADT Sec. Servs., Inc.*
649 F.3d 1189 (10th Cir. 2011) ........................................... 22

*Cuyler v. Sullivan*
446 U.S. 335 (1980) ................................................................ 21

*David v. City & Cnty. of Denver*
101 F.3d 1344 (10th Cir. 1996) ........................................... 13

*District of Columbia v. Carter*
409 U.S. 418 (1973) ............................................................... 16

*Dry v. City of Durant*
2000 WL 1854140 (10th Cir. Dec. 19, 2000) ...................... 3, 9

*E.F.W. v. St. Stephen's Indian H.S.*
264 F.3d 1297 (10th Cir. 2001) ............................................. 10

*Gallagher v. Neil Young Freedom Concert*
49 F.3d 1447 (10th Cir. 1995) ..................................... 12, 13, 23

*Griffin v. Maryland*
378 U.S. 130 (1964) .................................................................. 9

*Hall v. Witteman*
569 F.Supp.2d 1208 (D. Kan. 2008) ................................. 14, 15

*Jojola v. Chavez*
55 F.3d 488 (10th Cir. 1995) ................................ 2, 3, 4, 9, 15, 17, 23

*Lindke v. Freed*
601 U.S. 187 (2024) ........................................................................ 3

*Logsdon v. United States Marshal Serv.*
91 F.4th 1352 (10th Cir. 2024) ..................................................... 20

*Lugar v. Edmondson Oil Co., Inc.*
457 U.S. 922 (1982) ................................................ 13, 14, 19, 22, 23

*McGirt v. Oklahoma*
591 U.S. 894 (2020) ...................................................................... 20

*Monroe v. Pape*
365 U.S. 167 (1961) .............................................................. 14, 15, 16

*Romero v. Peterson*
930 F.2d 1502 (10th Cir. 1991) ............................................. 9, 10, 11, 23

*Romero v. Peterson,*
1993 WL 375746 (10th Cir. 1993) ............................................ 12, 23

*Schaffer v. Salt Lake City Corp.*
814 F.3d 1151 (10th Cir. 2016) ..................................................... 21

*Screws v. United States*
325 U.S. 91 (1945) ......................................................................... 15

*United States v. Classic*
313 U.S. 299 (1941) ......................................................................... 9

*West v. Atkins*
487 U.S. 42 (1988) ......................................................................... 14

## <u>STATUTES AND RULES</u>

42 U.S.C. § 1983 .................................... 2, 9, 15, 16, 17, 18, 20, 21, 22, 23

25 U.S.C. §§ 1301-05 (Indian Civil Rights Act) ................................... 16

OKLA. STAT. tit. 19 § 180.62 ....................................................... 5

OKLA. STAT. tit. 19 § 516 ............................................................. 7

OKLA. STAT. tit. 21 §§ 1362, 1436 & 1769 ................................. 5

OKLA. STAT. tit. 37 § 37-8 ........................................................... 5

OKLA. STAT. tit. 74 § 1221 ......................................................... 10

OKLA. CONST. ART. XVII, § 2 ..................................................... 7

OKLA. CONST. ART. II, § 12 ........................................................ 20

## OTHER AUTHORITIES

1990 OK AG 32, 1991 WL 567868 ...................................... 10, 18, 19, 20

2000 OK AG 58, ¶ 14 ...................................................................... 18

## ARGUMENTS AND AUTHORITY

I.   **APPELLEES' ACTIONS THROUGHOUT THEIR ENCOUNTER WITH DECEDENT WERE BASED OVERWHELMINGLY ON THEIR APPARENT AUTHORITY AS STATE LAW ENFORCEMENT OFFICERS.**

Appellees argue that "there are only three relevant facts" in this case, to wit:  (1) MCSO Deputies Kasbaum and Lee and ODWC Warden Hannah "were cross-commissioned … with the Choctaw Nation of Oklahoma," (2) "[Decedent Bobby] Barrick was an Indian," and (3) "the encounter rook place in Indian country." **[Dkt. #49, p. 24]**   Based on these three facts -- and completely ignoring dozens of other material, well-supported, undisputed facts presented by Barrick **[*see* Dkt. #43, p. 15 (¶ 2) – p. 33 (¶ 47)]** -- Appellees postulate that "[b]ecause the only authority **legally** available to [Appellees] was tribal, they could not have been acting under the color of state law for purposes of a § 1983 claim." **[*Id.*]**

Approaching the issue as directly as possible,  Appellees then argue that the trial court's entry of summary judgment against Barrick was appropriate "because [Appellees'] ***actual*** **authority** ***controls***" and is  inflexibly determinative. **[Dkt. #49, p. 43. ¶ II]**  According to Appellees, "[e]ven in cases where this Court has considered a broad range of factors beyond actual authority," any such consideration is ultimately futile because --  so the argument goes -- "the other factors … **cannot override** the threshold

2

requirement that one **must** have **actual state authority** for there to be a § 1983 claim." **[Dkt. #49, p. 48, ¶ ii]** [1]

Despite the self-assuredness with which Appellees present the foregoing argument, however, their characterization of the law runs afoul of well-established circuit precedent.  For instance, Appellees' argument was squarely rejected by this Court in *Jojola v. Chavez*, 55 F.3d 488. 492 (10th Cir. 1995), which held that the authority with which [a defendant law enforcement officer] is allegedly clothed **may be either actual or *apparent*.**"[2]

Under *Jojola*, Barrick need not prove that Appellees had actual legal authority to arrest Decedent under state law.  Barrick need only show that Appellees were clothed in the apparent authority of state law -- that **state**

---

[1]     Appellees rely almost exclusively on the case of *Dry v. City of Durant* , 242 F.3d 388, 2000 WL 1854140 *4 (10th Cir. 2000) in arguing that there can be no liability under § 1983 without "actual state authority." **[*See* Dkt. #49, pp. 48-49, ¶ ii; Dkt. #50, p. 21]**  As discused below, Appellees reliance on *Dry* is misplaced and unavailing.

[2]     Invoking *Lindke v. Freed*, 601 U.S. 187 (2024), Appellees argue that "actual authority over the specific challenged conduct must first exist before any other consideration is reached." **[Dkt. #49, p. 47]**  *Lindke*, however, is distinguishable in that it addressed a government official's **personal social media account** -- conduct outside his official duties which -- completely **unlike** the conduct of Appellees in this case -- had **no** state machinery behind it.  *Lindke* held only that state employment alone is ineffective to transform **personal** conduct into state action.  The case says nothing about bearing on the facts now before this Court (*i.e.,* state officers, subject to state supervision, who were engaged in police work, using state resources only for "departmental" (*i.e.*, MCSO / ODWC) business only, and responding to a state dispatch call about suspected violations of state law, who, as a matter of policy, were at all times primarily responsible to and governed by the state agencies with which they were employed, and who identified themselves as state officers only.

**machinery vested these officers with the power and appearance of state law enforcement**, and that they deployed that power against Decedent. In terms of apparent authority, every fact in the record now before this Court points to state authority: state employer, state uniform, state vehicle, state dispatch, state forms, state training, etc. No tribal affiliation was on display, nor did the temporary manifestation of any tribal color nullify or outweigh the prominent, overt display and exercise of state color. Indeed, as described in greater detail below, the state authority that Appellees displayed, by which they were governed, and under which they at all times appeared to operate was what every person at Lori's Corner Store saw and responded to.

*Jojola*'s apparent-authority rule is satisfied where -- as here -- the state itself played a role in creating the officer's appearance of authority. In this case, the State of Oklahoma did precisely that in a multitude of ways. It hired Kasbaum and Lee as MCSO deputies, and issued them state uniforms, badges, and insignia, state vehicles, weapons, restraints, body-worn cameras, pre-printed forms bearing MCSO insignia (on which to collect witness statements and prepare reports for submission to, and for review by, MCSO supervisory personnel), and other specialized equipment, not typically available to civilians, funded entirely by the state.

Additionally, MCSO and ODWC required its deputies and wardens to attend (or prove that they had attended) Oklahoma's state police academy,

4

required them to maintain a current state firearm certification, educated and regularly updated them regarding Oklahoma criminal law, trained them on the use of "reportable force" (*i.e.*, force "used by an officer to compel compliance from a suspect in conformance with the officer's official duties" as an MCSO deputy or ODWC warden), paid them with State money in accordance with state law (*see, e.g.,* OKLA. STAT. tit. 19 § 180.62), and dispatched them via the McCurtain County 911 / Public Safety Answering Point (PSAP) (which, in the case of their encounter with Decedent, was for the stated purpose of investigating possible violations of Oklahoma law, including under OKLA. STAT. tit. 21 §§ 1362, 1436 & 1769 and OKLA. STAT. tit. 37 § 37-8).

Pursuant to MCSO's policy and procedure manual, the State also expressly mandated that MCSO deputies must "use [Sheriff's] Department time, equipment, and personnel for **departmental** business only" (and, as such, **prohibited** the use of MCSO time, equipment, or personnel for non-MCSO business). Thus, while "the [written] policy of [MCSO strongly encouraged deputies] to provide assistance to other law enforcement agencies whenever possible," as a matter of official policy, any "assistance [MCSO provided] to other law enforcement agencies (including tribal police)," at all times:

> (i) constituted the "Departmental business" of MCSO first and foremost,

(ii)    had been formally designated as one of the "official duties" that MCSO deputies were expected to perform, and

(iii)    was classified as a basic job responsibility of MSCO deputies to which all such personnel were required to adhere.

The state-based policies enumerated above were also part of, and wholly consistent with, MCSO's larger mandate that at all times, on-duty MCSO deputies must "use the authority of their positions [as deputies] to accomplish the task[s] required by [**MCSO**]."  Indeed, pursuant to MCSO's hierarchical rules, any time a deputy provided assistance to an outside agency (including tribal police), "that [state] officer" -- and any conduct in which he engaged – would still remain **wholly** -- and **not** just primarily -- "governed and protected by the policies and procedures of [the MCSO] office."  In particular, under MCSO's express policies, MCSO deputies "**at all times**":

(i)    were "considered to be Sheriff's Office employees,"

(ii)    whose "**primary responsibility** was the the maccurtain (sic) County Sheriff's Office," and

(iii)    obligated to refrain from the use of constitutionally unreasonable force, irrespective of who they were dealing with, and whether or not they were cross-deputized.

Similarly, ODWC Warden Hannah, who expressly "admit[ted] that he was acting within the scope of his employment" at all times during the

6

encounter with Decedent, remained subject to ODWC's use-of-force policy (under which "[a]ny force [Hannah] used [was required to] be in accordance with state and federal law, [state agency] training, and [ODWC] policy)" throughout his interaction with Decedent.

Perhaps it was for the foregoing reasons that at no time during the encounter with Decedent did any Appellees present (or indicate or express any need to present) themselves as tribal officers or to make the determination that the matter was tribal.  Rather, Kasbaum and Lee presented themselves only as MCSO deputies, and Hannah held himself out as an ODWC warden only.

According to MCSO Captain Alicia Manning (the third-highest ranking official who oversaw all of MCSO's criminal investigations, was "responsible for anything that happens [at MCSO], and was subject to, and familiar with, the *Deputation Agreement* between the Choctaw Nation and MCSO), MCSO's cross-deputized personnel were taught to wear -- and, in fact, "w[ore]" – "**both** hats" (*i.e.*, "the state's hat" and "the tribe's hat") at all times when making an arrest.  Similarly, even when dealing with tribal suspects, MCSO deputies remained policy-bound to simultaneously maintain and carry out their **state** "statutory responsibilities" (*e.g.*, under OKLA. STAT. tit. 19 § 516, and OKLA. CONST. Art. XVII, § 2 ) "to keep and preserve the peace" in McCurtain County, "to quiet [and] suppress all affrays," to "apprehend[] or secur[e] any persons for felony breach of the peace," to "protect citizens against violence" (both tribal

7

and non-tribal alike, and including Decedent) -- and "to uphold the laws of the [S]tate" of Oklahoma.

It is also undisputed in this case that state interests were **perpetually** served by the cross-deputization of MCSO deputies, ODWC wardens, and other state law enforcement personnel (which, in turn, was wholly dependent upon said participants' status as "law enforcement officers employed by … [a] political subdivision[] of the State of Oklahoma). Indeed, under the Oklahoma Interlocal Cooperation Act and the State-Tribal Relations Act," cross-deputization was intended to -- and, in fact, did -- have the effect of "promot[ing] better law enforcement services" for **all** parties to the *Deputation Agreement* (including the participating state law enforcement agencies) and the communities they serve (which were populated by tribal and non-tribal citizens alike). **[*See* Dkt. #43, pp. 15-33, Fact Nos. 2 - 47]**

Without a doubt, the foregoing facts more than adequately establish the type of "state machinery" and direct state involvement that *Jojola* requires -- irrespective of whether or not Appellees would have had "actual authority" under state law to arrest Decedent. Put another way, __NO__ reasonable juror could look at this record and conclude that the facts set forth above only support the conclusion that Appellees' encounter with Decedent on the evening of March 13, 2022, was totally devoid of any pretense of state color.

*Dry v. City of Durant*, 2000 WL 1854140 (10th Cir. 2000), confirms the same point: "whether or not the defendant lacked actual state authority is **not** determinative." *Id.* at \*4. *Griffin v. Maryland*, 378 U.S. 130, 135 (1964), states the rule plainly: "[i]f an individual is **possessed of state authority** and **purports to act under that authority**, **his action is state action**." And *United States v. Classic*, 313 U.S. 299, 326 (1941), reaches the "misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Decedent Bobby Barrick succumbed to state officers who, *inter alia*, arrived in state vehicles and were wearing state uniforms. The state clothed them with that authority. *Dry*, *Griffin*, and *Classic* together foreclose any rule requiring "lawful actual authority" as a precondition to recovery under 42 U.S.C. § 1983.

## II. THE TENTH CIRCUIT'S MULTI-FACTOR *ROMERO* FRAMEWORK CONTROLS. THUS, REMAND FOR FACTFINDING IS THE PROPER REMEDY.

The proper disposition of cases involving cross-deputized officers and ambiguous authority is the *Romero* remand framework. This Court should apply it here.

### A. *Romero I* Requires Multi-Factor Factfinding, Not Single-Factor Summary Judgment.

In *Romero v. Peterson*, 930 F.2d 1502 (10th Cir. 1991) (*Romero I*), this Court remanded "for further factfinding proceedings," and directed the district

9

court to consider six "relevant, **but not exclusive**" factors: (1) sources of funding; (2) extent of federal regulation of tribal law enforcement; (3) interdependence of tribe and federal law enforcement; (4) responsibility for supervision; (5) whether defendants wore federal uniforms, carried federal weapons, used federal vehicles, or acted pursuant to federal badge authority; and (6) details of the cross-deputization. 930 F.2d at 1507-08; *E.F.W. v. St. Stephen's Indian H.S.*, 264 F.3d 1297, 1305 (10th Cir. 2001).

Adapting these factors to the state-versus-tribal context, every one points toward state color:

(1) *Funding*.  Kasbaum and Lee were paid by McCurtain County. Hannah was paid by ODWC. No tribal paycheck.

(2) *State regulation*.  MCSO's written policies governed Kasbaum and Lee's conduct "at all times," including when assisting other agencies. Hannah operated under ODWC general orders.

(3) *Interdependence*.  The cross-deputization agreement was authorized under the Oklahoma State-Tribal Relations Act, 74 O.S. § 1221 -- a state statute. The Oklahoma Attorney General concluded it "creates no new [tribal] office but only increases the authority of the state officer." 1990 OK AG 32, 1991 WL 567868 at *8.

(4) *Supervision*.  MCSO supervised Kasbaum and Lee, who, as a matter of binding policy, owed a primary duty to MCSO at all times. ODWC

10

supervised Hannah. MCSO's Lt. Williamson reviewed the Response to Resistance Forms under MCSO policy. No tribal supervisor was involved.

(5) ***Uniforms, weapons, vehicles, badges.*** All state. MCSO uniforms with "Sheriff" insignia. MCSO vehicles with "Sheriff" decals. MCSO-issued restraints. Oklahoma Game Warden uniform and badge. No tribal-issued equipment.

(6) ***Cross-deputization details.*** Defendants conceded seventeen months after the incident that they lacked sufficient information to determine their color of law. MCSO Cpt. Manning testified that the deputies "wore both hats" and "didn't even have to worry about whose hat they were wearing."

In addition to the foregoing, the additional facts previously set forth on pp. ___, *supra*, warrant additional factfinding in accordance with the procedure adopted in *Romero I.*

Every *Romero I* factor raises at minimum a triable issue. Appellees contend the factors are "merely guiding," but *Romero I* remanded *because* the record was "insufficient" to resolve the question -- a remand that would have been pointless if -- as Appellees now suggest -- a single fact (*i.e.* the detention of a tribal member on tribal land by cross-deputized officers) was dispositive of the issue. 930 F.2d at 1507. *Romero I* compels remand here.

**B. *Romero II* Validates the Process, Not a Shortcut Around It.**

Appellees argue that *Romero v. Peterson*, 1993 WL 375746 (10th Cir. 1993) (*Romero II*) stands for what is essentially a black-letter proposition: that cross-deputized officers are inevitably tribal actors.  The holding in *Romero II* that the defendant was a tribal actor, however, was reached **after full factfinding was conducted following remand**.  Among other things, the facts demonstrated that in addition to wearing BIA uniforms, carrying BIA weapons, and driving BIA vehicles, the officers in *Romero* were **employed by the tribe itself**, and **acting under tribal court orders**.

The facts here are categorically different. Those officers had BIA equipment and tribal employment. These officers have MCSO equipment and state employment. *Romero II* confirms that as opposed to some self-serving, black-letter rule, detailed, analytical factfinding controls.  Applied to this record, the facts point toward state color, not away from it.

**C. *Gallagher's* Four-Test Framework Provides an Independent Source Establishing State Color.**

It should be noted that *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1447 (10th Cir. 1995), identifies four independent tests for state action: (1) nexus/interdependence, (2) symbiotic relationship, (3) public function, and (4) joint action. *Id.* at 1454-57. Satisfaction of any one is sufficient.

12

Under the *nexus test*, state action exists where there is a "sufficiently close nexus between the State and the challenged action." The nexus here is overwhelming: state funding, state supervision, state policies governing Appellees' conduct at all times, and state legislation authorizing the cross-deputization agreement. **[*See also* pp. ___, *supra*]**

Under the *joint action test*, state action exists where the defendant "acted together with or has obtained significant aid from state officials." The encounter with Decedent on March 13, 2022, was initiated by state dispatch, carried out by state employees using state equipment, governed by state policies, and documented in state records. *David v. City & Cnty. of Denver*, 101 F.3d 1344, 1353 (10th Cir. 1996) ("under color of law determination rarely depends on a single identifiable fact"). Thus, even if the *Romero* analysis were insufficient to support reversal, at least two of the tests promulgated *Gallagher* adequately demonstrate the requisite state color.

## III. LUGAR'S STATE-EMPLOYMENT PRESUMPTION SURVIVES A TRIBAL COMMISSION.

Appellees cite the two-part test and the "fact-bound inquiry" language in *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 & 939 (1982), but never address the actual holding. *See id.* at 935-36: "[S]tate employment is generally sufficient to render the defendant a state actor." *Id.* at 936 & n.18. The Supreme Court elaborated that "a state employee generally acts under color

13

of state law **while acting in his official capacity** or **exercising his official responsibilities**." *Id.*; *see also West v. Atkins*, 487 U.S. 42, 49 (1988). The well-supported facts presented by Barrick in this case conclusively establish that Appellees were acting in their "official capacity" **[*see* Dkt. #43, p. 37 & n. 71]** as MCSO deputies **and** were exercising their "official responsibilities." **[*see* Dkt. #43, pp. 21-23, 46, 47, 50]** Moreover, the state employment presumption is **not** extinguished by a concurrent tribal commission. Nothing in *Lugar*, *West*, or any controlling authority holds otherwise.

Appellees were on duty as state employees when the MCSO dispatcher sent them to Lori's Corner Store. Their state duties required responding to calls, investigating suspected crimes, and securing the scene. MCSO policy required incident reports, Response to Resistance Forms, and compliance with MCSO policies "at all times" -- including when assisting other agencies on tribal land. Hannah's state Game Warden duties were the reason he traveled to the scene. The "state employment" presumption in *Lugar* covers all of this. Appellees offer nothing to rebut it.

*Monroe v. Pape*, 365 U.S. 167, 184 (1961), which Appellees invoke, actually confirms that § 1983 reaches any exercise of official authority, whether within or beyond the bounds of that authority. The tribal commission supplements Defendants' state employment — it does not displace it. *Hall v.*

*Witteman*, 569 F.Supp.2d 1208, 1222 (D. Kan. 2008) ("lack of actual state authority" does not automatically defeat a § 1983 claim).

Appellees' final move — that the state never had authority to give, so there was no state-law "source" — proves too much and is flatly inconsistent with *Jojola* and *Griffin*. A deputy without lawful authority to act still acts under color of state law when the state's machinery placed him in the position to violate rights. That is the premise of *Monroe v. Pape*, *Screws v. United States*, 325 U.S. 91, 111 (1945), and § 1983 itself.

## IV.   THE   REMEDY   GAP   ILLUMINATES   THE   PROPER INTERPRETATION.

During the recent oral argumenta in *Walden*, a panel member pressed both counsel: If the Court rules for Appellees, does the plaintiff have any remedy?  The answer from both sides was no.[3] The follow-up question - why that gap does not illuminate the proper interpretation of the color-of-law

---

[3]The exchange in *Walden* on the remedy gap involved Judge Matheson asking appellant's counsel whether Walden had any remedy if the court ruled against him. Counsel answered: only dismissal of the charges, which had already happened.  Judge Matheson then asked appellees counsel whether there was "some other recourse that Mr. Walden would have" -- specifically in tribal court.  Appellee's counsel answered, "Your Honor, I am not aware of any particular recourse in tribal court."  Judge Matheson then asked: "Why doesn't that question shed some light on how we should interpret the interplay between, under color of state law on the federal side here, or I guess it's the state side with Officer Archer, and the actual tribal authority that he was exercising?" Oral Argument in *Walden*, No. 25-6153.

15

requirement -- received no satisfying answer from the litigants.  Appellant attempts to provides one here.

The remedy gap is not merely equitable concern; it is an interpretive signal.  When Congress enacted § 1983, it was concerned with enforcement of constitutional rights against state officers who used governmental power to violate those rights. *Monroe v. Pape*, 365 U.S. 167, 172 (1961). Reading § 1983 to immunize state-employed, state-trained, state-equipped, state-governed, and state-dispatched officers from liability because they also held tribal commissions profoundly distorts that purpose.

Appellees cite *District of Columbia v. Carter*, 409 U.S. 418 (1973), as precedent for the purported textual limits of § 1983 . **[*See* Dkt. #49, p. 20]** But *Carter* held only that the District of Columbia was not a "State" within the statute's text — a definitional question. It did not address cross-deputized state-employed officers or hold that a state officer could be stripped of § 1983 accountability because he also held a commission from a sovereign not named in the statute.

The Indian Civil Rights Act, 25 U.S.C. §§ 1301-05, confirms the interpretive point. ICRA was enacted to protect Indians from *tribal governmental action* — Congress crafted it because § 1983 does not reach tribal governments. Congress never suggested ICRA would shield *state-employed officers*.  The two statutes address different actors.

16

Where two readings of § 1983 are plausible — one providing a remedy for constitutional violations by state-employed officers, one providing none because those officers held tribal commissions — the Court should prefer the reading that does not leave a constitutional violation unaddressed.

## V. THE DUAL-COMMISSION / "TWO HATS" THEORY IS WELL-FOUNDED IN CIRCUIT PRECEDENT AND § 1983'S PLAIN TEXT.

Appellees argue dual-commission officers can only act under one sovereign's authority at a time, and that since tribal authority was the "only" valid "actual" authority in Indian country, state color is impossible. Both premises are flawed.

The exclusive-authority premise has no support in this Court's precedent, and the *Walden* panel was openly skeptical of it.[4] The *Walden* argument also raised the further point that *Bressi v. Ford*, 575 F.3d 891 (9th Cir. 2009), along with common law tort principles, support dual authority, and that no circuit case rejects it in the constitutional sphere.[5]

---

[4]    The *Walden* panel's skepticism of the "one sovereign at a time" rule was evident throughout the argument. Judge Matheson noted that *Romero I*'s remand framework left open the question of dual authority and asked why the Court should not "read the case that way." The presiding judge separately asked appellee to reconcile the exclusive-authority position with the apparent-authority doctrine in *Jojola* and *Dry*. Oral Argument in *Walden*, No. 25-6153.

[5]    Appellant's counsel in *Walden* argued in rebuttal: "[T]he argument that we were getting into at the end is whether or not you can act under dual authority, which

17

Section 1983's text forecloses the "exclusive authority" rule. The statute creates liability for persons who violate rights "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. "Under **exclusive** color" and "under **primary** color" are not in the statute. "Under" requires only that state authority be **an** operative component — **not** the **only** component. **[*See also* Dkt. # 43, p. 41 (addressing requirement that officer only need represent state in "some" capacity)]** A state dispatcher sent state officers in state vehicles wearing state uniforms, using state restraints, to investigate suspected state crimes. The tribal commission **supplemented** that state authority; it did not erase it. *See generally*, 1990 OK AG 32, 1991 WL 567868 *8; 2000 OK AG 58, ¶ 14.

### A. The Cross-Commission Agreement's "State Authority" Disclaimer Does Not Eliminate State Color Already Vested by Employment.

Kasbaum and Lee argue that the agreement's language -- "[a] commission issued by the BIA under this agreement shall not be used to invoke any State of Oklahoma authority," App. Vol. 10 at 2170 -- contractually eliminates state authority the moment Appellees held the commission.

---

*Bressi* in the Ninth Circuit said you could. And under the Common Law of Torts, which is the background for Section 1983 action, it's well established that you can act under dual authority. And I've found no cases that have rejected that in the constitutional sphere." Oral Argument in *Walden*, No. 25-6153.

18

The provision states that the *BIA commission* shall not be used to invoke state authority. It says nothing about the state employment relationship, state dispatch, state policies governing Appellees' conduct, or state equipment. Defendants did not "invoke" the BIA commission when the MCSO dispatcher sent them to Eagletown, when they arrived in MCSO vehicles, or when they filled out MCSO forms. The agreement does not say officers cease to be state employees when they enter Indian country. Indeed, the Oklahoma Attorney General concluded it "creates no new [tribal] office but only increases the authority of the state officer." 1990 OK AG 32, 1991 WL 567868 at *8. A contractual provision cannot override the state employment relationship that independently establishes § 1983 liability under *Lugar*, 457 U.S. at 935-936.

## B.    The Fact That Tribes Control Commission Issuance Does Not Transform a State Employee into a Tribal Officer (Hannah Only).

Hannah argues that because the Choctaw Nation controls commission issuance and revocation, he acts "under the authority of the tribe just as much as a tribal officer employed by the tribe." But a tribal-employed officer is paid, trained, equipped, supervised by, and reports to the tribe. Hannah is paid, trained, equipped, supervised by, and reports to ODWC and Oklahoma. The tribal commission gives Hannah authority he would not otherwise have in Indian country; it does not replace his state employment, duties, supervision,

19

or accountability. The Oklahoma Constitution, Art. II, § 12, prohibits holding a second law enforcement "office."   The AG concluded cross-deputization creates no new office. 1990 OK AG 32, 1991 WL 567868 at *8, ¶ 3. Hannah holds one office — Oklahoma Game Warden — with expanded authority.

**C.    The Existence vel non of Alternative Remedies Is Not Immaterial — It Illuminates Congressional Intent (Hannah Only).**

*Logsdon v. United States Marshal Serv.*, 91 F.4th 1352, 1359 (10th Cir. 2024), which Hannah cites, involved a suit against a *federal* agency whose officers are expressly outside § 1983's "color of state law" requirement. The absence of a remedy there was textual — federal officers do not act under color of *state* law. Here, Defendants are state-employed officers — exactly the class § 1983 was designed to reach. Denying a remedy here would create a judicially-crafted immunity based on a tribal commission the state itself participated in creating.

*McGirt*'s anti-handwringing language cautioned against letting inconvenient consequences override clear legal rules. Here the legal rule is not clear — it is the very question in dispute. Where the color-of-law question is genuinely contested, the remedial purpose of § 1983 is a legitimate guide to resolving ambiguity in favor of Plaintiff.

## VI. THE COLOR-OF-LAW QUESTION IS A MIXED QUESTION OF FACT AND LAW THAT COULD NOT BE RESOLVED ON SUMMARY JUDGMENT.

The district court identified three facts as dispositive, declared thirty-two undisputed facts immaterial, and entered judgment as a matter of law. That process violated summary judgment standards.

In *Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1155-56 (10th Cir. 2016), this Court held that the determination of whether one acted uner color of state law presents a mixed question of law and fact.  Appellees, however, argue that *Cuyler v. Sullivan*, 446 U.S. 335 (1980), holds that color of law is a purely legal question.  Appellant would note, however, that *Cuyler* was, *inter alia*, a habeas ineffective-assistance case - not a § 1983 cross-deputization case.

The Court need not resolve this perceived tension. Even if color of state law is ultimately a legal question, it depends on disputed factual predicates: whether Appellees were invoking state authority, tribal authority, or both at the moment of the violation; whether their conduct was consistent with state employment duties; whether a reasonable person in Decedent's position would have understood them to be exercising state authority. The district court resolved this issue by promulgating a black-letter "primacy" rule (which violates the both the requirement that the court conduct an intensely "fact-bound inquiry" **[*see* Dkt. #43, p. 41]**, as well as precedent requiring only the presence of "some" or "any" state color, irrespective of the presence or amount

of tribal color present. **[*See* Dkt. 43, p. 54]**) and of tribal color — an evidentiary determination for the jury that inescapably involved the weighing of evidence. **[Dkt. #43, pp. 56-57]** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Appellant presented thirty-two undisputed facts establishing state color. Appellees disputed none. The district court dismissed all but five (5) of Appellant's facts as "immaterial." Under *Lugar*, 457 U.S. at 939, this is a "necessarily fact-bound inquiry." Under *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011), summary judgment is inappropriate when "a rational trier of fact could resolve the issue either way." A trier of fact viewing MCSO uniforms, MCSO vehicles, MCSO dispatch, MCSO forms, MCSO supervision, MCSO governance, and Appellees' own inability to determine their color of law could easily resolve this for Appellant and requires reversal.

## CONCLUSION

A panel of this Court, hearing argument in a companion case just weeks ago, asked the same questions, reached for the same cases, and signaled the same concerns Appellant has raised throughout this litigation. *Jojola* confirms that apparent authority establishes state color — and the litigant in *Walden* who claimed otherwise was told he was arguing against circuit law. *Romero I* requires factfinding, not summary judgment. *Gallagher* provides a multi-test

22

framework. *Lugar* establishes a state-employment presumption that Appellees have never rebutted. And the remedy gap a panel member pressed in *Walden* has no answer except the one Congress provided in 1871: § 1983.

The district court took thirty-two undisputed facts establishing state color, declared all but five (5) of them irrelevant, impermissibly weighed tribal authority against state authority, and promulgated a black letter rule that the existence of tribal color in a purportedly higher percentage nullifies all state color for purposes of Section 1983 liability. This is not what courts are meant to do at the summary judgment stage. Fact-finding must be left for juries at trial.

For the foregoing reasons, Plaintiff-Appellant respectfully requests that this Court REVERSE the district court's grant of summary judgment and REMAND for the multi-factor factfinding inquiry required by *Romero v. Peterson*, 930 F.2d 1502 (10th Cir. 1991), and *Romero v. Peterson*, No. 93-2073, 1993 WL 375746 (10th Cir. 1993), consistent with *Jojola v. Chavez*, 55 F.3d 488 (10th Cir. 1995), *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1447 (10th Cir. 1995), *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935-936 (1982), and 42 U.S.C. § 1983.

23

Respectfully submitted,


/s/ Christopher L. Camp
**Christopher Lincoln Camp, OBA #18541**
**CAMP LAW FIRM**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma  74133**
**Telephone: (918) 200-4871**
**E-mail: camplawfirm@gmail.com**

**and**

**D. Mitchell Garrett, Jr., OBA #20704**
**GARRETT LAW CENTER, PLLC**
**320 South Boston Avenue, Suite 825-G**
**Tulsa, Oklahoma  74103**
**Telephone: (918) 978-2226**
**Facsimile: (918) 340-6799**
**E-mail: mitchell@garrettlawcenter.com**

**Attorneys for Plaintiff/Appellant**

24

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

### Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ■ this document contains <u>5,137</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   ☐ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ■ this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word (Version 16.15)</u> in <u>13-point</u> font size of the <u>Centruty Schoolbook</u> type style, or

   ☐ this document has been prepared in a monospaced typeface using _____ with _____ characters per inch in the _____ type style.

**Date:** <u>April 15, 2026</u>         /s/ Christopher L. Camp
                                                **Christopher L. Camp, OBA #18541**
                                                **CAMP LAW FIRM**
                                                **7122 South Sheridan Road, Suite #2-382**
                                                **Tulsa, Oklahoma 74133**
                                                **Telephone: (918) 200-4871**
                                                **E-mail: camplawfirm@gmail.com**

                                                **Attorney for Appellants**

25

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1)     all required privacy redactions have been made per 10th Cir. R. 25.5;

(2)     if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3)     the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, and according to the program are free of viruses.


/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**

## CERTIFICATE OF SERVICE

I, Christopher L. Camp, hereby certify that on April 15, 2026, I electronically transmitted the foregoing *Appellant's Reply Brief* to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Alejandra J. Brigida, Esq.
Jessica James Marie Curtis, Esq.
Robert Lafferandre, Esq.
Sheila G. Jessee, Esq.
Kevin L. McClure, Esq.
Devan A. Pederson, Esq.
Jamison C. Whitson, Esq.
Randall J. Wood, Esq.

/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**

27