**CASE NO. 25-7082**
**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

**BARBARA BARRICK,**
**as Special Administrator of the**
**ESTATE OF BOBBY DALE BARRICK, deceased,**

***Plaintiff/Appellant,***

**v.**

**DEPUTY MATTHEW KASBAUM,**
**DEPUTY QUENTIN LEE,**
**and WARDEN MARK HANNAH,**

***Defendants/Appellees.***

---

**On Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**Honorable John F. Heil, III, District Judge**
**District Court Case No. 23-CV-00129-JFH-GLJ**

---

**APPELLANT'S SUPPLEMENTAL BRIEF**
**PURSUANT TO THE COURT'S AUGUST 13, 2026 ORDER**

**(Effect of *Walden v. City of Duncan*, No. 25-6153 (10th Cir. Aug. 12, 2026))**

---

Pursuant to this Court's Order of August 13, 2026, Appellant Barbara Barrick submits this supplemental brief addressing the effect of *Walden v. City of Duncan*, 2026 WL 2329610 (10th Cir.), on this appeal. *Walden* confirms the central positions Appellant advanced below: (1) applying the *Cooley* principals, a state officer, using his authority as such, can "stop [a tribal member], detain him while conducting an initial investigation, and then either hold him until the arrival of tribal officers or transport him to tribal authorities," irrespective of whether or when the detainee presents his tribal membership card to the officer; (2) an officer's own subjective uncertainty about which sovereign's authority he is exercising supports, rather than defeats, a finding of state color; (3) the objective "indicia of state authority" *Walden* identifies are independently present here, and more numerous; and (4) Walden forecloses the "primacy" rule Mag. Judge Jackson invented and the district court adopted (under which the presence of any tribal color nullified all state color).[1]

## I. *Walden* confirms that Appellees' discovery of Barrick's tribal membership card did not draw a bright line nullifying all state color, and that Appellees' authority <u>as state officers</u> to stop, detain, investigate, and await the arrival of tribal authorities persisted throughout the encounter.

Appellees argue that *Walden* is distinguishable because Officer Archer was not identified as an Indian until after his arrest and transport to jail, whereas Kasbaum and Lee found Barrick's Choctaw Nation membership card relatively early in their encounter with Barrick. That distinction does not survive *Walden*'s holding, which forecloses any rule

[1] Appellees' position rests on the claim that "there are only three relevant facts" bearing on color of law, and that everything else -- uniforms, dispatch, training, paperwork -- is immaterial. Dkt. #49, pp. 15 & 49-50. *Walden*'s own fact-intensive analysis of exactly that kind of evidence forecloses this premise. *Walden* at **11-12.

keyed to the sequencing of an identification.

*Walden* holds that "[a]s a state officer, Archer could detain a suspect before **conclusively** determining whether the suspect was an Indian." *Walden*, at * 2. That holding rests not on timing, but on the defendant's authority as a state officer to detain and investigate while status remains unresolved. *Id.* at **8-11; *citing U.S. v. Cooley*, 593 U.S. 345 (2021), and *Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1006 (10th Cir. 2015). *Cooley* rejected any rule requiring officers "first to determine whether a suspect is non-Indian" before acting, since it "would produce an incentive to lie" and introduces "a new standard into search and seizure law" whose contours are "not obvious." *Id.* at **9-10; *citing Cooley*, 593 U.S. at 353. *Cooley*'s rationale -- that requiring officers to resolve status before acting is unworkable in the field -- has nothing to do with timing.

The very Deputation Agreement under which the deputies were cross-commissioned confirms this: It recites that officers "may not know whether the suspect or the victim is an Indian or non-Indian, or whether the arrest … has occurred in Indian country," and that "the official jurisdiction determination will be made by a prosecutor or court . . . not by cross-deputized arresting officers." No official determination was made at Barrick's arrest, nor was any deputy permitted to make one -- confirming that an officer's on-the-spot assessment is not the "conclusive determination" *Walden* requires.

Nor could Appellees draw such a line even if they tried. As noted in *Walden*, "[c]onclusively determining" status requires more than glancing at a card in a pocket. Indian status can be "vigorously contested," applying tests this Court has vacated and

reheard *en banc* even in the criminal context. *Id.* at *8 & n. 4. This Circuit applies a totality-of-the-evidence approach to Indian status precisely because no single document -- including a tribal card -- is dispositive. See *Diaz*, 679 F.3d at 1187–88.[2] A card resolves the jurisdictional question no more conclusively than the verification letter this Court found inadequate in Hatley, or the enrollment testimony it found insufficient in *Ruiz*. There is no "conclusive determination" moment here for Appellees to point to.

*Walden* describes a state officer's authority in precisely these terms: he may lawfully "stop [a tribal suspect], detain him while conducting an initial investigation, and then either hold him until the arrival of tribal officers or transport him to tribal authorities." Such activities constitute the exercise of state authority, *Walden* at *11, and in no way action that is exclusively or primarily tribal. *See id.*; *citing Cooley*, 593 U.S. at 347-48 & 352. Here, Appellees' act of detaining Barrick (by cuffing him and placing him the patrol vehicle) in order to conduct a pre-arrest investigation, attempting to remove Barrick from the vehicle for the purpose of getting him medically assessed (as opposed to arresting him), and then attempting to place Barrick back in the vehicle simply to gain control of him (again, as opposed to arresting him) -- all before any Choctaw Nation-only official arrived -- falls squarely within this authority, which *Walden* treats as colorable state conduct, not conduct that automatically becomes exclusively tribal the moment a tribal membership card is found.

---

2 See *U.S. v. Prentiss*, 256 F.3d 971 (10th Cir. 2001); *U.S. v. Diaz*, 679 F.3d 1183, 1187-88 (10th Cir. 2012); *U.S. v. Hatley*, 153 F.4th 1112 (10th Cir. 2025); *U.S. v. Ruiz*, 164 F.4th 1223 (10th Cir.), reh'g en banc granted, opinion vacated, 174 F.4th 1253 (10th Cir. 2026); *St. Cloud v. U.S.*, 702 F. Supp. 1456, 1461 (D.S.D. 1988); *Wadkins v. State*, 2022 OK CR 2 (Okla. Crim. App.).

## II. Appellees satisfied both prongs of *Walden*'s color-of-law test, and cross-deputization only expanded – never narrowed – their existing state authority.

*Walden*'s controlling standard is two-pronged: "State action for purposes of § 1983 exists only if an individual (1) possessed actual authority to take a particular action on the state's behalf and (2) purported to exercise that authority." *Walden*, at * 6; *quoting Martinez v. City of Aurora*, 174 F.4th 745, 755 (10th Cir. 2026). Both prongs are satisfied -- the first because a state deputy or state warden's authority to detain, investigate, and hold or transport a suspect does not depend on a cross-commission at all.

### A. Actual authority: *Walden* confirms that a state officer's authority to stop, detain, investigate, and hold-or-transport a suspect flows from his status as a state officer, not from any cross-commission -- which means cross-deputization cannot logically narrow that authority.

The passage of *Walden* most directly on point states, "Under the principles of *Cooley*, Archer, exercising his authority as a DPD officer, could stop Plaintiff, detain him while conducting an initial investigation, and then either hold him until the arrival of tribal officers or transport him to tribal authorities." *Walden* at *11. That sentence grounds Archer's authority entirely in his status "as a DPD officer" -- a state officer -- and says nothing about his cross-commission. The rule operates by direct analogy to *Cooley*: just as a tribal officer may detain a non-Indian before a non-tribal authority takes over, *Ute Indian Tribe*, 790 F.3d at 1006, a state officer may detain an Indian suspect before a tribal authority takes over, cross-commissioned or not. *Walden at* **10-11.

That has a decisive consequence for this case. If a McCurtain County deputy who held **<u>no</u>** cross-commission with the Choctaw Nation had done exactly what Kasbaum and Lee did -- responded to a dispatched call, restrained and investigated a combative, injured

suspect, and awaited the arrival of tribal officers -- there would be no serious argument that any of it was anything other than action taken under color of state law. *Walden*'s own reasoning confirms this authority does not depend on cross-commission status; it is baseline authority every state officer possesses. **It would therefore make no sense that cross-deputizing an officer somehow <u>subtracts</u> from that baseline authority, and leaves a cross-commissioned deputy with <u>less</u> color-of-law protection than an identically-situated deputy who lacks a cross-commission altogether.**

Cross-deputization agreements exist to add authority, not subtract it -- the Deputation Agreement recites its purpose as enabling officers to react immediately to violations of law and providing "efficient, effective, and cooperative law enforcement efforts," an expansion of capacity. Oklahoma's own Attorney General has read cross-deputization agreements of this kind the same way: such an agreement "creates no new tribal office but only increases the authority of the state officer to enforce tribal laws." 1990 OK AG 32, 1991 WL 567868, at *8; see also 2000 OK AG 58, ¶ 14. An instrument that, by its own terms and by official interpretation, only increases an officer's authority cannot simultaneously be read, as Appellees would have it, to eliminate the state authority the officer already possessed before the commission was ever granted.

Captain Manning's testimony confirms this. Asked whether a cross-commissioned deputy wears "the state's hat" or "the tribe's hat" when arresting, she testified: "You wear both hats . . . we both possess the ability to arrest tribal or nontribal members." Appx., Vol. 9, 1854 (32:11-19). Cross-deputization, she explained, "gives us the authority to effect an arrest . . . either way." *Id.* at 1854–55 -- layering tribal authority on top of the deputies'

pre-existing state authority, not stripping it away.

### B. Purported to exercise that authority: the extensive, uncontested "appearance and function" evidence catalogued in Part IV, *infra*, independently satisfies the second prong.

*Walden*'s second prong asks only whether the officer "purport[ed] to use" that authority. *Walden* at *12, *quoting Lindke*, 601 U.S. at 201. Part IV, *infra*, catalogues the same category of evidence *Walden* found sufficient, standing alone, to preclude summary judgment on this prong -- and materially more extensive here. Both prongs are therefore independently satisfied.

## III. Officers' subjective belief weighs in favor of Appellant.

*Walden* treats an officer's subjective belief as "relevant to determining whether they possessed actual state authority." *Id.* at *11 & n. 6; *citing Martinez v. City of Aurora*, 174 F.4th 745, 759 (10th Cir. 2026), but declines to apply that factor because Archer's belief was undisputed. *Id.*

Mag. Judge Jackson's *Report and Recommendation* took the opposite position -- and did so expressly. In rejecting the relevance of the officers' own understanding of their authority, the Mag. Judge held that "an officers' legal status in this context exists apart from the officers' subjective understanding of the basis for their authority at any given time." Dkt. No. 224 at 13 n.5. That holding cannot be squared with *Walden*, which treats an officer's subjective belief about his own authority as a factor "relevant to determining whether they possessed actual state authority." *Walden* at *11 & m. 6. The categorical exclusion of subjective belief from the color-of-law analysis is thus one more respect in which the ruling below rests on a legal standard *Walden* has since undermined -- and a

particularly consequential one here, because the officers' own admitted uncertainty is exactly the kind of evidence the Magistrate Judge's rule would have excluded from consideration altogether, regardless of how probative it might be.[3]

Here, the record affirmatively shows that Kasbaum, Lee, and Storey did not -- and still do not -- know whether they were acting under color of state law when they detained Barrick. Seventeen months after his death, they each stated in sworn discovery responses that they "lack[ed] sufficient information to either admit or deny" whether they were "acting under color of state law." And Captain Manning testified that cross-deputized personnel are trained to, and in practice do, "wear both hats" and "don't even have to worry about whose hat [they're] wearing," because that "is for the prosecutor to decide later."

This evidence weighs heavily against Appellees. It is not evidence that the deputies believed they were acting exclusively as tribal officers -- the premise underlying their entire "actual authority" argument. It is evidence that the officers cannot themselves identify their color of law, even years later and under oath. If they themselves cannot say, a reasonable juror plainly could conclude state authority was in play -- particularly where every objective indicium on display was a state indicium. At minimum, this defeats any suggestion the inquiry can be resolved as a matter of law for Appellees; it is the kind of

[3] This omission may not be coincidental. Mag. Judge Jackson considered only five of the thirty-two facts Appellant presented in opposition, expressly disregarding the other twenty-seven as immaterial. *See Appellant's Opening Br*. at 33–34; *citing* Dkt. No. 224 at p. 5. The lower court's categorical rule -- that an officer's subjective understanding is irrelevant to color of law -- would, if applied consistently, have required disregarding exactly the kind of evidence Appellant presented on that subject, including the deputies' own sworn admissions and Captain Manning's testimony. If that is why this evidence was treated as immaterial, Walden's contrary holding is reason enough to revisit that conclusion on remand.

fact-bound question *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 939 (1982), reserves for the factfinder.

**IV. Walden's "appearance and function" indicia of state authority are overwhelmingly present here.**

From the moment McCurtain County dispatch sent Kasbaum and Lee to investigate suspected violations of Oklahoma law until Barrick was placed in the patrol vehicle and beyond, Kasbaum, Lee, and Storey were first and foremost McCurtain County Sheriff's deputies -- not tribal officers who happened to also carry state credentials -- and Hannah was, by his own sworn admission, acting within the scope of his employment with a state agency throughout.[4] *Walden* confirms that the objective "appearance and function" of that state role independently establishes state color.

*Walde*n held that Archer's uniform, vehicle, badge, and equipment, his performance of state-trained duties, his reading of Oklahoma's Implied Consent warnings, his completion of a state license-revocation form, and his transport to a county jail on state charges all supported a finding that he "purport[ed] to use" state authority -- and that "[d]uring this process, Archer never identified himself as a tribal officer or displayed any indicia of tribal authority." *Walden* at *12. Every one of those indicia has a direct -- and here, stronger — analogue:

- State uniforms, vehicles, and badges. [Opening Br. Fact Nos. 24–25, 30–32, 36–38, 44–46].

---

[4] The deputies discharged state-conferred duties independent of any cross-commission – MCSO's peacekeeping mandate, 19 O.S. § 516; dispatch to investigate specific state crimes; and Hannah's admission he acted "within the scope of his employment" with ODWC -- each independently satisfying Walden's first prong.

- State training and equipment. [Opening Br. Fact No. 2] [5]
- Dispatch to investigate specific state-law violations. [Opening Br. Fact Nos. 23, 29, 35]
- Official state paperwork reviewed by a state supervisor. [Opening Br. Fact Nos. 28, 34, 40, 47]
- No display of tribal authority. [Opening Br. Fact Nos. 25, 32, 38, 46]
- Continuous state accountability. [Opening Br. Fact Nos. 15–17, 26, 33, 39] [6]

If Archer's indicia sufficed in *Walden* to preclude summary judgment, the more extensive indicia here do so *a fortior*i.

## V. *Walden* confirms that dual color of law is a cognizable, fact-bound possibility that cannot be resolved on summary judgment – and forecloses the "primacy" rule below.

*Walden*'s penultimate paragraph states: "we note the possibility that the evidence could support a determination that Archer was acting under color of both tribal law and state law. But it would be premature for us to opine on whether § 1983 would apply in that circumstance." *Walden* at *12..

First, this passage forecloses the "primacy" rule Magistrate Judge Jackson invented and the district court adopted. Dkt. No. 233 at 9–11. The panel could not have "note[d] the possibility" of dual color if tribal color automatically extinguished state color instantly. That the panel treated dual color as an open, live possibility means the existence of tribal color does not, as a matter of law, nullify state color. A "primacy" rule and a live "dual color" possibility cannot coexist; *Walden* endorses the latter and forecloses the former.

Second, *Walden* confirms that a sovereign's exclusive authority to prosecute does

---

5 MCSO policy requires this form whenever a deputy "utilizes reportable force . . . in the performance of their duties." Appx., Vol. 19, 3747.

6 MCSO restricts deputies to Department "time, equipment, and personnel for departmental business only," Appx., Vol. 19, 3734, while making assistance to other agencies "the policy of this Office," id. at 3723 — itself departmental business, not activity outside employment.

not conclusively establish that the arresting officer's contemporaneous detention and investigation were conducted under that sovereign's exclusive color of law. The district court reasoned that because Oklahoma lacked authority to prosecute Barrick, Kasbaum and Lee necessarily could not have exercised any state authority when they detained and arrested him. *Walden* rejects that syllogism. The panel acknowledged "a logic" to the view that the prosecuting sovereign's jurisdictional limits should dictate the arresting officer's color of law -- the same logic the district court applied below -- but held that view rested on "a misconception of the applicable law" once its "practical consequences" for actual policing are considered. *Walden* at * 2, 8. The panel expressly distinguished the question of who may prosecute from what authority an officer exercises in the field: "It is certainly acceptable to require the prosecuting authority to decide before trial whether it has jurisdiction … But how is a law-enforcement officer (state or tribal) supposed to act after deciding that a crime may have been committed when the suspect's Indian status is in question[?]" *Id.* at * 8. The *McGirt/Ross* line of cases on which the district court relied answers only who may ultimately prosecute Barrick's alleged offenses -- it does not, and under *Walden* cannot, answer whether Kasbaum, Lee, Storey, and Hannah's contemporaneous acts of detention, restraint, and investigation were performed under color of state law.

## CONCLUSION

*Walden* confirms the principal grounds for reversal: identifying a suspect as Indian does not draw a bright line severing state color, and the detain-and-transport function remains colorably state action. Walden forecloses the "primacy" rule below. This Court

should REVERSE and REMAND, or permit further factual development.

**Respectfully submitted,**

/s/ Christopher L. Camp
**Christopher Lincoln Camp, OBA #18541**
**CAMP LAW FIRM**
**7122 South Sheridan Road, Suite #2-382**
**Tulsa, Oklahoma 74133**
**Telephone: (918) 200-4871**
**Facsimile: (918) 340-6799**
**E-mail: camplawfirm@gmail.com**

**and**

**D. Mitchell Garrett, Jr., OBA #20704**
**GARRETT LAW**
**320 South Boston Avenue, Suite 825-G**
**Tulsa, Oklahoma 74103**
**Telephone: (918) 221-6190**
**Facsimile: (918) 340-6799**
**E-mail: mitchell@garrettlawcenter.com**

**Attorneys for Plaintiff/Appellant**

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, and according to the program are free of viruses.

/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**

# CERTIFICATE OF SERVICE

I, Christopher L. Camp, hereby certify that on August 25, 2026, I electronically transmitted the foregoing *Appellant's Opening Brief (Corrected)* to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Alejandra J. Brigida, Esq.
Jessica James Marie Curtis, Esq.
Robert Lafferandre, Esq.
Sheila G. Jessee, Esq.
Kevin L. McClure, Esq.
Devan A. Pederson, Esq.
Jamison C. Whitson, Esq.
Randall J. Wood, Esq.

/s/ Christopher L. Camp
**Christopher L. Camp, OBA #18541**